**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

Graham Walsh

               Plaintiff,

          v.                                   Case No.
                                           17-CV-

Ionnais P. Rigas
Daniel Standen
Alexander Loucopoulos,                  Jury Trial Demanded
Golden Sciens Marine Investment Ltd.,
Golden Sciens Investment Management Co., Ltd,
Golden Sciens Holdings
Sciens Capital Management

          667 Madison Avenue
          New York, NY 10065

Sciens Institutional Services, LLC, and
SMH Management, Ltd
                  Defendants.
_____

**COMPLAINT**

For his complaint against the Defendants, Plaintiff alleges as follows:

**TABLE OF CONTENTS**

I.       SUMMARY   ……………………………… ……………… 4
II.     PARTIES  ………………………… .. ……………… **7**
III.   NON-PARTIES  ……………………… …………… 16
IV.   VENUE & JURISDICTION …………… .. …………… 17
V.    FACTS ………………………… ………………… 18

      A.     GSMI'S Fraudulent Capital Raising Activity …………. . 18

            1.     Initial Closing – March 2014 ………………… 21

1

2.    Second Closing  - As of June 2014  . . . . . . . . . . . . .         22
3.    Third Closing  - December 2014    . . . . . . . . . . . . .         26
4.    Fourth and Final Closing  - 2015     . . . . . . . . . . . . .       27

      Failed Attempt In Spring 205         . . . . . . . . . . . . .        27
      Intervening Capital Calls            . . . . . . . . . . . . .        27
      September 2015 Final Closing         . . . . . . . . . . . . .        31
      Changes to  Articles of Association  . . . . . . . . . . . . .        37

5.    Further Capital Calls During The Obligation Period           38
6.    Total Capital Paid In by Plaintiff Walsh                     40

B.    Warehousing Transactions  . . . . . . . . . . . . . . . . . . . . . . . . . .         40


1.    Hull 2695 (a/k/a M/V Secretariat) . . . . . . . . . .         41
2.    Options on Ships        . . . . . . . . . . . . . . . . . . . . . . . .     **42**

C.    Use of Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     45

1.    Ship Acquisitions: Pricing, Delivery Schedule and
      Cancellation of Ships . . . . . . . . . . . . . . . . . . . . . . . . . . .         45
2.    GS Holdings            . . . . . . . . . . . . . . . . . . . . . . . . .        48
3.    Summary Of Current  "Levered" Portfolio  . . . . . .         49

D.    Operating Expenses and Losses . . . . . . . . . . . . . . . . . . . . . . . .      50

1.    Unrealized Losses     . . . . . . . . . . . . . . . . . . . . . . . . .       51
2.    Management Fees       . . . . . . . . . . . . . . . . . . . . . . . . .       52

VI.    CLAIMS FOR RELIF

COUNT I: Violation Of Section 10(B) Of The Securities Exchange Act Of 1934
And Rule 10b-5 Thereunder By  Rigas, Standen, Loucopoulos, GSMI, GS
Holdings, and Sciens Institutional Services
(The "Issuer Defendants") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          53


COUNT II: Violation Of Section 10(B) Of The Securities Exchange
Act Of 1934  And Rule 10b-5 Thereunder By Rigas, Standen, Loucopoulos,
Sciens Capital, SMH Management, GSMI
Management, and Sciens Institutional  Services (The "Advisor
Defendants")  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       77

COUNT III: Controlling Person Liability, Violation of Section

20(a) of the Securities Exchange Act of 1934 By
Defendant Rigas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     86

COUNT IV:  Controlling Person Liability, Violation of Section
20(a) of the Securities Exchange Act of 1934 By
Sciens Capital Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     88

COUNT V: Liability Through Or By Means Of Another
Violation of Section 20(b) of the Securities Exchange Act of 1934
By Rigas and Standen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     90

COUNT VI: Breach Of Fiduciary Duties
By  Rigas, Standen, Loucopoulos, GSMI and GS Holdings
Other  (The "Issuer Defendants") . . . . . . . . . . . . . . . . . . . . . . . . . . . .     91


COUNT VII: Breach Of Fiduciary Duties
By RIGAS, Standen,  Loucopoulos, Sciens Capital, SMH
Management, GSMI Management, and Sciens Institutional
Services  ("Advisor Defendants") . . . . . . . . . . . . . . . . . . . . . . . . . . . .     93

COUNT VIII: Intentional Misrepresentation
By Rigas, Standen, Loucopolous, GSMI, and GS Holdings,
("Issuer Defendants "). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     95


COUNT IX: Intentional Misrepresentation
By Rigas, Standen, Loucopoulos, Sciens Capital, SMH
Management,  GSMI Management and ,  Sciens Institutional
Services (The "Advisor Defendants") . . . . . . . . . . . . . . . . . . . . . . .     98

COUNT X: Fraud In The Inducement
By  Rigas and Sciens Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..     100

COUNT XI :  Negligent Misrepresentation
By Defendants Rigas, Standen, Loucopoulos, GSMI and
GS Holdings (The "Issuer Defendants") . . . . . . . . . . . . . . . . . . . . .     101

COUNT XII :  Negligent Misrepresentation
By Rigas, Standen, Loucopoulos,  Sciens Capital, SMH
Management,  GSMI Management, and Sciens  Institutional
 Services  (The "Advisor Defendants") . . . . . . . . . . . . . . . . . . . .     103


COUNT XIII : RESPONDEAT SUPERIOR
By Sciens Capital Management . . . . . . . . . . . . . . . . . . . .     105

COUNT XIV: Breach Of Contract
By _GSMI, SMH Management, GSMI Management, and
 Sciens Institutional Services . . . . . . . . . . . . . . . . . . . . . ..                108


COUNT XV : Breach of Third Party Beneficiary Contract
By Sciens Capital, SMH Management, GSMI Management, and
Sciens Institutional Services . . . . . . . . . . . . . . . . . . . . . .                110

COUNT XVI : Unjust Enrichment
By The Issuer and Advisor Defendants . . . . . . . . . . . . . . . . . . . .                113


VII.      PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                114

## I. SUMMARY

1.      This suit, asserting multiple federal securities and common law claims, seeks

rescissionary damages for the fraudulent solicitation and inducement of private

equity investments and capital contributions for Golden Sciens Marine Investments

Ltd. ("GSMI" or "Fund"), a Cayman Islands corporation, that claimed it would use the

proceeds to buy dry bulk cargo ships, and for the gross and fraudulent

mismanagement by the asset management firm, Sciens Capital Management LLC

("Sciens Capital"), and its affiliated companies that serve as the Investment Manager,

the Portfolio Manager, and the Administrator.   This suit alleges, among other things,

fraud when inducing and conducting various closings and capital calls, gross

mismanagement of investor funds, fraudulent misrepresentations and omissions,

and breaches of fiduciary duties and contract not only by the officers and directors

of GSMI as the issuer of securities, but also by the officers and directors of the Sciens

Capital and its affiliates, the Investment Manager, the Portfolio Manager, and the

Administrator, each of which are defined more fully below.

2.      In 2014, the Defendants Ionnais "John" Rigas, Sciens Capital, the Investment
Manager, the Portfolio Manager, GSMI and possibly other defendants commenced
a "blind pool offering" and started to market and solicit securities in GSMI, which
were denominated non-voting "Participating Shares." The GSMI investment
proceeds were to be invested directly in Capesize and ice-class Panamax dry bulk
shipping vessels.   Under the terms of the POM, Defendant GSMI, the issuer and the
Fund, had the ability to make investments within the first two years of the initial
closing (*i.e.,* March 2014 to March 2016).   The Fund would liquidate on the 5th
anniversary of the final closing (*i.e.,* on September 2020, five years after the final
close in September 2015).  This so-called multiple closing blind pool offering,
however,  is rife not only with misleading disclosures and omissions of material
information when there was a duty to speak truthfully and completely, but also
fraudulent and deceitful practices when there was a duty of utmost integrity and
honesty Plaintiff as an advisory client.

3.      Sciens Capital, the asset manager, head quartered in New York City, and the
entity that sought and induced Plaintiff's investment, invited Plaintiff to make direct
investments in Panamax and Capsize dry bulk shipping vessels "alongside"
Defendants Rigas and Sciens Capital Management. To attract and induce Plaintiff's
investment participation, Defendants used materially misleading emails and other
marketing materials that trumpeted capital appreciation of more than 20% and
annual yields of 5%-10%, relying on downside protection from locked-in forward
charter rates, which a Sciens Capital representative stated was the heart of the

investment program. Whereas Defendants Rigas and Sciens Capital never made

their initial cash capital contributions, Plaintiff committed to invest $750,000, and

was later informed in or about September 2015 that he would be required to pay an

added capital contribution of $231,000 to prevent dilution of his investment.

4.     Defendants' purported "contributions" to the Fund have been an exercise in

chicanery.  In addition to transferring a contract for a "warehoused" ship into GSMI

(the Fund) at an artificially increased net asset value ("NAV") for their own gain

during the initial closing and at the expense and using funds of Plaintiff and other

participating shareholders, Defendants also have made distributions to themselves

from the second and third closings without making any capital contributions, in

order to recapture their "deposit" on the warehoused ship.  The end result is that

Defendants used private investor money to bring a "warehoused" asset into the

GSMI Fund and then paid themselves back out of other private funds invested, while

at the same time issuing themselves participating shares of the Fund.

5.     Defendants Sciens Capital and its affiliated companies also have grossly

mismanaged GSMI through its holding company and through special purpose

offshore vehicles that hold the ships, the financial information for which is sparse if

not non-existent, lost deposits on ships, cancelled ship contracts, conducted

operations below breakeven, while paying themselves management fees (the total

amount of which is still undisclosed)  – all in violation of the fiduciary duties owed

by directors and control persons of GSMI.

6.     What is equally troubling is an unaccounted for and by all appearances

missing funds in the amount of  $29.1 million.  Defendants may be hiding and

misrepresenting the character of these unaccounted for funds as "unrealized losses," though the lack of a complete financial picture at all levels within the corporate structure and the lack of transparency about all operations makes it impossible at this time to determine how much has been lost and where these funds are.

7.      The exact hierarchy and layers of the corporate structure of GSMI is currently unknown.  Long after the initial offering, Sciens and its affiliates revealed the name of an entity called Golden Sceins Holdings, LLC, ("GS Holdings"), which was later described as an "intermediate holding company," but left undisclosed its relationship with GSMI and Sciens Capital and its affiliates.  Defendant Rigas, Sciens Capital and its affiliates have made liberal use of this intermediate holding company to bury expenses and losses.

8.      Accordingly, in addition to the lack of transparency of all material information, including financial information, this suit alleges multiple instances of acts, practices, and courses of business – though still hidden from Plaintiff and other participating shareholders, but which flow throughout a multi-layer investment advisory structure – that operated or would operate as a fraud or deceit on Plaintiff and participating shareholders, including artificial NAVs, misleading disclosures in the quarterly updates and emails, hidden accounting treatment, lack of transparency, conflicts of interest, dilutive financing practices, preference for insider and Sponsor Group members to the detriment of  Plaintiff, and payment of fees.

9.      The whole truth about what has actually happened remains hidden from view and undisclosed at this time.  The full extent of the fraud remains unknown.

## II.   PARTIES

10.   **Plaintiff.**  Graham Walsh is one of the participating shareholders of GSMI, the Fund, and is a resident of Miami Beach, Florida.

11.   **John Rigas**.  At all pertinent times, Mr. Ionnais P. Rigas a/k/a John Rigas, the English translation of his Greek name, is the Founder and principal shareholders of the Sciens Group of Companies, and he serves as its Chairman and CEO. Defendant Rigas also is Chairman and CEO of Sciens Capital Management  and is Executive Chairman of GSMI, the Fund. Further, he is the sole voting shareholder of SMH Management, the Investment manager; he is the Executive Director of GSMI Management, the Portfolio Manager; and, he is the sole managing member of Sciens Institutional Services, the Administrator (herein after all such entitles collectively referred to as the "Advisor Defendants ").   In the Biographical section of GSMI's October 2014 *Investment Proposal*, Defendant Rigas described himself as having

> "broad experience in alternative assets including private equity, venture capital, structured finance and hedge funds. Mr. Rigas is the Founder and principal shareholder of the Sciens Group of Companies and serves as the Group's Chairman and Chief Executive Officer.  In this capacity, Mr. Rigas [states that he] **directs** portfolio construction, investment research, fund operations and risk management activities as well as corporate management and strategy. Since inception, Mr. Rigas has directed the Sciens private equity team in completing over 50 investments in portfolio companies and in the creation of numerous investment funds in a variety of asset classes."

October 2014 Investment Proposal, page 11(Emphasis added). Defendant John Rigas is designated in this Complaint as both an "Issuer Defendant" and as an "Advisor Defendant," unless the context otherwise requires.   Supplement Number 2 to the POM, dated September 2015, stated that investors wishing to receive detailed

information about GSMI's investment activity and related information regarding the investment program should contact Mr. Rigas.  Accordingly, on information and belief, Defendant Rigas possesses the ultimate control and authority over what is said, what is not said, and what business practices will be employed by all the defendants. Defendant Rigas is so critical to the ongoing nature of the private equity program at issue here that he is listed as one of the key personnel, whose death may be the cause for termination of the investment program.

12.     **Daniel Standen.** Daniel J. Standen is one of the members of the board of directors of GSMI, appointed by SMH Management, Ltd., the Investment Manager, and is a member of the board of directors of GSMI Management, the Portfolio Manager, appointed by the Investment Manager. Mr. Standen, who is designated in this Complaint  as both an "Issuer Defendant" and as an "Advisor Defendant," unless the context otherwise requires, is a partner in the Sciens Group of Companies, where he co-manages the group's private equity investment activities.  Mr. Standen became a member of the Investment Committee on or about July 1, 2015 and he serves on the boards and investment committees of a number of the Group's other portfolio companies, management companies and joint ventures in various industries.  Mr. Standen also served as the Chairman of Colt Defense LLC, one of the world's oldest and most famous firearm companies, which, according to news articles, was acquired in or about 2015 by its 87% private equity owner, Sciens Capital, "which sucked the company dry" from advisory, consulting and administrative fees, "wound up owning its headquarters, and left the company

struggling to compete." Rob Cox, Chapter .22, (June 16, 2015)

www.breakingviews.com.

13.    **Alexander Loucopoulos.**   Alexander Loucopoulos joined the Investment

Manager and its affiliated entities, including the Administrator, in 2005.  Mr.

Loucopoulos is referenced on documentation as a Sciens  "principal." Supplement

Number 2 to the POM, dated September 2015, stated that investors wishing to

receive detailed information about GSMI's investment activity and related

information regarding the investment program should contact Mr. Rigas or

Alexander Loucopoulos, who is designated as both an "issuer Defendant and an

"Advisor Defendant" herein.

14.    **Golden Sciens Marine Investments Ltd (the "GSMI," the "Fund," or the**

**"Company").** Golden Sciens Marine Investments Ltd (the "GSMI," the "Fund," or the

"Company") is the issuer of the securities offered in the form of "participating

shares" in GSMI pursuant to a December 2013 Private Offering Memorandum

("POM"), which described GSMI as a private shipping venture. The POM stated that

GSMI would "operate as a holding company, with all of its vessel owned, directly or

indirectly, through special purpose limited liability companies (the "Operating

Subsidiaries… ), the majority of which are expected to be formed in the Marshall

Islands." *(See Private Offering Memorandum ("POM"), at 14.)*   The May 2014

*Investment Proposal* stated that GSMI was formed by Sciens Capital Management,

though an earlier October 2013 *Investment Proposal* stated that  Sciens' Capital

Management's had formed "GSMI" or the "Company" "as a 50/50 partnership with

**Golden Union Shipping**, one of the most established and successful ship owners and operators, and that GSMI  that will "acquire a fleet of modern secondhand, new builds and resale vessels."  The December 2013 *Investment Opportunity* stated that GSMI planned to purchase Capesize and Panamax dry bulk vessels at "near investment-cycle low point prices," charter-out the vessels to generate current income, and then dispose of the vessels at "investment-cycle high point prices." GSMI may be an affiliate (possibly a parent, though uncertain at the time of filing this Complaint) of Golden Sceins Holdings, LLC,  (" GS Holdings").

15.      **GSMI's Board of Directors.** The members of the Board of Directors of GMSI are appointed by the Portfolio Manager as the holder of all of GSMI's issued and outstanding non-participating and voting management shares ("management shares").  The Portfolio Manager in turn has authorized the Investment Manager, SMH Management, to select at least half of the members of the board.

16.    **GSMI's Investment Committee.**   The POM states that the Company has established an Investment Committee that would advise the Portfolio Manager on all decisions relating to the acquisition, holding and disposition of investments. The members of the Investment Committee are John Rigas, Alexander Loucopoulos, and Daniel Standen, who are affiliated with the Investment Manager, and Lefteris Veniamis, George Gabriel and Kostas Karagiannis, who are affiliated with the Vessel Manager.

17.    **Golden Sceins Holding Company (The Intermediate Holding Company).** With GSMI supposedly operating as a holding company, the defendants  and their affiliates  - well after the offering   - revealed the name of another  entity called

Golden Sciens Holding Company ("GS Holdings"), which was later described as an "intermediate" holding company, but left undisclosed its relationship with defendants GSMI and Sciens Capital.   GS Holdings thus presumably took over some or all of the role to be played by GSMI and acted as an intermediate holding company into which the defendants have deployed cash, which also presumably means that all vessels would be owned through GS Holdings by special purpose limited liability companies in the Marshall Islands. It also appears that the defendants have made liberal use of this separate entity to bury losses.

18.     **Sciens Capital Management LLC' ("Sciens Capital") - Asset Investment Firm.**  Sciens Capital Management LLC' ("Sciens Capital"), which for all intents and purposes markets itself, operates or directs the operations of the GSMI Fund and the other affiliated advisory entities described below (except the Vessel Manager), is headquartered in New York City with offices at 667 Madison Avenue, New York, NY 10065.  Sciens Capital formed GSMI . According to its website, Sciens Capital is an independent investment firm that provides **"bespoke"** (*i.e.,* highly personalized managed advisory and portfolio management services, brokerage and private wealth management) and **"integrated"** investment solutions – including investment advisory, portfolio management and administrative services – to institutional and private clients globally.  Sciens claims that it "offers differentiated investment solutions throughout market and economic cycles."  Sciens' website refers to three (3) asset classes, including private equity, the one which is the subject of this Complaint.   Sciens' website states that it has been active in private equity since 1994 and has invested in over 50 direct private equity transactions.  Its website also

states that "Sciens' long history of private equity investment provides in-depth knowledge and a network of contacts that have been a catalyst in the growth of its portfolio companies." The website further states that "Sciens is an opportunistic investor and focuses on middle market buyouts, growth buyouts, and distressed and turnaround opportunities in North America and Europe.  Sciens is an active investor, generally seeking to take majority control or lead investor positions, with significant representation on the board of directors and all board committees." Sciens Capital states that its group of companies and affiliates operate in major financial centers and are regulated in multiple jurisdictions: SEC, CFTC (U.S.A.), FCA (U.K.), GFSC (Guernsey), CIMA (Cayman Islands).  The Private Equity Investment Opportunity publications, the Investment Proposals, Market Updates and Quarterly Updates – all of which were sent to prospective and current investors  – were all issued by Sciens Capital Management and under the Sciens name.   Indeed, at the bottom of each page of many of the updates, the note states that the "information contained herein is the property of Sciens Capital Management and its affiliates." Sciens is designated herein as an "Advisor Defendant."

19. **SMH Management, Ltd.  –  Investment Manager** - SMH Management, Ltd ("SMH," "Investment Adviser" or "Investment Manager"), another one of the entities forming part of Sciens Capital's integrated services and designated herein as one of the "Advisor Defendants," with the same business address as Sciens, has, along with the Portfolio Manger and the Administrator, been delegated the day-to-day responsibility for managing GSMI's overall business administration and operations as well as all investment decisions.   The services provided by SMH to GSMI include

not only direct portfolio and operational risk management services but also oversight of certain day-to-day administrative operations of GSMI. SMH is a New York-based investment adviser registered with the United States Securities and Exchange Commission ("SEC").  It serves as the investment Adviser and owes fiduciary duties to the participating shareholders under the federal securities laws.

20.    **GSMI Management Co., Ltd.  - Portfolio Manager.**    Defendant GSMI, the issuer, and SMH Management, Ltd., the investment adviser, engaged GSMI Management Co., Ltd, ("GSMI Management"), the asset management company and affiliate of the SMH Management, to act as the "Portfolio Manager," which has responsibility for selecting the ships, profitably employing them, and then liquidating them.  GSMI Management, as Portfolio Manager and designated herein as an "Advisor Defendant,"  owns all of the issued, outstanding and non-voting Management Shares of GSMI. According to Defendant Sciens Capital's website, "[i]n 2013 Sciens formed GSMI Management Co., Ltd., an asset management company, with Golden Union Shipping Co. S.A.,"  which Sciens claims to be "a leading operator, owner, and manager of dry bulk assets." The Portfolio Manager, another Cayman Islands company, was formed as a joint venture between SMH Management, Ltd, as Investment Adviser, and Flag Stone Shipping Co., S.A. ("Flag Stone"), a company organized under the laws of Panama and affiliated with the Vessel Manager, which in turn is run by GUS. The Portfolio Manager is advised by an "investment committee," whose members include Defendants Rigas, Alexander Loucopoulos, Lefteris Veniamis, and others.   Significantly, the POM further states that the ability to achieve the Fund's investment objectives and pay distributions to participating

shareholders "is largely dependent upon the **performance of the Portfolio Manager** in identifying suitable vessels (that are in good condition) ... and making such investments at favorable prices..." (*See POM at 29.*)

21. **Sciens Institutional Services, LLC-  The Administrator.** Defendant Sciens Institutional Services, LLC, (the "Administrator"), a Delaware limited liability company and designated herein as both one of the 'Issuer Defendants" and one of the "Advisor Defendants, " serves as the company's administrator.   The POM provides that the board of directors of GSMI "has delegated, subject to its continuing supervision and review, responsibility for the day-to-day operations and administration of the Company [GSMI] and all investment decisions" to the Investment Manger, the Portfolio Manager, the Vessel Manager and the Administrator." (POM, at 6.)   As Administrator, its duties include investment management support, general internal corporate accounting, general corporate and contractual support, compliance, tax, accounting and financing and administrative functions, but the Administrator does not provide Sciens' primary legal, tax or audit advice.  Defendant Sciens, when acting as Administrator, is not a true independent third party administer, however, because it is part of Sciens Capital's integrated investment solutions and is an affiliate of the asset manager, the Investment Manager, and the Portfolio Manager.  At the time of the conduct alleged in this Complaint, Defendant Rigas – who not only serves as executive chairman of GSMI and the Portfolio Manager, but who also sits on the investment committee that advises the Portfolio Manager – was <u>sole</u> managing member of the Administrator responsible for all the duties the Administrator was and is to provide.

22.    From top to bottom, as well as sideways, each entity within the corporate and fund structure is affiliated with every other entity, some of which appear to have interlocking directorates, and all of which function under the oversight not only of Defendants Sciens Capital management, but also Defendant GSMI's Board of Directors, which consists of Defendant Rigas, Daniel Standen, who, along with Defendant Rigas, were purportedly appointed by Defendant SMH Management, Ltd., the Investment Manager, and by the Vessel Manager.

23.    This complex corporate structure has been designed to disguise the true details of the business operations of Defendant Sciens and its numerous affiliates. Core operations have been setup offshore.  Further, despite being marketed as a collaboration between Defendants Sciens and Golden Union Shipping ("GUS"), this elaborate corporate structure has been designed entirely to protect the "Sponsor Group" from ultimate responsibility.  The POM defines the "Sponsor Group" as the Investment Manager (or adviser), the Portfolio Manager, and their respective affiliates, directors, managers, officers, beneficial owners, members, shareholders, partners and employees.

### III.    NON-PARTIES

24.    **Golden Union Shipping, S.A. - Dry Bulk Ship Operator.** According to Sciens Capital Management's website, Golden Union Shipping Co. S.A. ("GUS") is a "a leading operator, owner, and manager of dry bulk assets."  Scien's website reports that GUS is based in Piraeus, Greece and "manages a fleet of over 50 dry bulk vessels." Sciens Capital formed the Portfolio Manager with GUS.  The POM

represented that GSMI, the issuer, and the Vessel Manager would enter into management agreements pursuant to which GUS would– subject to oversight and direction of defendant GSMI as issuer of the securities   – provide the entities responsible for procurement, administrative and technical management services, including internal audit and review service, corporate reporting services in accordance with International Financial Reporting Standards ("IFRS"), finance and bank services, administrative services, and oversight services of external audit procedures according to International Standards of Auditing ("ISA").

25.     Flag Stone Shipping Co., S.A. ("Flag Stone"), is a company organized under the laws of Panama and affiliated with the Vessel Manager, which in turn is run by GUS.

26.      Vessel Manager.   Lefteris and Theodore Veniamis, residents of Greece, were selected by Flag Stone, to serve as Vessel Manager.   Mr. Lefteris Veniamis is the Chief Executive Officer of GUS and director since 2001. Mr. Veniamis sits on GSMI's Investment Committees and serves on the board of directors of the Portfolio Manager.


## IV.  VENUE & JURISDICTION

27.     This court has jurisdiction over Plaintiff's claims under the Securities Exchange Act of 1934 pursuant to Section 27(a) of the that Act, 15 U.S.C. ¶78aa (a), and under 28 U.S.C. § 1331.

28.      This court also has jurisdiction over this matter pursuant to 128 U.S.C. § 1332(a)(1) because the Plaintiff and the Defendants are citizens of different states.

29.     This court has supplemental jurisdiction over Plaintiff's common law claims

pursuant to 28 U.S.C § 1367.

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because

defendants reside, are incorporated, or maintain their principal place of business in

New York City.

## V.  FACTS

## A.     GSMI'S Fraudulent Capital Raising Activity

31.     In 2014, Defendants Rigas, Sciens Capital, SMH Management, GSMI

Management, GSMI and possibly other defendants commenced a "blind pool

offering" and started to market and solicit securities in GSMI, which were

denominated non-voting "Participating Shares."  GSMI The GSMI investment

proceeds were to be invested directly in Capesize and ice-class Panamax dry bulk

shipping vessels.   Under the terms of the POM, Defendant GSMI, the issuer and the

Fund, had the ability to make investments within the first two years of the initial

closing (*i.e.,* March 2014 to March 2016).   The Fund would liquidate on the 5th

anniversary of the final closing (*i.e.*, on September 2020, five years after the final

close in September 2015).

32.     In or about December 2013, Defendant Scien's issued its marketing literature

entitled *Private Equity Investment Opportunity,* in which Defendant Sciens Capital

represented that GSMI provided "a niche strategy, real asset company in the private

equity space that offers the opportunity to invest in dry bulk shipping at a unique

entry point." It emphasized three points:

•Portfolio of large size only dry bulk vessels (Capesize and Panamax) with no legacy issues

•**Direct** investment at the vessel level with combination of **annual yield (5%-10%) and value appreciation (> 20%)**

•At the start of an expected significant market upturn following the deepest cyclical low in history

33.     The December 2013 *Private Equity Investment Opportunity* publication also described the investment "Strategy" pursuant to which "GSMI would seek to establish a portfolio of 10-12 vessels (4 Capesize & 8 Panamax). *See December 2013 Private Equity Investment Opportunity, "Strategy," page 2*.   Indeed, Defendants Rigas, Sciens, SMH Management, GSMI Management and GSMI claimed to already have ships in the "pipeline," since GSMI had already been inspecting the first several potential targets and "will also contribute contracts and rights to 4 vessels with delivery in 2015/16."   The portfolio of shipping assets would consist of assets that are both 'in the water' (second-hand) and also new-builds. It also stated that:

"•The second-hand vessels can bring immediate cash-flow under time charters. GSMI is targeting distributions to investors as early as the second year, with an average annual yield of 5%-10%

"•The new-build[s] maximize the portfolio value appreciation"

The publication further stated that "[o]verall, by establishing a fleet that is very young, less than 5 years age, GSMI expects to maximise [sic] the capital appreciation of the assets upon a liquidation event in 3-5 years, as the charter rates and vessel values revert to the long-term mean for the industry from the current historic lows."

34.     Defendant GSMI sought up to $250 million in capital with a minimum investment of $5 million for individuals and $20 million for institutions.  A page from a Sciens' document entitled *Strong Pipeline of Acquisitions/Options,* dated March 2014, described the total estimated value of ships to be acquired to be approximately $430 million, "requiring **equity of $210mm**" and senior debt of $220 mm."

35.     The POM described a participating shareholder's *obligation* to satisfy a capital commitment as expiring on the second anniversary of the Initial Closing Period, which meant by March 25, 2016 (the "Obligation Period").

36.     The *March 2014 GSMI Investment Proposal* contained the following chart of "Strong Pipeline of Acquisitions/ Options," for the "initial phase" of the private equity program:

| Vessel Type | Acquisition | Year Launched | Estimated Delivery | Price | Detail |
| --- | --- | --- | --- | --- | --- |
| (Three) Ice-Class 1B | Newbuild - Option | 2016 | Q1/ Q2 2016 | At Contract Price - $28 mm per vessel | Option to exercise Q1 2014 with Asian shipyard |
| (One) Hull 2695 181,000 DWT Capesize Vessel | Newbuild | 2016 | June 2015 | At NAV - Estimated $56 mm | Warehoused for the Company, contract executed in July 2013 with Hyundai Shipyards |
| (One) Capesize | Secondhand – to be identified | 2011 | Q1 2014 | Estimated $41-43 mm per vessel | Will be purchased in secondary market |

| (One) Kamsarmax | Secondhand – to be identified | 2011 | Q1 2014 | Estimated $27-28 mm per vessel | Will be purchased in secondary market |
|---|---|---|---|---|---|

1. **Initial Closing  - March 2014**

37.     The Issuer Defendants held the first close in March /April 2014.  As of the

date of the Initial closing on March 25, 2014, Defendant GSMI had obtained only

$63.325 million in capital commitments, well short of its projected capital needs.

(See Supplement No. 2 to POM.)   Approximately $32.16 million was committed

capital from the Sponsor Group (*see GSMI Financial Statements for the Period March*

*6, 2014 Through December 31, 2014, page 15*) and the balance of  $31.16 was

committed capital from public participating shareholders like Plaintiff.

38.     Given the lack of transparency to date, it is unknown whether Defendant

Sciens – and to what extent GUS – in fact made any initial cash capital contributions,

as had been represented in the POM, which stated that they would be a 20%

stakeholder in the GSMI through Defendant Portfolio Manager.  On information and

belief, Defendant Sciens and GUS were to contribute $30 million (i.e., $15 million

each).  However, on information and belief, Sciens Capital contrived a $21.8 capital

contribution, which is nothing more than a **contribution of a purchase contract**

for a ship (Hull 2695, referenced in paragraph 36 above) at an inflated value.

Accordingly, Defendant Sciens Capital did <u>not </u>make its initial cash contribution; and,

instead, Defendants Rigas, Sciens and the Issuer Defendants obtained and relied

largely on the funds of public participating shareholders contributed to finance the enterprise.

39.     This so-called contribution in kind, which is later reflected in the 2014 year-end financial statements, added no working capital.

40.     For this so-called over-inflated "contribution" to the GSMI Fund, the Sponsor Group awarded themselves 30,750,000 worth of shares in the Fund.

### 2.     Second Closing – As of June 2014

41.     Plaintiff Walsh was contacted on or about May 29, 2014 by Mr. Wilkinson, President of Sciens Fund of Funds Management, an affiliate of Sciens Capital, to invest "alongside" Defendant Sciens as it moved to finalize the second close.  By using the term "alongside," which is a particularized investment term with specific and unique investment implications, Plaintiff understood he was being asked to invest directly as a co-investor with Sciens and thus buying a direct stake in the ship assets (as alleged in paragraph 31 above) alongside Sciens, the investment firm and organizer and sponsor of the GSMI, the private equity fund.

42.      To induce plaintiff's investment, plaintiff was presented with Sciens December 2013 publication entitled *Private Equity Investment Opportunity*.

43.     In late May or early June 2014, Plaintiff Walsh by email questioned the assumptions underlying the investment strategy, the present value of the earnings stream given the drop in charter rates, and the projected values of the ships.

44.     In a June 4, 2014 email, in response to the concerns raised by Plaintiff about vessel prices, President Wilkinson of Sciens Capital stated: " Today, you can buy a Cape size vessel for circa $60mm (we just bought one for GSMI for $56mm)."

45.     In that June 4, 2014 email, in response to the concerns raised by Plaintiff about charter rates, President Wilkinson of Sciens Capital also stated that Plaintiff "failed to draw a distinction between spot charter rates and one-year/two-year forward charter rates."  President Wilkinson explained that spot rates are very volatile and soft, because they are "so  (winter) weather dependent."  In contrast, President Wilkinson stated: "BUT forward charter rates" are "much less volatile and have been on a secular increasing trend pretty much throughout the second half of last year and continuing through the first few months of this calendar year." President Wilkinson also referenced a separate email from Stavros Siokos, the Chief Executive Officer of Sciens Alternative Investments (Sciens Fund of Funds), which revealed that the "one-year forward rates for both Capes and Panamax vessels have risen substantially (e.g. from circa $10,500 a day in May 2013 to $26,000 a day in May 2014 for Capes) and have held onto those gains."  President Wilkinson's email emphasized the critical need to lock in forward charter rates:

> "[Y]ou can lock in forward charter rates (one or two years) at circa $26,000 p/d [per day] whilst your opex costs have only ticked up marginally (if you have competitive rates for the levered component of the funding) to circa $14,000 a day. You can then **insure against charter default** (again at compelling rates if the charterer is a quality name like Cargill and assuming you yourself are a quality operator, as our partner GUS very much is)."

> "Thus you can **lock in positive daily cash-flow** of circa $12,000 p/d equating to circa $4mm per annum. This **downside protection is absolutely key to and at the heart of this investment opportunity...**"

> * * *

> "I[t] is the trend in forward rates and the extent to which they now far outstrip daily opex that creates the asymmetric **upside opportunity** and that has us excited about this particular opportunity."

46.     On or about June 24, 2014, President Wilkinson provided Plaintiff with yet another email in which he presented "the basic math within the opportunity" and also addressed "the broader supply and demand picture."  In that email, Defendant Sciens projected increase in iron ore production as well as the projected uptick in demand and production of coal and other dry bulk cargoes (coke, pet-coke and grains).  In that email, defendant Sciens ran through "the math" for a "strong downside protection and significant upside potential."   According to Defendant Sciens, the projected increase in iron ore production over the next three (3) years would be two times greater than the projected supply of new "capes" coming into the water and thus require an additional 200 Capesize vessels per annum in capacity.  In bold face type, the email then summarized its key points as follows:

>    -    **There is a sharp increase in iron ore production underway by all the major producers. This alone (ignoring coal production which is also increasing) will need to be shipped and will require at least twice as many additional capes as will be delivered into the water.**
>
>    -    **On all known historical experience, this will see both charter rates and vessel prices rise further. Potentially significantly so...**
>
>    -    **Falling iron ore prices only adds to the demand for capes as Chinese iron ore producers cannot compete effectively and in any event lack quality.**
>
>    -    **The macro story is intact and very supportive of rising charter rates and rising vessel prices.**
>
>    -    **If they rise back to adjusted 10-year average prices (ignoring & excluding the peak-price years of 2006-2008), the upside is very significant. With our base case being around 25% per annum.**
>
>    -    **If Armageddon materializes, everything unravels and it all falls over, the downside (of losses on vessel prices) is very well protected**

**(and offset with 2 – 3 years of chartering) by the profit locked in on the forward charters.**

**-     Under all conceivable scenarios, this translates into significant upside potential and very limited downside.**

47.     The June 2014 email added that yield on ship acquisitions does not take in account  "any potential profits from trading vessel and options to acquire vessels (of which there is already circa $15 mm of profit within GSMI from three ice-class options contributed *gratis* by GUS [Golden Union Shipping] at $28 mm and currently trading in excess of $33 mm)."  President Wilkinson noted that it is possible to experience trading losses, "but the $15 mm + profit is a very good start and a nice cushion to have …"

48.     Based on the representations by President Wilkinson of Sciens Capital, Plaintiff agreed to make a capital commitment of $750,000. He signed and submitted the subscription documents on or about July 3, 2014.

49.     On July 8, 2014, defendant SMH Management, as the Investment Adviser, notified Plaintiff that his subscription had been accepted for Class A Participating Shares and that defendants GSMI and SMH Management would "hold" the closing for sale of participating shares to plaintiff until receipt of the letter.  The letter also contained a capital call in the amount of $640,371.90, which represented 85.38% of his capital commitment.  Plaintiff was further asked to pay a "Make-Up Amount" of $8,183.21, from the date of the Initial Closing on March 25, 2014 to the current date.

50.      Defendant Sciens held back its second close to give Plaintiff time to invest and then back dated and held its second closing in June 2014.

51.     The second closing allegedly occurred three (3) weeks earlier on June 19, 2014 and provided capital commitments of an additional $37,765,000 (see Supplement  No. 2 to POM),  which brought total commitments to $90.3 million, still well short of the $210 million sought.

52.     However, from capital commitments of $37.765 million, Defendants Rigas, Sciens Capital, SMH Management and GSMI Management drew approximately $32.25 million and paid out distributions of approximately $9.2 million.

### 3.     Third Closing  - December 2014

53.     The third closing was scheduled to occur in September 2014, but did not occur until mid December 2014, and was conducted during a significant write down in the net asset values ("NAVs) of the ships. During this closing, Plaintiff satisfied his capital contribution of $71,250 by a deduction in a distribution made by defendant GSMI.

54.     During this third closing, Defendant GSMI (Issuer/Fund) stated that it obtained an additional $44,565,000 in commitments (see Supplement  No. 2 to POM), bringing the total of the three (3) closings to $145.655 million - still far short of the $210 million in equity needed and without taking into account the distributions to the Issuer Defendants and outside investors during the second closing.

55.     Moreover, Defendant Rigas, Sciens Capital got back in the form of a distribution approximately  as much as  $8.9 million.  Thus, by the end of the third close, Defendants Rigas and Sciens Capital had recouped almost 90% of their initial

"deposit" of approximately $10 million on the purchase contract – a distribution they obtained using capital contributed by participating shareholders.

### 4. __The Fourth and Final Closing  - 2015__

56.     Defendants Rigas, Standen, Loucopoulos, the Issuer Defendants and the Advisor Defendants attempted to effect the fourth and final close in the spring of 2015, but failed. They then issued capital calls.  The fourth and final close later occurred "as of" September 30, 2015.

<u>Failed Attempt In Spring 205</u>

57.     In the spring of 2015, Defendants Rigas, Standen, Loucopoulos, Sciens Capital, the Issuer and Advisor Defendants attempted to hold the fourth and final closing, which would have required existing shareholders to contribute more  but met resistance from existing shareholders.

<u>Intervening Capital Calls</u>

58.     Defendant GSMI issued its Annual Report for Fiscal year December 2014 on or about May 8, 2015.  Defendant Rigas, by email to Plaintiff on May 8, 2015, which enclosed the annual report, stated that the "Fund has raised $145.6 million in commitments and has purchased seven vessels, and a one half participation in an eighth vessel."   Defendant Rigas also stated that the "Fund's fleet requires $41.0 million of equity financing in excess of its available capital over the next two and a half years to continue operating on the basis of present charter rates and in order to take possession of the new buildings contracted for to date." Defendant Rigas stated that the "Fund continues its marketing campaign to secure additional capital commitments and expects to secure such additional commitments prior to the

termination of its fund raising period on September 25, 2015." Defendant Rigas

further stated that:

> "The four largest investors in the Fund have expressed an interest or
> contracted to increase their commitments to the Fund. These investors
> include the two co-sponsors of the Fund, Sciens and Golden Union. Following
> the release of the Fund's Annual Financial Statements and the audited NAV
> per share, the Fund will communicate its plans for any further closings and
> will give the opportunity to all existing investors of the Fund to participate as
> well as solicit commitments from new investors."

59.     In his letter dated May, 8, 2015, Defendant Rigas further stated that:

> "Depending on the aggregate commitments raised, the Fund will utilize its
> undrawn and any future commitments, with the following priority:

> (A)     fund the operations of its fleet;
> (B)     honor existing commitments to shipyards for new building
>         contracts; and
> (C)     acquire additional vessels in the water."

60.     On May 14, 2015, Defendant SMH Management, as investment

manager/adviser on behalf of Defendant GSMI, sent a capital call to Plaintiff for

$74,171.86.  The stated purpose was the need for additional cash of $14,590,000

not only to raise the remaining cash of $8.4 million to purchase a ship called

Hyundai Hull (2695), but also for the following reasons: (a) amortization of $1.5

million, (b) dry dock expenses for a ship called "Seattle Slew" of $1 million (c) added

"minimum" corporate level liquidity of $3 million, and (d) fees and expenses of

$700,000, which included management fees.

61.     By email on or about May 17, 2015, President Wilkinson wrote to Plaintiff

that: "Stavros Siokos, CEO of Sciens Fund of Funds] is still pretty sweet and staunch

on this being a great five year play.  ...Stavros spoke to Lefteris [the Vessel Manager]

last week and he was adamant it was still looking like a great buying opportunity (5 vessels still to be acquired and buying into the ongoing softness in rates/the Baltic dry and the broader market)."  Accordingly, based on representations of senior officers inside Defendant Sciens Capital and its affiliated entities, Plaintiff was led to believe that it was still a good investment of his capital.

62.     On or about May 18, 2015, Plaintiff wrote to President Wilkinson about whether "the cash call is for a vessel purchase. Perhaps we can verify that it is actually happening."  Thus, Plaintiff sought verification from Sciens Capital's President that the money was being called for the purpose represented and not used for some other improper purpose.

63.     Defendant Rigas sent Plaintiff a letter dated June 5, 2015, stating that Defendant GSMI expected to hold its fourth and final closing on or before June 30, 2015.  Defendant Rigas targeted funding needs of $45 million or more in additional commitments and stated that that "this funding will cover all of the Fund's existing financing needs (*i.e.,* for existing vessel orders) and, more importantly, provide the opportunity to acquire additional vessels."  Defendant Rigas stated that the $45.0 million in additional capacity offered as part of the fourth closing (and any amount of over subscription in the fourth closing by exiting investors) would be offered on a priority basis." Using audited values as of December 31, 2014, which had been written down, Defendant GSMI offered additional participating shares on a *pro rata* basis at a much lower entry point (*i.e.*, not valuing the vessels at cost). Defendants Defendant Rigas stated that "[i]nvestors participating in this closing with acquire an **additional** interest in the Fund."   Defendant Rigas informed Plaintiff that his

additional *pro rata* commitment, over and above his original $750,000, would be
**$231,711**. This amounted to a request for **30.9% additional funds** over and above
Plaintiff's original commitment, unexpectedly pushing his capital commitment to
almost $1 million.  Defendant Rigas claimed that "this entry point is lower than the
original cost basis of the committed capital into the Fund." Defendant Rigas stated
that the "Fund's practice" was to be "fully funded relative to its existing obligations"
and then utilize "any available funding in excess of that amount for opportunistic
acquisitions." Drawdowns would occur periodically in 2015 through 2017
"consistent with the expected deliveries of contracted vessel in the Fund's portfolio
(as presented in the Fund's Annual Report for 2014.)"   Defendant Rigas requested
completion of an attached form indicating Plaintiff's decision to participate or not.

64.     Defendant GSMI sent Plaintiff a capital account valuation statement showing
capital contributions, after management fees, of $473, 147.45, as of June 30, 2015.
From that amount, Defendant Sciens deducted net unrealized depreciation of
$32,393.56.  There was no valid explanation for the net change in fair value of the
ships (two secondhand and four for future delivery).  Indeed, the Annual Report and
Fleet Update, dated May 2015, stated that the value of the full fleet had declined
largely attributable to value reduction for two ships, Seattle Slew and Hyundai Hull
2695, the latter of which was not due for delivery until Q2 in 2015.   Hull 2695 was
marked down from $61.5 million to $55.5 million, even though it would not be
delivered for almost one year.  Thus, Defendants Rigas, Sciens Capital, the Issuer
Defendants and the Advisor Defendants marked down the NAV of the ships a second
time for the purpose of raising more money.

65.     Defendants Rigas, Sciens Capital, and the other Issuer Defendants and the Advisor Defendants wrote down the NAV of ships a second time in order to give a preferential "rights" to the Sponsor Group.  No explanation was given for this preferential treatment or the second write down.

66.     By Letter August 7, 2015, Defendant SMH Management, on behalf of Defendant GSMI and over Defendant Rigas's signature, made another capital call for $14, 345.00 from Plaintiff, allegedly for the second installment of $2.786 million on an ice-class ship (AVIC Hull No. B82-3), which Defendant Rigas had earlier represented had been under option and Defendant Rigas had projected for delivery in 2016.  On information and belief, the real basis for the capital call was that the requested participation by existing shareholders in this fourth and final close was lackluster.

<u>September 2015 Final Closing</u>

67.     As stated in paragraph 63 above, total capital sought for the fourth and final closing was $45 million.  However, according to an email on or about September 23, 2015, two days before the expiry of the Commitment Period, Cecilia Santos, an assistant to Defendant Rigas, wrote to Plaintiff that he need <u>not</u> be concerned about any <u>insufficient </u>funding because "on the basis of present market facts, the Fund's capital needs will be fully funded with **$10mm."**  Ms. Cecilia Santos (personal assistant to Defendant Rigas) added, however, that "[w]e believe that the Fund will close on such additional commitments so that it can complete its investment program." Accordingly, the defendants planned to raise more than was needed to

meet the Fund's expenses, including management fees, and to obtain enough additional capital to "complete its investment program."

68.    By email to Defendant Sciens dated September 21, 2015, Plaintiff stated that in order to make a decision on the new *pro rata* capital call for additional funding up to $45 million, Plaintiff would need the following:

> "1.    The unaudited value of the Fund as of June 30th 2015, as described as the reference value for the offering
>
> "2.    My investment value at that June 30 2015 valuation.
>
> "3.    A description of the *legal ability* to carry out such an additional fund raise."

69.    In response, by email dated September 22, 2015 Wilkinson stated that "[a]ll good with the Company and - per the update note included in what was sent to you - GSMI in much better shape now than the calendar year-end write down in NAV would suggest."

70.    In another response by email also dated September 22, 2015, Ms. Santos of Defendant Sciens Capital told Plaintiff that (1) the capital balance of GSMI was $85,446,307,  (2) attached was his June 30, 2015 statement, showing that his investment had been reduced by $35,072.53 "due to change in **unrealized** [depreciation] on investment & expenses" (emphasis added), and (3) the legal ability to carry out the added funding came from page 17 of the POM, which was quoted in italics:

> "*Notwithstanding anything to the contrary set forth in this Section, in the event that the Investment Manager and Portfolio Manager determine that it would be inappropriate for the Additional Shareholders to participate in an Investment held by the Company at that time, then they may, in their sole discretion, either (i) adjust the amount of Capital Contributions to be made by Additional Shareholders to reflect such different valuation, or (ii) exclude the*

*Additional Shareholders from participation in such Investment.*"

71.     They had no right to conduct a close at a reduced NAV, which they did. The only way to avoid dilution was to increase his investment to the Fund. But, some chose not to and were therefore diluted.

72.     The POM further stated that "[f]or purposes of determining the proportionate interests of Additional Shareholders and Existing Shareholders in Investments that are held by the Company at the time of a Subsequent Closing, the Investments generally will be valued **at cost**. [As stated in paragraph 61 above, however, Defendants Rigas, Standen, Loucopoulos, Sciens Capital, SMH Management, GSMI Management, Sciens Institutional Services, and GSMI wrote down the value of certain ships below acquisition cost.  The write down obviously watered down Plaintiff's ownership percentage.

73.     On or about September 23, 2015, Plaintiff spoke with Defendant Loucopoulos, who claimed that Defendants Sciens, SMH Management, GSMI and GSMI Management **have sole discretion to value the offering at NAV** based on the section from the POM quoted in paragraph 70 above. Participating shareholders may be invited to participate, but if they **do not, they are diluted** – in the case of Plaintiff, by a **30% write-down** in his investment since inception.  Such a mark down in NAV, however, could not be justified because these vessels are **illiquid** and not something t to be marked to market  ("MTM") every quarter.  The only purpose of such a MTM was to <u>force </u>existing investors to participate or face sizeable dilution**.** Defendant Sciens claimed that they did not have a large investor lined up, but rather planned (or forced) an offering that will be largely filled by existing investors out of

fear of dilution.

74.     Defendants Rigas, Sciens, GSMI and GSMI Management misused the provisions of on the POM to obtain added capital, and did so by twice decreasing the NAV (on newly built ships) without any good rationale and without adhering to the procedures stated in the POM.

75.     On or about September 23, 2015, Plaintiff asked a series of pointed questions regarding this purported fourth closing, including what percentage of existing shareholders have committed to participate, what happened if shareholder participation was too low, would they be charged a management fee, and would Plaintiff's participation be diluted?

76.     Ms. Santos, on behalf of Defendants Rigas, Sciens, SMH Management, GSMI and GSMI Management, wrote to Plaintiff that no new investors were lined up, but that "many of the largest investors have agreed to participate, including Sciens and Golden Union and the two largest institutional investors in the Fund." As stated in paragraph 67 above, she also represented that the Fund's capital needs would be fully funded with $10 mm.  Further, participating investors would be charged a management fee backdated to the date of the first closing.  Finally, she confirmed that Plaintiff's participation level would be diluted, which would either be 8.3% (if only $10 million were raised), or 29%  (if $45 million were raised).  Thus, Plaintiff risked a near 30% dilution if the $45 million claimed by Defendant Rigas occurred.


77.     In an email dated September 24, 2015, Plaintiff expressed his displeasure over Ms. Santo's comments and the way the fourth and final closing was being

administered:

> "I am extremely disappointed to hear that the management is engaging in this fourth closing using a **substantially depressed NAV**. Such a move is not in the interests of existing shareholders because it coerces participation under the threat of forced dilution.

> Given that there are no new investors lined up, and far from full participation from existing investors, it appears to be a tactic to **enhance the returns of the insiders, namely Sciens and Golden Union**. There is no need to execute this closing at a reduced NAV and there would be no reason for an investor to expect that you would do so."

78.     On or about September 28, 2015, Plaintiff also sent an email to Defendant Sciens' President Wilkinson that he was concerned "about the dilution effect on one's ownership of existing assets or dilution from cost, which substantially increases the returns required to get your money back."

79.     On or about October 3, 2015, President Wilkinson stated that he would ask "for clarification as to the uptake of the 'offer' by existing investors," but noted that he had been met with silence..." Sciens' President Wilkinson added that it "seems **it is all about the two largest holders"**  -- "one takes up $4.5mm worth," but, as to the other, he did not  "know if largest subscriber took up its $9.2mm worth."  He pointed out that Defendants "Sciens & Golden Union each have $15mm subscribed." He added that "[i]f either [one of the] largest holder or Sciens/Golden Union combination take up their 'rights,' [then] that gets GMSI the $10mm Sciens informed you is needed to meet future/current commitments." President Wilkinson stated that he was "determined to find out whether any 'friends of Sciens' are invited to subscribe at these sharply discounted levels for their first subscription..." Accordingly, it became abundantly clear that the fourth and final closing would be for the benefit of at least Defendants Sciens Capital, GUS, SMH Management, and

GSMI Management, if not other affiliated defendants.

80.      Plaintiff responded with an email dated October 3, 2015 in which he stated that "[i]t is extremely unusual that a stakeholder would not be given such information." President Wilkinson replied on October 4, 2015 by stating "It's more than unusual; **it's a disgrace** - and it has been reported this side of the pond."

81.      Plaintiff declined to increase the size of his original subscription and, as a result, Defendants diluted him by as much as 21.5 %.

82.      Since other existing participating shareholders also did not want to subscribe, Defendants Rigas, Standen, Loucopoulos, Sciens Capital, SMH Management, GSMI Management, Sciens Institutional Services and GSMI only obtained commitments of $22 million at a diluted value.  Although unknown and undisclosed at this time, Defendants Rigas, Sciens, SMH Management, GSMI Management and GSMI/Fund used this final close to obtain a greater share of the Fund's assets at a reduced NAV, at the expense or and against the will of existing shareholders.

83.      By email dated November 3, 2015, sent by Ms. Santos on behalf of Defendants Rigas and Sceins, Ms. Santos reported that the Fund's final closing occurred "as of" September 25, 2015. The final closing produced $22 million in commitments.  Ms. Santos reported that "[a]s of September 25, 2015, the Fund had received aggregate capital <u>contributions</u> of $123.7 million and has remaining unfunded capital <u>commitments</u> of approximately $44.3 million."  Thus, after the final closing, "the Fund will have aggregate capital *commitments* of $168 million."  This statement, sent after the final close of 2015, is directly contradicted by the 2015

financial statements that report total shares outstanding of 176,642.78 which represent $176,642 million in capital commitments.

84.      In reality, the fourth and final closing raised little new money, since a significant portion was returned to diluted shareholders.

85.      The resulting dilutive financing was conducted without authority and with deceit.  It hurt participating shareholders, added little or no value to the working capital, and resulted in losses that should have been realized and can never be recovered. At the same time, defendants accorded preferential treatment to the Sponsor Group of insiders who failed to honor their full commitments.

86.      Therefore, the Fourth and Final closing took place in a manner inconsistent with the POM where assets were supposed to be valued at cost but were not, used a dilution procedure not disclosed in the POM, occurred for the benefit of certain large stakeholders and not in the best interests of exiting participating shareholders, and provided increased management fees.

<u>Changes to the Articles of Association</u>

87.      As a result of the final closing, defendants Rigas, Sciens, SMH Management, GSMI Management and, GSMI also changed the Articles of Association to favor institutional investor(s), the Sponsor Group and other large stakeholders.

88.      In her November 3, 2015 email, Ms. Santos stated that "[b]ased on discussions with investors," which did not include Plaintiff,  " the Fund has agreed to make certain revisions to the Memorandum and Articles of Association of the Fund dated as of October 22, 2015.  Ms. Santos stated that the changes, which did not require the approval of investors, but which "we believe are favorable to all

investors," took effect "as of" the Fund's final closing.  The Sponsor Group thus acted on their own accord.

89.     Both the original and the revised Articles of Association forbade Plaintiff or any other member from reviewing or inspecting "any accounting record or book or document of the company," unless conferred by law or authorized the Fund's directors.

### 5.     Further Capital Calls During The Obligation Period

90.     Relying on the "Obligation Period," and by letter dated November 30, 2015 only two months after its fourth and final closing, Defendants Rigas, Sciens Capital, GSMI and SMH Management made another capital call from Plaintiff for $22,379.61, which was deducted from a return of capital "due to subsequent closing," Defendant Rigas stated that the purpose of the capital call was to fund a second installment on the ice class ship (AVIC Hull B82-4), a third installment on ice class ship (AVIC Hull B82-3), working capital and management fees.  Defendants ignored deadlines and "closing" dates when it suited their needs. For undisclosed reason, the Sponsor Group did not participate.

91.     Defendant Sciens made yet another capital call on March 15, 2016.  Plaintiff was required to invest another $11,613 by March 30, 2016 and wire it to the account of Defendant Sciens Institutional Services, LLC, the Administrator, at JP Morgan Chase Bank.  Defendants Rigas, Sciens Capital, GSMI and SMH Management stated that the purpose of the capital call was "working capital needs" to cover not only minimum liquidity levels, but also the Fund's fees and expenses.   Plaintiff was

informed that, after meeting this capital call, he would be funded up to 78.8% of his capital commitment.

92.     Defendants Rigas, Sciens Capital, GSMI and SMH Management made a further capital call on June 29, 2016.  The purpose of the capital call, like the one two months earlier, was "primarily to cover corporate liquidity levels (approximately $2,200,000) as well as vessel working capital needs and Fund fees and expenses for an aggregate of $3,350,000."   Plaintiff was required to invest another $15,420.69; but, inconsistent with usual procedure, Plaintiff was now instructed to wire the funds offshore to a bank in Hamburg, Germany.

93.     Defendant GSMI's "want" for cash apparently will continue to extend way beyond the end of the Commitment Period.   Despite cash mismanagement and consumption of cash by fees, the POM states that participating shareholders will still be required to contribute "all or a portion" of their remaining capital commitment after expiration of the Commitment Period (i.e., after September 25, 2015) to  (a) fund investments committed by the GSMI prior to the end of the commitment period, (b) pay future Company expenses, including management fees, (c) make additional, or follow-on, investments in existing investments, such as exercising options to buy vessels,  paying expenses for retrofitting, or paying capital needs for existing vessels, and (d) enable the GSMI to satisfy exiting debt.

94.     Indeed, in note 3.2 of GSMI's year-end 2015 financial statements, which Defendant first obtained on or about June 16, 2016, Defendant GSMI states that, in order to maintain or adjust its capital structure, the Investment Manager and Portfolio Manager may call unfunded capital commitments from participating

shareholders.  GSMI claims that its objective when managing capital is to "safeguard" GSMI's ability to continue as a" going concern" in order to provide returns to shareholders, provide "**benefits for other stakeholders"** and maintain a strong capital base to support GSMI's development of its the investment activities. *See GSMI's 2015 Financial Statements, note 32.*   The "other stakeholders" include members of the Sponsor Group, who are the insiders.

### 6.   Total Capital Paid In by Mr. Walsh

95.    Following payment by Plaintiff of the capital call in July 2016, he has made total capital contributions of **$606,467.79.**   As discussed in greater detail below, from this $606,467.79 in contributed capital, Plaintiff's "investment" has dwindled to $158,502, which is almost a **75% decrease** in investment, and, Defendants Rigas, Standen, Loucopoulos, the Issuer Defendants and the Advisor Defendants claim that **net unrealized depreciation** has consumed almost **70%** of the invested capital, while fees for Defendants Investment Manager, Portfolio Manage , and Administrator have absorbed at least another 4.1% of capital contributed.

### B.    Warehousing Transactions

96.    Defendant Rigas, Sciens Capital, SMH Management, GSMI Management and GSMI have presented inconsistencies in its disclosure of various warehousing transactions that involve contracts to acquire ships.  [In the *December 2013 Investment Opportunity*, Defendant Sciens Capital claimed to already have ships in the "pipeline, since **GSMI** "will also contribute contracts and rights to 4 vessels with delivery in 2015/16."  *See December 2013 Private Equity Investment Opportunity, "Strategy," page 2.*

1.    **Hull 2695 (a/k/a M/V Secretariat)**

97.    The POM described a "warehoused" ship which later turned out to be only a contract owned by a Marshall Islands company called Harpoon Line, S.A ("Harpoon") to acquire a new build Capesize ship with expected delivery in second quarter (Q-2) of 2015.   The POM stated that **affiliates of the GSMI Management**, the Portfolio Manager, held 100% of the shares of Harpoon. The POM further provided that, on or about the "closing date," these affiliates of the Portfolio Manager would contribute the Harpoon shares to GSMI at their then current value in exchange for Participating Shares in the GSMI.

98.    The contract for the ship (Hull 2695, later a/k/a M/V Secretariat) had been signed in June 2013 for $50 million. However, as shown on the chart  in paragraph 36 above, the NAV estimate was marked up to $56 million as of March 2014, and then, contrary to the Wilkinson email on June 4, 2014 which stated the ship was purchased for $56 million (see paragraph 44 above),  the ship was acquired by Defendant Fund in March 2014 – the same month – for **$61.5 million,** with a delivery date into the Fund of June 2015.   Defendants GSMI, Sciens, SMH Management and GSMI Management inflated the purchase contract from $50 million to $61.5 million, effectively misappropriating from the Fund **$5.5 million** in charges for their own profit.  *See GSMI, Annual Report and Fleet/ Market Update, May 2015, page 39.*   Then, by June 2016, one year later, after the Issuer Defendants had profited from the artificial inflation of the NAV, the NAV was dropped to **$38.5 million.**

99.     The gross pricing disparity of this inter-party, affiliate or related party, transaction was not adequately disclosed in the December 2013 POM either under the section on "Warehousing Transactions," the section called "Pre-Closing Investment/Warehousing," or in the section on "Potential Conflicts of Interest."

100.    This in-kind contribution seemingly later shows up in Defendant GSMI's financial statements for year-end 2014, which Plaintiff first received on or about June 16, 2015, as "shares of vessel received in lieu of payment of participating share subscriptions," valued at $21,852,000.  *See* GSMI 2014 Financial Statements for Period March 31, 2016 through December 31, 2016.  Although the financial statements refer to a contribution of shares of a <u>vessel</u>, the POM disclosed only that the affiliates of Harpoon would contribute their <u>shares</u> in Harpoon. This disclosure was materially false and misleading, by in its characterization and in its assigned valuation.

### 2.     **Options on Ships**

101.    The POM also stated that the **Vessel Manager** held "options" to purchase three new build Panama Ice-Class lB vessels from an Asian shipyard, which must be exercised in the first quarter of 2014 for expected delivery in the first half of 2016. The POM also stated that the Vessel Manager expects to contribute the options at their current value, "which is **nil.**"  (POM, at 6. ) The *March 2014 Sciens Investment Proposal*, in a section called *Strong Pipeline of Acquisitions/ Options* showed an option for three ice-class ships, but did not disclose who held it or whether it had been contributed to GSMI. *See* chart in paragraph 36 above.

102.    As stated in paragraph 45 above, Defendant Sciens Capital claimed in a June 2014 email to Plaintiff that these options to acquire ice class vessels had "locked in" $15 million profit within GSMI.  Sciens Capital noted that this "$15 mm + profit is a very good start and a nice cushion to have …" Thus, the Vessel Manager allegedly transferred the options to the Fund at zero value for later exercise at the full purchase price of $27.86 million per ship.

103.    The claim by Defendants Rigas, Standen, Loucopoulos, Sciens Capital, the Issuer and the Advisor Defendants that that Defendant Sciens Capital had "locked in" $15 million in profit from the three ice class options was false.   At some point, these "free options" needed to be exercised and turned into actual contracts to buy those ice-class ships, which would require both significant deposits and a future payment obligation schedule.

104.    Defendant GSMI's letter of August 26, 2014 announcing the "second close," however, stated that the three ice-calls ships were already acquired in March 2014 at a price of $27.86 million per ship.   The November 2014 Market Update issued by Sciens Capital, in a section called "The Fleet," similarly shows that the ships had already been acquired in March 2014, the same date as March 2014 "Strong Pipeline" document which reported it as only an option, as had the POM.  The option on all three (3) ice class ships continued to be reported on the fleet detail sheets in the quarterly updates through September 2015 while the fourth and final capital raise was ongoing.

105.     By the time of the May 2016 *Quarterly Update*, however, Sciens reported that

it had <u>cancelled</u> all three contracts on all ice class ships. (*See GSMI Quarterly Update,*

*May 2016, "Summary" pages 2 and 12.)*  The explanation offered for this cancellation

was described in a contemporaneous letter dated May 10, 2016 from GUS, an

affiliate and part owner of the Vessel Manager:

> "We cancelled three Ice-class new build vessels due to high potential
> exposure on increased capital needs, both as loans could be much
> lower plus negative operating cash flow.  However, we managed to get
> approximately **90% in credit** for the money spent on those vessels to
> purchase one Ice Class that will be 50% owned by the Fund.  The
> vessel is **fully financed** at very competitive terms.  The new vessel
> was also purchased **at a discount** and with a delivery extension
> expected early 2017."

106.     Then, the *September 2016 Update* showed that one ice-class 1B ship (Hull

B82-4) on the Fleet schedule is <u>same one</u> among the three originally reported

(c*ompare* November 2014 Update  (AVIC B82-3, -4 and -5) *with* September 2016

Quarterly Update) , but which had been cancelled.  As noted above, the same update

for Q2-2016 also reported that the delivery of this ice class ship was <u>postponed</u> until

April 2017 "while sellers credit and a discount price was agreed."  *See GSMI*

*September 2016 Quarterly Update, page 7*.   Nowhere is there sufficient disclosure

about just exactly how much money was spent (deposited) on those three (3) ice

class ships, how much was lost, and how much was returned as a purported 90%

credit.

107.     The Fleet Build-Out Detail chart in the *May 2015 Quarterly Report, page 39,*

shows $11.28 million in deposits for the three (3) ice class ships. Similar disclosure

is lacking for 2015.  Accordingly, the total amount of deposits in unknown.

**C.    Use of Funds**

       1.    <u>Ship Acquisitions: Pricing, Delivery Schedule and Cancellation of Ships</u>

108.    The June 2014 email from President Wilkinson represented that ship acquisitions would occur at a scaled rate or pace, not multiple acquisitions all at once.  However, contrary to the representations, multiple ships were acquired using investor capital and leveraged debt, which ultimately led to cancellation of contracts, lost deposits, and liquidity problems.

109.    As described in paragraphs 36, 38, 97 through 100 above, the exact outcome of the warehoused "assets" mentioned in the POM (*see POM at 6 and 29*)  is unclear and the disclosure is inconsistent.

110.    Throughout tis private equity investment program, e exact number of assets under management (AUMS) – *i.e.,* ships –is also unclear, as it vacillates from report to report, and Sciens Capital has left undisclosed the actual and full nature of the payments, using investor funds, made towards the ships.

111.    The November 2014 update reported six (6) vessels (four new builds and two secondhand) had been purchased, most of them in March 2014 and the others within two months, at a total cost of $230.6 million.  With only $104,932,677 in "capital" having been raised in 2014,[1] the GSMI had to take on a significant amount of debt.  That debt, however, and contrary to the representations in Wilkinson's June

---

[1] As discussed elsewhere in this Complaint, *see e.g.,* paragraphs 38, 152 and 227, $21.8 million of that so-called "capital" was a contribution of a vessel contract instead of cash.

[2]  Unless otherwise alleged, the "Issuer Defendants" refers to and includes Rigas, Standen, Loucopoulos, Sciens Capital, GSMI and GS Holdings.

2014 email (*see* paragraphs 41-46 above), did not enhance returns.  Instead, this "all at once" strategy depleted capital, created liquidity problems, and exposed investors to the risk of significant loss in equity, especially with the drastic write-downs in ship NAVs over the next two years and the increased senior debt burden.

112.    In or about May 2015, Defendants Rigas, Sceins, SMH Management, GSMI Management and GSMI changed their business practices.  These defendants resorted to <u>cancellation</u> of ship contracts, a reshuffling of the portfolio, and a purported "release of liquidity" to take advantage of "opportunistic acquisitions."  In pursuit of these new "opportunistic opportunities," deposits as of May 2015 of at least $18.4 million on three (3) ice class and Hanjin Capesize Hull SN00269 (*see May 2015 Quarterly Update, page 39)]* disappeared along the way.

113.    In the September 2015 Quarterly Update,  defendants Sceins, SMH, GSMI Management and GSMI reported that they were "in active discussions" with an Asian shipyard "to possibly cancel the existing order" on a Capesize vessel "but with a simultaneous agreement to avoid the loss on the deposit. "In reality, these defendants lost another $7.16 million from this initial deposit when it cancelled the Hanjin Capesize (Hull SN00269).

114.    When defendant Sceins *cancelled* the options on the ice class ships in early 2016, Defendant Sceins Capital not only lost the "nice cushion" of $15 million, it also lost the deposits. Piecing together what little information has actually been provided by Sceins Capital, the deposits on the ice class ships were at least $16.85 million. At a minimum, defendants Sceins Capital, SMH Management, GSMI Management, Sceins Institutional Services and GSMI have experienced a realized loss of $16.85 million.

115.    The *GSMI's January 2016 Year End Fleet/Market Update, page 3,* confirms that

Defendant Sciens Capital lost the deposit when it cancelled the contract on Hanjin

Capesize (Hull SN00269), *see January 2016 Year End Fleet/Market Update, pages 20

& 23*, which had been carried on the "Fleet Summary Detail" at a value of $57.3

million.  *See September 2015 Fleet/Market Update, page 18*.  Thus, asset values

dropped demonstrably.  In the same January 2016 update,  Sciens Capital reported

that "one additional vessel has been cancelled to date, with no cost to the Fund, as

Vessel Manager absorbed loss." Therefore, defendant Sciens Capital misrepresented

what had actually happened with the deposit.

116.    In February 2016, as part of its new strategy to obtain "opportunistic

acquisitions," GSMI added only one more ship, the Malena, of which the Fund would

own **only 20%.**  *See May 2016 Quarterly Update, page 14*.  Therefore, the Vessel

Manager did not absorb any loss at all, since some of the deposit(s) were rolled into

the Malena, valued at $34.60 million, for which the Defendant GSMI Fund had only a

20% ownership interest.  The disclosures contained material omissions about

financing of this ship, use of deposits, its value, and conflicts of interest.

117.    The AVIC Ice Class  (Hull B82-4) ship, which was among the three original

ice class ships reported as part of the new builds, but which was cancelled under the

option (discussed below), reappeared on the Fleet Sheet in the May 2016 Quarterly

Report as having been acquired in March 2016, but then scheduled for delivery in

March 2017 (instead of 2016 as originally reported).  Even though it is the same

ship on which GSMI had previously deposited at least $6.5 million, (*see May 2015 Quarterly Update, page 39)*, the Fund would now own **only 50%** of that ice class ship, leveraged at 55%.  (*See May 2016 Quarterly Report, page 1*4.)  The most recent Update for Q2-2016, as noted, reported that the delivery of this ice class ship was postponed until April 2017 "while sellers credit and a discount price was agreed." (*See GSMI September 2016 Quarterly Update, page 7.* )

118.    The deposits on the three (3) ice class ships (known to be at least  $11.28 million in 2014 and $2.786 million in 2015) were rolled into just 50% of one ice class, which was one of the original ice class ships that already had been under contract.

119.    By letter dated May 8, 2015, Defendant Rigas reported that "the Fund has raised $145.6 million in commitments and has purchased seven vessels, and a one half participation in an eighth vessel," which the quarterly update showed as M/V Phar Lap.  However, based on the Sciens and GSMI Quarterly Update for September 2016, the Fund's ship portfolio has dropped to five (5) ships, only three (3) of which are owned outright and for two (2) of which the Fund only has either a 50% or 20% ownership interest. Total capital expended on those five (5) ships is **$176.5** million with over 50% financed with loans; and, the Defendant GSMI has spent or committed to spend $13.93 million on the remaining ice class (AVIC Hull B82-4).

2.    GS Holdings

120.    As noted above in paragraph 16, Defendants used an "intermediate" holding company into which it deploys cash.

121.    Defendants Rigas, Standen, Loucopoulos, Sciens Capital, the other Issuer Defendants and the Advisor Defendants also have used special purpose vehicles ("SPVs") to acquire and hold ships, one SPV for each ship acquired. However, for each of these SPVs, there is no disclosure about how much each ship cost, the debt incurred, the running costs, or any financial statement information.

122.    Instead, GSMI's financial statements for year-end 2015, note 8, which refers to the Marshall Islands "Investments," simply states that the investments in Defendant GS Holdings LLC, have **shrunk** in 2014 from $98,236,003 to $81,838,815, and in 2015 from $119,486,722 down to only $46,582,157.

123.    The mystery surrounding the accounting and use of funds through these SPVs illustrates the lack of transparency available to investors in a structure where all aspects of accountability for operations are hidden from view.

       3.    <u>Summary Of Current "Levered" Portfolio</u>

124.    Through leverage, Defendants GSMI/Fund, GS Holdings or one of the SPVs have incurred debt of $93.5 million and used **$83 million in cash** to buy the portfolio of the five (5) ships for $176.5 million. *See September 2016 update, page 12.* The financial statements through December 2015 show cash of only $7.5 million and accumulated management fees and expenses of $3.8 million. Thus, the amount raised ($104.9 million in 2014 capital contributions, plus the $21.25 million from the  2015 fourth /final closing contributions, plus $5.85mm raised in 2016, for a total of **$132 million**) exceeds the amount spent on the ships.

125.    There is no little and vague explanation for the unaccounted difference in funds.  There could be from $29 million to $38 million in investor funds that have been squandered and left unaccounted for by the Defendants.   There is no disclosure of the extent of realized losses because the truth of what is happening is hidden behind an intermediate holding company and Marshall Island SPVs.  To the extent these missing funds, , which are unknown at this time, include additional fees, financing costs, lost deposits and losses on vessel leasing, such losses and fees should not be reported as "unrealized" losses," as Defendants claim.

**D.    Operating Expenses and Losses**

126.    Defendant GSMI used investor funds to cover Management Fees and Company Expenses, which it defined to include tax, legal, accounting fees, liability insurance, and expenses related to the "purchase, sale, holding and operational and transmittal of investments."  Those services were provided by defendant Sciens Institutional Services, the Administrator, an affiliate of Defendants Rigas Sciens Capital, SMH Management, GSMI Management, and GSMI.  It also used investor funds to pay "Operating Subsidiary Expenses," which referred to investment activities and expenses of each of its special purpose limited liability companies in the Marshall Islands, including brokerage commissions, custodial fees, borrowing expenses, research and due diligence expenses, travel costs, registration and qualification for sale of investments, transfer taxes, expenses related to crewing, repairs, dry dock, and vessel maintenance, legal fees, and costs associated  with regulatory and compliance activities, such as anti-money laundering oversight. It is unclear whether expenses incurred by GUS area also being paid by Defendant GSMI, the

Fund.

127.    In June 2014, defendant Sciens Capital projected operating expenses (Opex costs) minus debt at $7,000 per day.  Sciens also stated that, by deploying $25 million equity and $30 million debt to purchase a capsize ship, another $7,000 would be added to Opex.  Thus, Opex would be about $14,000 per day.

128.    Defendant GSMI issued financial statements for March 31, 2014 through December 31, 2014, which Plaintiff first received on or about n June 16, 2015.  The financial statements for January 31, 2015 through December 31, 2015 were not issued by Defendant GSMI until and not received by Plaintiff until June 2016.

129.    As the updates issued by defendant Sciens and financial statements show, however, these projections simply have not borne out. The financial statements suggest an entirely different picture. Operating loss is reported at $18,216,401 for 2014 (March 6 through December 31, 2014) and $58,497,544 for 2015.

      1.    Unrealized Losses

130.    The September 2015 Quarterly report in a section called "Valuation Evolution" stated that, although there was an increase in asset values from Q1 to Q2 in 2015, the capital accounts reflected a **unrealized los**s of approximately $6 million during the same period  "primarily due to delivery of M/V Secretariat during Q2 and the use of completion accounting."

131.     There is no disclosure and explanation of these and other unrealized losses.

132.    There also is no explanation of how completion accounting method on which Defendants rely caused a drop in value of Hull 2965 from $61.5 million at acquisition date to $53.25 million at delivery.

133.    Defendants Rigas, Standen, Loucopoulos, Sciens Capital, the Issuer Defendants and the Advisor Defendants have masked the accounting treatment of losses at various levels of the corporate structure so as to mislead – and omitted to inform – Plaintiff and other participating shareholders as to realized versus unrealized losses.

      2.    <u>Management Fees</u>

134.    The POM represented that defendants GSMI and the GSMI Management, as Portfolio Manager, would use its management fees to pay for the services provided by Sciens Institutional Services, the Administrator.  (*See POM, at 8*).

135.    Later documents reveal a different story.  From 2014 to June 2016, management fees were payable quarterly in advance, even though the defendants employed an invest "all at once investment strategy."  Once the contracts were executed, there was nothing more to do. There were only two ships allegedly in the water in 2014 and only two more in 2015.  The June 2015 update also shows another ship (the Malena) delivered in February 2016 and one more to come in February 2017. They were simply in the shipyard being built.  There was nothing to be managed.

136.    Further, whereas the POM noted that management fees would be 1.3% of net assets valued at <u>cost</u> during the Commitment Period, (*see POM, at 21),* note 9 to the Fund's year-end 2015 financial statements described the payment of management fees based on <u>capital commitments</u> of Class A and C participating shareholders. Thus, contrary to the POM, management fees were charged on <u>committed</u> money,

even before it was received and put to use. As stated in paragraph 89 above, later documents show that management fees are also charged on borrowed funds.

137.    At the time of the September 2015 fourth and final closing, there was also improper backdating of management fees.

138.    According to note 9 of the Fund's year-end 2015 financial statements, after the Commitment Period, which ended September 25, 2015, management fee will be charged at a rate equal to 1.3% per annum of NAV, with all investments valued at cost, without giving effect to depreciation, though defendants have repeatedly marked down ship NAV when it suited their needs to raise capital.

139.    Accordingly, defendants Rigas, Standen, Loucopoulos, Sceins Capital, the Issuer Defendants, and the Advisor Defendants have pursued a janus-faced approach to management fees. These defendants believed it to be acceptable to reduce ship values to raise more capital and threaten dilution of shareholdings; but, when it came to paying themselves management fees, the defendants have found it acceptable to base that fee on capital committed and even borrowed funds and then further, after the Commitment Period, to base those fees on historical cost – without effect to reduced NAVs.

## VI.    CLAIMS FOR RELIF

### COUNT I

**VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934
AND RULE 10B-5 THEREUNDER
By
Rigas, Standen, Loucopoulos, GSMI, GS Holdings, and Sciens Institutional
Services
(The "Issuer Defendants")**

140.    Plaintiff repeats and re-alleges paragraphs 1 through 139 above as if fully set forth herein.

141.    The Private Equity Investment Opportunity publications, the Investment Proposals, Market Updates and Quarterly Updates – all were sent to prospective and current investors through interstate commerce and were issued by Sciens Capital and under the Sciens Capital name. Plaintiff presumes and relies on the presumption that these publications and those mentioned elsewhere in this Complaint were the collective work of these defendants, since they had direct involvement in the operations of the business of Defendants Sciens Capital, GSMI and its affiliates. Indeed, in the Sciens Capital Investment Proposals, Market Updates and Annual Reports, a note at the bottom of each age routinely states that the "[i]nformation contained herein is the property of Sciens Capital Management and its affiliates." though a few later ones (May 2015 and later) use the same footnote but refer to Defendant Golden Sciens Marine Investment, Ltd and its affiliates."

142.    Plaintiff relies on the same presumption for preparation and issuance of GSMI's financial statements for the period March 31, through December 31, 2014 and for the year January 1, 2105 through December 31, 2015.  They are the financial statements of management of GSMI and allegedly include the operations of GS Holdings and the SPVs.  Accordingly, while unknown at this time, Plaintiff alleges that these financial statements are the collective work of all the Issuer [2] and

_____

[2]  Unless otherwise alleged, the "Issuer Defendants" refers to and includes Rigas, Standen, Loucopoulos, Sciens Capital, GSMI and GS Holdings.

Advisor [3] Defendants.

143.    The "Issuer Defendants," as well as GSMI's investment committee, contrary to

the fiduciary duties it owed Plaintiff, engaged in devices, schemes and artifices to

defraud, made untrue statements of material facts or omitted to state material facts,

and engaged in acts, practices and courses of business that operated or would

operate as fraud or deceit upon Plaintiff and participating shareholders.  Through

these practices and misrepresentation and omissions, the Defendants both

concealed and misstated the risks associated with this investment program and

scheme.

      1.    <u>GS Holdings</u>

144.    There has been inadequate disclosure about GS Holdings.

145.    GS Holdings was not mentioned in the POM. Nor was it mentioned in the

October 2014 Investment Proposal, nor in any of the quarterly updates during 2015

and 2016.  The May 2015 Annual Repot and Fleet/Market Update simply refers to a

GS Holdings as an "intermediate holding company" to which investor capital has

been "deployed." *See Sciens May 2015 Annual Report and Fleet/Market Update, page*

*30.*

146.    GSMI's financial statements for year-end 2014, issued in June 2015, and the

financial statements for year-end 2015, issued in June 2016, showed a new entity –

Golden Sciens Holdings, LLC ("GS Holdings"), identified elsewhere as an

"intermediate" holding company, which has been the recipient in 2014, 2015 and

---

[3]  Unless otherwise alleged, the "Advisor Defendants" refers to and includes Rigas,
Standen, Loucopoulos, Sciens Capital, SMH Management, GSMI Management, and
Sciens Institutional Services.

2016 of investor funds.  *See GSMI Financial Statements for the Period March 6, 2014 Through December 31, 2014, page 3; and, GSMI's 2015 Year-End Financial Statements, Schedule of Investments, page 3, and note 11, Subsequent Events.*

147.    Defendants claim that there have been no realized losses to date on the vessel purchase and chartering, even though there are likely realized losses between 22% and 30% of all GSMI investor funds "deployed" or invested into GS Holdings, LLC.

2.    Capital Contributions

148.    The notes to the financial statements reveal a capital structure quite different from the one represented to and expected by Plaintiff.   At the outset, in order to induce and convince Plaintiff to invest, he was invited to invest "alongside" Sceins. The implication and expectation was that Sciens Capital itself would assume a large investment position in the Fund, on information and belief to be approximately $15 million. However, the financial statements show differently.

*(a)    Initial Capital Contribution*

149.    The Issuer Defendants also have misrepresented whether they actually made any capital contribution when the GSMI Fund was started or even during the fourth and final close in September 2015.

*(b)    In Kind Contribution*

150.    There was inadequate and untimely disclosure of the non-cash in-kind contribution during one of the closings in 2014 by one the affiliates of the Portfolio Manager.

151.    That non-cash contribution for Class B participants purportedly was a contribution of "shares of vessel received in lieu of payment of Participating Share Subscriptions," rather than cash for share subscriptions, which is a materially false ands misleading statement.  It was most likely a contract, and not actually shares of any vessel, that was allegedly transferred by the Sponsor Group valued on an undisclosed basis. (*See GSMI's Audited Financial Statements, page 6, issued June 5, 2015.)*  Indeed, according to GSMI's financial statements for year-end 2014, defendant Sciens Capital and the Vessel Manager used the contract for Hull 2695 and treated it as a contribution of a vessel in lieu of payment for participating share subscriptions in the amount of $21,852,000 at year end. (*See GSMI Financial Statements for the Period March 6, 2014 Through December 31, 2014,  page 6).*

152.    This non-cash contribution, the value of which is unknown at this time but likely valued at $30 million and well in excess of the true equity value of the contract, allowed the Sponsor Group to receive distributions in cash from the GSMI Fund as new investors contributed.  This so-called "contribution" deprived the GSMI Fund of at least $21.85 million in cash for working capital.  Through this device and contrivance, the  Sponsor Group and Issuer Defendants were able to recoup almost all of their initial investment deposit  in the so-called "warehoused" vessel.

153.    For this non-cash contribution, the Sponsor Group, as Class B shareholders, was credited with a cumulative  "net capital" contribution of $22,819,342 on the year-end 2014 financial statements.  (*See GSMI Financial Statements for the Period March 6, 2014 Through December 31, 2014, page 15).* This $1 million discrepancy also is not explained in the financial statement, and none of this information  --

which still omits material information -- was made available to Plaintiff until the receipt of the year-end GSMI financial statements accounts in June 2015.

154.    It also was inaccurate to state that the Issuer Defendants GSMI acted for the "benefit of its stakeholders," awarding an extra $5.5 million in participating shares to GUS and Sciens Capital, for a ship that GSMI had valued at $56 million but caused the GSMI Fund to pay $61.5 million to acquire.

155.    The POM and the marketing materials neither disclosed how the valuation of that ship (or contract on a ship) was performed, nor that 20.8% of capital contributed (*i.e.,* $21,852,000 of $104,932,677) would not be cash.

156.    The Issuer Defendants' commitment to and investment in this project may thus consist entirely of a vessel contract, in whole or in part.  The Issuer Defendants have capitalized this project solely with the funds of investors, who they have misled all along the way.

          3.     Valuations of Assets

157.    The Issuer Defendants and the Advisor Defendants engaged in devices and schemes to defraud, made untrue statements of material facts or omitted to state material facts and engaged in acts, practices and courses of business that operates or would operate as fraud or deceit upon Plaintiff and others when valuing various assets.  Through these practices and misrepresentation and omission, the Defendants both concealed and misstated the risks associated with this investment program and scheme.

          (a)     *Valuation of Ships*

158.    The POM stated that valuations shall be determined by GSMI's Board of

Directors "in good faith as determined in accordance with the Company's valuation

policies and procedures "as adopted from time to time." (*See POM at page 20-21.)*

The POM also stated that the "[f]air value for shipping assets either contributed to

or acquired by the Company will be determined in accordance with the following

procedures: The Company will obtain a valuation of the assets from two

independent brokers recognized in the shipping industry generally as experts with

regard to valuing shipping assets." (*See POM, at 6.)*

159.    The notes to the year-end December 2015 financial statements – which were

not received by Plaintiff until June 2016  – further state that GSMI has established a

valuation process and procedures designed to ensure that fair value measurements

are appropriate and reliable, that they are based on "observable inputs" where

possible, and that GSMI's approach to valuation is consistently applied and the

assumptions and inputs are reasonable.  The notes to the financial statements

further state the GSMI has established processes to ensure that the valuation

methodologies, techniques and approaches for Level-3 investments are fair,

consistent and verifiable. The responsibility for valuing Level-3 assets is placed in

the hands of a "Valuation Committee," chaired by Defendant Rigas. (*See GSMI*

*Financial Statements for Year End 2015, notes, page 12.)*  Despite these

representations, though material, the Issuer Defendants resorted to "unobservable

inputs" for Level 3 assets.  (*See GSMI Financial Statements for  Year End 2015, notes,*

*page 11.)*

160.    Defendants have not disclosed who the independent brokers are, what procedures the Valuation Committee follows, and what criteria are used to value shipping assets in a "fair, consistent and verifiable" manner.   The value of the shipping assets, which moved up and down as the Issuer and Advisor Defendants deemed beneficial to them, is material and critical information, but the Issuer Defendants have failed to reveal this information when they had a duty to reveal it.

161.    The officers and directors of GSMI, including those who sat on the investment committee, not only breached this duty, but also engaged in fraud and deceit. They have aggressively marked down the NAV of ships – beyond any market conditions - when it suited their needs.

162.    The Issuer Defendants also engaged in the practice of increasing the value of ships early in the program to make it appear that the Fund was doing well, but then, when advantageous to Defendants, started devaluing the ships to raise added capital and even dilute existing participating shareholders.

163.    As alleged in paragraphs  36 and  98 the value of the Hyundai built ship (Hull 2695) was marked up from June 2013 at $50 million to an NAV of $56 million in March 2014 and then acquired by the Fund at $61.5 million the same month.  But, by end of Q3 for 2014, the same ship was devalued to $60 million and by year-end December 2014 devalued to $55.5 million, and by June 2016, one year later, dropped in value to only $38.5 million.  Defendant Sciens reported that the Fund's poor performance was due largely to the value reduction of this ship (Hyundai Hull

2695) and another ship.  There was no disclosure for the bases for this devaluation –
either the methodology or the policies and procedures for doing so.

164.    The two large markdowns in the value of the vessels was fraudulent,
especially when only two ships were secondhand and the remainder were all new-
builds scheduled for delivery in June 2015, February 2016 and February 2017.

165.    As alleged in paragraphs  130 and 132, the September 2015 Quarterly report
in a section called "Valuation Evolution" stated that, although there was an increase
in asset values from Q1 to Q2 in 2015, the full appreciation in the ship values may
not be reflected in Fund's capital accounts, and the capital accounts also reflected a
unrealized loss of approximately $6 million during the same period  "primarily due
to delivery of M/V Secretariat during Q2 and the use of completion accounting." (*See
GSMI Fleet/Market Report, September 2015, at 2).*   There is no explanation of why or
how M/V Secretariat dropped in value by time of delivery, and there is no
explanation of how completion accounting method justifies a drop in value from
$61.5 million at acquisition date to $53.25 million at delivery.

166.    The timing of these valuation changes was tied to capital calls, which
required participating shareholders and new shareholders to contribute more
capital to make up for shortages in asset values.  Indeed, the Issuer and Advisor
Defendants aggressively marked down the NAV of the ships prior to the fourth and
final capital raise – using "unobservable inputs" – in order to attract new money,
including insider money to the detriment of existing investors.  This practice was
contrary to representations in the POM that stated" "For purposes of determining
the proportionate interests of Additional Shareholders and Existing Shareholders in

Investments that are held by the Company at the time of a <u>Subsequent</u> Closing, the Investments generally will be <u>valued at cost</u>."  (*See POM, page 17.)*  The Issuer Defendants violated this representation when they engaged in the fourth and final close during the spring, summer and  fall of 2015 , and by doing so, caused dilution of participating shareholders' interests.

> *(b)     Valuation of Options*

167.    As discussed in paragraphs 36 and 101 above, the POM stated that the Vessel Manager held options for three ice-class ships, which the POM stated would be contributed to the Company at "nil." (*See POM, at 6).*

168.    The Issuer and Advisor Defendants engaged in a fraudulent scheme, device and artifice to defraud and fraudulent acts, practices and courses of business by valuing the options on the three (3) Ice Class ships as worth more than the zero ("nil") paid for them, as represented by the POM. Based on some undisclosed theory, by November 2014 Sciens Capital  "tacked on" an additional 13% value to each of the three ice class ships, marking them up from $27.86 million to $31.5 million, even though during this period the ships were illiquid and were still under construction, and other ships in the portfolio were being marked sharply lower. Contrary to Mr. Wilkinson's assertion, as stated in paragraph 47, there was no $15 million profit cushion from these options.

169.    The disclosures were inadequate and conflicting.  There was no disclosure about when the option was obtained, when exercised, for how much, for whose benefit, what ship (or ships) was obtained at exercise, for what price; or, conversely, when the options were cancelled and why, and what happened to the funds used to

pay for the three (3) ice class ships reported on the Fleet sheet in 2014 worth

$27.86 million each and scheduled for delivery in 2016, and what so-called "credit"

was obtained for the money spent, including one Ice Class ship only to be 50%

owned by the Fund.   It all has been mudded, and hidden, by little and inconsistent

disclosure.

*(c)     Affiliate "Warehousing" Transactions*

170.    As stated above in paragraphs 97 and 98, Defendant Sciens Capital and

Golden Union Shipping, or GUS, the Vessel Manager, sold a warehoused ship – or

purchase contract to acquire a ship  – into the Fund at inflated prices, garnering

themselves a $5.5 million profit using participating shareholder money, even though

the POM provided that any ship or contract to acquire a ship would be contributed

at its "then current value." *(POM, at 23)*.

171.    The terms of this contract, though it had been in existence since June 2013,

was not disclosed in the POM or the quarterly updates.

172.    Nor was the gross pricing disparity of this inter-party, or related party,

transaction adequately disclosed, though it was between undisclosed affiliates

partners, including shareholders of the Portfolio Manager, and done to the

detriment of the Fund's participating shareholders using their capital.   The true

value of the ship was falsified on the books of GSMI and on its year-end financial

statements.

*(d)     Joint Venture Ownerships of Vessels*

63

173.    In its latest *September 2016 Quarterly Update, page 12*, defendant GSMI identifies partial ownership in three (3) vessels: 50% of a Capesize  (M/V Phar Lap), 20% of a capsize (M/V Malena), and 50% of an Ice-Class 1B new build (AVIC Hull B82-4) yet to be delivered.  The parties to these joint ventures are undisclosed.

174.    However, there has been no disclosure whatsoever regarding the terms of any of these transactions, in direct contradiction to the GSMI's  "Summary of Investment Terms" concerning Corporate Governance that stated: "No related party vessels will be sold into the fund beyond initially warehoused deals."  *(See December 2013 'Private Equity Investment Opportunity- Golden Sciens Marine Investments.)*

      4.    <u>False and Misleading Projections</u>

175.    In June 2014, Defendants Rigas, Sciens Capital, SMH Management, GSMI Management and GSMI represented that defendants would make investments relying on overall projections or specific projections of varying underlying assumptions, including charter rates, operating expense, interest rates or derivative costs developed by the Investment Manager and Portfolio Manager.

176.    The Issuer and Advisor Defendants represented that any assumptions would have to take into account vessel prices, charter rates and market outlook.  The investment itself would ultimately be valued at a present value of an earnings stream. And, most importantly, these defendants represented that, in order to ensure a steady and stable earnings stream, rates would be locked in ahead of time with forward contracts. They did not do so, and, by 2014, charter rates had gone down.  Indeed, there was no $15 million profit cushion as Mr. Wilkinson had asserted in his email of June 24, 2014.

177.     These false and misleading material projections included both the upside

potential and downside protection. Through these misrepresentations and

omissions, the Issuer and Advisor Defendants both concealed and misstated the

risks associated with this investment program and scheme.

178.     *Upside Potential*.  The upside potential would come in the form of immediate

cash flows and capital appreciation of up to 20%.

179.     In addition to immediate cash flows from revenue, Defendants assured

capital appreciation from the vessels, because they were offering an opportunity to

invest in dry bulk vessels at a unique entry point that provided for "direct

investment at the vessel level with combination of annual yield  (5% - 10%) and

value appreciation ( > 20%)."

180.     The October 2014 *Investment Proposal* Defendants further claimed that the

vessel assets "can be traded in the secondary market which is strong and liquid."

The *Investment Proposal* also claimed as part of the exit strategy to monetize the

investments that "individual vessel sales, fleet sale, and public market exist" with

individual and fleet sales at 100% exist and with a worst-case scenario of gross IRR

of approximately 10%.

181.     Such claims for Level-3 assets, especially ones that have not even been built,

are specious.  Vessels are illiquid, not liquid, as asserted; and, the exit strategy

trumpeted asset appreciation.  Nowhere did it mention a continued quarterly write

down of net unrealized depreciation that would absorb 70% of invested capital.

182.    *Downside Protection*. The Issuer and Advisor Defendants represented that downside protection would be provided and profits protected by forward chartering that  "will already be locked in," which Plaintiff was told was the "**absolutely key to and at the heart of this investment opportunity**..." and which was thus a material term of the investment.

183.    Defendants never entered into the promised and crucial forward chartering.

184.    The POM was clear that it fell on Defendant GSMI Management, as the Portfolio Manager, to employ the vessels profitably. *(See POM, at 29.)*

185.    *Liquidity.*  In their *September 2016 Quarterly Update*, Defendant Sciens Capital trumpeted how GSMI's liquidity was "well managed" due to "strong support from shareholders and banks."  However, this so-called well-managed liquidity program was in actuality a function of mandatory capital calls on participating shareholders, reducing or eliminating liquidity at the corporate levels, pushing off current debt service in exchange for balloon payments later, and cancelling contracts on valuable assets that were acquired using investor capital.   Thus, the Issuer and Advisor Defendants, in allegedly managing liquidity, have instead lost deposits, lost interest payments, lost potential revenue on high quality ships, and lost capital appreciation on future liquidations  – the exact opposite of Sciens Capital's stated investment objectives and business plan.

5.      Fourth and Final Closing.

186.    As stated in paragraphs  159 and 166, the Issuer and Advisor Defendants

aggressively marked down the NAV of the ships prior to the final capital raise using

"unobservable inputs" [4] in order to attract new money including insider money to

the detriment of existing investors.

187.    As described above in paragraphs 50 through 83 above, during March, April

or May 2015, the Issuer and Advisor Defendants first sought to raise funds for its

fourth and final close, but could not obtain sufficient interest from participating

shareholders.   When the fourth and final closing did occur in September 2015, it did

not raise the funds claimed and represented by these defendants.

188.    As stated in paragraph 59 above, by letter in June 2015 Defendant Rigas

sought additional capital of $45 million.  However, the financial statements for year-

end 2015 show total capital contributions of only $23,725,522.

189.    What is evident is that the fourth and final closing, rather than raising new

funds, was predominantly used to "pay back" existing investors in a forced dilution

at a reduced NAV.  This evident lack of participation in the fourth closing from

existing shareholders who protested, was so widespread that defendant Rigas was

forced to impose an impromptu capital call on November 30th in order to claw back

some of the repayment from investors. The unwillingness to disclose these realities

to investors was highly deceptive.

---

[4] *See GSMI Financial Statements for year-end 2015 and For Period March 6, 2014 to
December 31, 2014, section 3.3 Fair Value Estimation* ("fair value hierarchy has the
following levels:  … Level 3 inputs are unobservable inputs that have been applied in
valuing the respective asset.")

190.    The Sponsor Group was treated differently and favorably.  In May and August 2015, Plaintiff was obliged to, and did, make capital calls totaling $88,500 from a committed capital amount of $750,000, plus received a request for an additional $231,711 for the fourth and final closing, which he declined to pay.  The Sponsor Group had a total <u>commitment</u> of $32,165,000, (*see GSMI Financial Statements for the Period March 6, 2014 through December 31, 2014, page 15, note 9, regarding Class B shares),* which rose to $41.9  million at the time of the fourth closing in September 2015.  Accordingly, the total capital calls required of the Sponsor Group, including the fourth closing in 2015, amounts to **$13.5** million.  That the 2015 GSMI accounts show Class B capital contributions of only **$8.423** million, *see GSMI Financial Statements, page 5, (net capital contributions of Class B shares)*, is indicative of the preferential treatment accorded the Sponsor Group to the detriment of the investors.

6.    Dilution of Participating Shareholders' Interests During Fourth and Final Close in September 2015

191.    Defendants engaged in a fraudulent device, scheme and artifice to defraud and acts, practices and courses of business that operated or would operate as a fraud or deceit upon the Plaintiff and other participating shareholders during the period leading up to and at the time of the fourth and final close in September 2015.

192.    More specifically, as described in paragraphs 67  through  86 above,  when conducting the fourth and final close, Defendants engaged in dilutive financing practices  – the sale of equity at a prices lower than the previous valuation of the company's assets  – which operated as a fraud or deceit on existing participating

shareholders and by which they breached their fiduciary duties to existing shareholders.

193.    Since Defendants were unable to obtain sufficient interest on the part of the existing participating shareholders to raise sufficient capital for the fourth and final closing, the Issuer and Advisor Defendants engaged in the equivalent of a preferential rights offerings for the benefit of the insider Sponsor group, which diluted the share values of existing shareholders.

194.    In the section of the POM describing "subsequent closings," the POM stated that, "[f]or purposes  of determining the proportionate interests of additional shareholders and existing shareholders in investments that are held by the Company at the time of the Subsequent Closing, the investments generally will be valued <u>at cost</u>." (*POM, at 17.)*  The Issuer Defendants disregarded this material representation, which is intended to protect investors from marked  write-downs in assets values and sales to predatory investors to the detriment of existing investors.

195.    Despite the lack of authority to do so, the Issuer and Advisor Defendants issued additional shares (30,787 shares in number) in 2015 (*see GSMI Financial Statements for Year-End for 2015, page 16)* while simultaneously – and contrary to the representations in the POM to value investment assets at cost – writing down the NAV on the vessels forming the investments.

196.    Between the time when defendant Rigas first contacted investors in June 2015 about a fourth closing and the closing date in September 2015, defendant Rigas, Sciens, SMH, GSMI Management and GSMI further adjusted the NAV downward in a last minute attempt to raise additional funds before their window of

opportunity, as defined by the POM, closed. Contrary to the statements made by Defendant Rigas in his written communications (*see* paragraphs 59 and 63 above), the defendants also made false and misleading claims as to use of funds raised; and, contrary to the representations made by Ms. Santos (see paragraphs 67 and 76 above), Plaintiff was mislead as to the level of interest on the part of the Sponsor Group and other investors.

197.    The fourth and final closing was a fraudulent practice. Not only did defendants likely not receive the funds by the time of the stated deadline of September 25th had passed, but defendants were also forced to implement a capital call for funds that needed to be returned to existing shareholders. In reality, much of this fourth capital raise was used to buyout existing shareholders including the Plaintiff at a sharply reduced price of assets or NAV.

198.    The fourth and final closing in September 2015 should have produced a realized loss from the <u>dilution</u> of shares.  In being diluted, the existing shareholders who did not participate in the fourth closing were effectively selling at a price lower than cost a piece of each vessel in which they had an ownership interest. A 21.5% dilution means that the ownership share was reduced to 78.5%. The distribution from that exchange of ownership interest was reflective of a transfer of ownership at a significantly reduced asset valuation (-28%), not at cost. Accordingly, the issuance of new participating shares by the Issuer Defendants to reflect this fourth closing disguised the realization of that loss, a loss that can never be recovered.

7.     Losses, Lost Deposits and Missing Funds

199.    Defendants Rigas, Loucopoulos and the other Issuer and Advisor Defendants

continued to maintain a rosy picture while at the same time withholding material

information about what was actually happening with the shipping assets and its

business operations.  Through these misrepresentation and omissions, the

Defendants both concealed and misstated the risks associated with this investment

program and scheme.

200.    None of the ongoing Sciens Capital updates nor either of GSMI's 2014 or

2015 annual financial statements provide a detailed description or an explanation of

the vessel purchases and ships owned, nor a description of the losses that have been

incurred as a result of lost deposits on cancelled contracts, nor the ongoing

operational losses, nor the excessive fees earned by the Issuer and Advisor

Defendants and their affiliates and the shipyards.

201.    Defendants Rigas, Sciens, SMH, GSMI Management and GSMI used GS

Holdings as an offshore intermediate holding company into which it funnels

investor cash, while at the same time withholding pertinent financial information

from GSMI shareholders about GS Holdings and its downstream SPVs and treating

losses as unrealized.  For example, if the "average daily finance and loan

amortization costs," (*see September 2016 Quarterly Update, pages 14-16),* are being

made from GS Holdings, LLC – which, as "owner" of the ships, is most likely the party

to the loan documents, (*see POM, at 23"Borrowings"* – those payments should be

reflected in operating profit and loss and be reflected as realized (and not

unrealized) losses.  This material information is being withheld from Plaintiff and other participating shareholders.

202.    As alleged in paragraph 125 above, Defendant Sciens and its affiliates have experienced realized losses from between $29 million and $38 million, and many investors have experienced the realized loss from the dilutive financing that occurred during the fourth and final close.   Yet Defendants Rigas, Loucopoulos and the other Issuer Defendants of the Fund have failed to itemize these losses in the financial statements of GSMI  and  falsely reported such losses as "unrealized, " presumably to lull investors into believing that these losses can somehow later be recovered.  Defendants used GS Holdings, the so-called "intermediate" holding company level, to disguise these losses.

203.    In defendant GSMI's March 31, 2016 account statement to Plaintiff, Defendants Rigas, Sciens, SMH, GSMI Management and GSMI indicated that, out of a commitment by that date of $591,047, Plaintiff was sitting on unrealized losses of $408,802, has no realized losses, has deductions for management fees of $20,312, and has incurred additional fund administration expenses of $3,768.  These representations omit material information about the true nature of the losses incurred  by Plaintiff on his investment.  These purported financial statements do more to conceal the real loss than to disclose it, when these Issuer Defendants had a duty to disclose.

> 8.    False and Misleading Financial Statements

204.    The year-end 2014 and 2015 GSMI financial statements are false and misleading or omit to state material information, including capital contributions by

Sciens Capital and the valuation of the contributed ship or purchase contract for ship, issuance of shares to the Sponsor Group, distributions to Sciens Capital, and realized losses from all aspects of the investment program and business operations.

205.    The Issuer Defendants' fraudulent practices and materially misleading statements and omissions as alleged above in Count I occurred in connection with the purchase and capital contribution payments by Plaintiff of his Participating Shares.

206.    Plaintiff relied on the oral and written statements made to him during the Obligation Period and the Commitment Period and is presumed to have relied on the failure to state material information.  But for these material misrepresentations and omissions, Plaintiff  would not have committed to the several capital contributions he was required to make or entered into this securities  transaction, which has proved to be to  his detriment.

207.    The Issuer Defendants caused Plaintiff's loss by engaging in the fraudulent and deceptive acts, practices and courses of business alleged in this Complaint, including arbitrary valuation practice, a non-cash (in kind) contribution at an artificially inflated value, dilutive financing practices, gross mismanagement of business operations and loss of investor funds, payment to themselves of distributions and other fees that depleted investors funds, failure to lock in forward charter rates, and affiliated transactions.  These acts and practices not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused Plaintiff's loss and injury because the risk of his investment loss from these concealed fraudulent and deceptive business practices were within the zone of risk

concealed by these business practices as alleged in this Complaint, without which

Plaintiff would not have invested initially or continued to make capital

contributions.

208.     The Issuer Defendants also caused Plaintiff's loss by making materially

misleading statements on which Plaintiff relied and by omitting to state material

information on which Plaintiff is presumed to have relied when agreeing to commit

to and meeting the capital contribution schedule demanded of Defendants – in the

absence of which Plaintiff would not have invested in this private equity program.

The material misstatements included up and down valuations when it suited these

defendants, warehousing transactions  (contracts to acquire a Capsize ship and

three options to acquire Panamax ice class ships),  loss of deposits on ships,  dilutive

financing  practices that gave preferential treatment to the insider Sponsor Group

(stakeholders) to the detriment of other participating shareholders like Plaintiff,

loss of profits by failing to enter into forward charter contracts – represented to be

crucial to and the heart of the investment program  and failure to pursue a gradual

acquisition policy.  The material omissions included failure to disclose – when there

was a duty to do so – lost deposits, effect of cancelled contracts, "realized" losses

(including debt) for each SPV "owning" each of the ships, financial information

about GS Holdings,  and  various levels of transaction fees, all of which were

undisclosed and unaccounted for, hidden as they were behind an intermediate

holding company and off-shore SPVs.  These material misrepresentations and

omissions not only had a foreseeable consequence on Plaintiff's investment, but also

proximately caused Plaintiff's loss and injury because the risk of his investment loss

from these material misrepresentations and omissions were within the zone of risk concealed by the material misrepresentations and omissions as alleged in this Complaint, without which Plaintiff would not have invested initially or continued to make capital contributions.

209.    Defendant Rigas,  Loucopoulos , the board of directors of GSMI and Sciens Institutional Services that ran day-to-day operations of GSMI have acted with *scienter* (*i.e.,* with intent to deceive or recklessly) not only by engaging in the fraudulent acts and practices alleged in this Complaint, but also by failing to disclose the whole truth  when they had a duty to do so about, among other things, the GSMI shipping acquisitions, payments and deposits, capital contributions by Sciens throughout  the Commitment Period, distributions,  financial information provided to participating shareholders, and misleading marketing updates.

210.    These Defendants also acted intentionally or recklessly because they knew or had access to information, which they failed to disclose when they had a duty to do so, and were obliged to monitor all information about capital contributions (both monetary and in-kind contributions), assets under management (AUMs), random fluctuations in valuations, lost deposits, profits and losses of GS Holdings and the SPVs, ship cancellations, and improper affiliated or related party transactions. These defendants not only deliberately engaged in illegal conduct, as alleged in this Complaint, but they also benefited from the September 2015 fourth and final close when they diluted the interest of participating shareholders in favor of their own and other members of the Sponsor Group, and they benefited from the various forms of fees paid to them, such as management fees, administrative fees, and they

will ultimately benefit from this private equity investment program when they end up holding the largest share of any future liquidation, should it actually occur.

211.    Further, Defendant Rigas and the other Issuer Defendants had ample motive to engage in the alleged conduct in this complaint with *scienter* because they not only stood to benefit and did benefit from the September 2015 Fourth and Final Close, but they also benefited from the sale and transfer of a vessel contract to the Fund,  excessive and ongoing fees earned, and stand to benefit from the ultimate liquidation of the ships, having acquired them with the money provided by Plaintiff and other participating shareholders and with little or no money of their own.

212.    As alleged in paragraph 95 above, Plaintiff has suffered substantial damages due to the fraudulent practices and material misrepresentations and omission of the Issuer Defendants.  His investment and capital contributions have dropped by almost 75%, from  $606,467.79  to $158,502.  Contrary to the representations used to induce his investment alongside the Issuer Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante.*

213.    Accordingly, Defendants Rigas, Standen, Loucopoulos, Sciens Capital and the other Issuer Defendants violated Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. 78j(b)  and Rule 10b-5(a)-(c), 17 C.F.R. 240.10b-5(a)-(c),  promulgated thereunder.

## COUNT II

**VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF
1934  AND RULE 10B-5 THEREUNDER
By
Rigas, Standen, Loucopoulos,  Sciens Capital, SMH Management,
GSMI Management, and Sciens Institutional Services
(The "Advisor Defendants")**

214.    Plaintiff repeats and re-alleges paragraphs  1 through 213 above as if  fully set forth herein.

215.    The POM provides that all investment decisions have been delegated by Defendant Sciens Capital to Defendants SMH Management (as Investment Manager), GSMI Management (as the Portfolio Manger),  and Sciens Institutional Services (as the  Administrator).  *(POM, at 6.)*   As stated in paragraphs 18 through 21 above, each of these entities provided critical services to the success of the investment program.  The POM explicitly stated that "[p]articipating shareholders must rely entirely on the management ability of the Investment Manger, the Portfolio Manger, the Vessel Manager, the Administrator and the Company's other service providers." (*POM, at  29.)* Indeed, the Advisor Defendants individually and collectively owed fiduciary duties of unconditional and undivided loyalty and utmost good faith to act in the best interests of Plaintiff and the participating shareholders, to avoid conflicts of interest,  and to make full disclosure of all material facts to Plaintiff and other participating shareholders.

216.    As stated in paragraph 18 above, Sciens Capital, served as the lead asset management firm and creator of this private equity program and its structure, sponsored the GSMI Fund, solicited the initial capital and additional capital calls, provided all the marketing literature, arranged the advisory services – including

investment management, portfolio management, and administrative services – and decided which entity performed which functions.

217.    As stated in paragraph 19 above, as part of the integrated financial services, SMH Management  was, along with the Portfolio Manger and the Administrator, delegated the day-to-day responsibility for managing Defendant GSMI's overall business administration and operations as well as all investment decisions.   The services provided by SMH to GSMI included not only direct portfolio and operational risk management services, but also oversight of certain day-to-day administrative operations of GSMI.

218.    As stated in paragraph 20 above, GSMI Management, an affiliate of the SMH Management, acts the "Portfolio Manager," and as such has the responsibility for selecting the ships, profitably employing them, and then liquidating them. The POM further states that the ability to achieve the Fund's investment objectives and pay distributions to participating shareholders "is largely dependent upon the performance of the Portfolio Manager in identifying suitable vessels (that are in good condition) … and making such investments at favorable prices…"  (*See POM at 29.)*

219.    As alleged in paragraph 21 above, Defendant Sciens Institutional Services, LLC, as the Administrator and designated herein as both one of the 'Issuer Defendants" and one of the "Advisor Defendants, " has, along with the Portfolio Manager and the Investment Manager,  been  delegated -- subject to its continuing supervision and review by Sciens Capital -- responsibility for the day-to-day operations and administration of the GSMI Fund and all investment decisions.

*(POM, at 6.)*   As Administrator, its duties include investment management support, general internal corporate accounting, general corporate and contractual support, compliance, tax, accounting and financing and administrative functions.  Defendant Sciens, when acting as Administrator, is not a true independent third party administer, but is part of Sciens Capital's integrated investment solutions and is an affiliate of the asset manager, the Investment Manager,  and the Portfolio Manager.

220.    The officers and directors of each of the Advisor Defendants also owed fiduciary duties to Plaintiff.

221.    Thus, as advisers, each of the Advisor  Defendants, some of which were registered with the United States Securities & Exchange Commission, owed a fiduciary duty Plaintiff to act unconditionally in the best interests of Plaintiff and other participating shareholders,  to provide undivided loyalty and to demonstrate utmost good faith.  As fiduciaries, they were forbidden from engaging in any activity that might conflict with their obligations to Plaintiff and other participating shareholders.  Instead, these Advisor Defendants breached their fiduciary duties to Plaintiff by engaging in devices, schemes and artifices to defraud, as well as engaged in acts, practices and courses of business that operated or would operate as a fraud or deceit on Plaintiff and other participating shareholders – all to further their own interests and those of their affiliates, rather than the best interests of Plaintiff and other participating shareholders.

222.    The Advisor Defendants have employed devices, schemes and artifices to defraud, made untrue statements of material fact or omitted to make statements of material fact, and have engaged in acts, practices and courses of business that

operated or would operate as a fraud or deceit upon Plaintiff and the other

participating shareholders.

223.    More specifically, the devices, artifices, and schemes to defraud, as  well as

the acts, practices and courses of business that operated or would operate as a fraud

on Plaintiff  included the fictitious capital contribution practices, valuation practices,

false and misleading projection practices, dilutive financing practices during the

fourth and final closing, financial accounting and reporting practices, and loss of

funds , management fees, all as alleged in Count I above.

224.    On information and belief, by year-end 2014 the Advisor Defendants had not

only established their stake in the business of GSMI, but also had distributed

substantial amounts to themselves for the in-kind contribution of the vessel

contract earlier in the year.  As stated in paragraph 98 above, the contract for the

ship (Hull 2695, later a/k/a M/V Secretariat) had been signed in June 2013 for $50

million. The down payment on that ship purchase contract  is normally 20%, or $10

million. They "contributed" the purchase contract for the ship, to GSMI, at a year-end

value of  $21.852 million. *(See GSMI F/S for Year-End 2014, page 6.)*  However, when

the Advisor Defendants authorized distributions to Class A participating

shareholders during 2014 as a result of the second and third closings, the Advisor

Defendants likely distributed to themselves substantial amounts by claiming as

much as  $30.8 million value for their 'in-kind' contribution of the ship purchase

contract.  Accordingly, by year-end 2014, the Issuer and Advisor Defendants

"refunded" to themselves from the GMSI Fund, using Class A participating

shareholder money, most of their original $10 million deposit, while at the same

time retaining  the full value of $21.85 million in shares in the GSMI Fund.  In other words, through these deceptive and fraudulent business acts and practices, these defendants fully recaptured their deposit and obtained a substantial share of the GSMI Fund assets without any cash outlay, and without a word of disclosure.

225.    Moreover, the Advisor Defendants also not only made materially false and misleading statements, but also failed to disclose material information.

226.    Through their respective roles, the Advisor Defendants made, caused to be made or approved  false and misleading statements of material fact or omitted to state material facts in connection with capital contributions, financial projections, losses, deposits, undisclosed fees,  and affiliated party transactions, including a warehoused ship and joint venture ownership of vessels, all as alleged in paragraphs 148 through 204 above.

227.    The Private Equity Investment Opportunity publications, the Investment Proposals, Market Updates and Quarterly Updates were all sent to prospective and current investors including Plaintiff and were issued by Sciens Capital Management and under the Sciens Capital's name.  Plaintiff presumes and relies on the presumption that these publications and those mentioned elsewhere in this Complaint were the collective work of the Advisor Defendants, since they had direct involvement in the operations of the business of Sciens Capital, the Fund and its affiliates.  Indeed, the POM explicitly states that the board of directors of GSMI has delegated – subject to their continuing supervision and oversight – responsibility for the day-to-day operations and administration of the Company and all investment decisions to the Investment Manager, the Portfolio Manager, the Vessel Manager and

the Administrator."  Further, as stated above  in paragraph 18 and 144, at the bottom of each page of many of the updates, the note states that the "information contained herein is the property of Sciens Capital Management and its affiliates." Therefore,  Plaintiff  alleges that he relies on the presumption that statements in the POM,  annual reports, press releases, or group-published information, are the collective work of all these Defendants who had direct or indirect involvement in the everyday business of the Issuer Defendants and the Advisor Defendants.

228.    Defendants' fraudulent practices and materially misleading statements and omissions occurred in connection with the purchase and obligatory capital contribution payments of Plaintiff of his Participating Shares.

229.      Plaintiff relied in good faith not only on the business practices of the Advisor Defendants but also on the oral and written statements made to him during the Commitment and Obligation Periods.  Plaintiff is also presumed to have relied on the failure to state material information.  But for these material misrepresentations and omissions, Plaintiff would not have purchased his participating shares and committed to the several  capital contributions he was required to make or entered into this securities  transaction, which has proved to be to  his detriment.

230.    Defendants Rigas, Standen, Loucopoulos and the other Advisor Defendants caused Plaintiff's loss by engaging in the fraudulent and deceptive acts, practices and courses of business alleged in this Complaint, including arbitrary valuation practices, a non-cash (in-kind) contribution at an inflated value,  dilutive financing practices, conflicts of interest, gross mismanagement of business operations and loss of investor funds,  payment to themselves of distributions and fees that

depleted investors funds, failure to lock in forward charter rates, affiliated related party transactions, and hidden business operation behind an intermediate holding company and off-shore SPVs. s. These acts and practices not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused plaintiff's loss and injury because the risk of his investment loss from these fraudulent and deceptive business practices were within the zone of risk concealed by these business practices as alleged in this Complaint, without which Plaintiff would not have invested initially or continued to make capital contributions.

231.     Defendant's Rigas, Loucopoulos and the other Advisor Defendants also caused Plaintiff's loss by making materially misleading statements on which Plaintiff relied and by omitting to state material information on Plaintiff is presumed to have relied in agreeing to commit to the capital contribution schedule demanded of Defendants – in the absence of which Plaintiff would not have invested in this private equity program.  These material misrepresentations and omissions not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused Plaintiff's loss and injury because the risk of his investment loss from these material misrepresentations and omissions were within the zone of risk concealed by the material misrepresentations and omissions as alleged in this Complaint, without which Plaintiff would not have invested initially or continued to make capital contributions.

232.     As alleged in paragraphs 209  through 211 above, each of the Advisor

Defendants also have acted with *scienter* (*i.e.,* with intent to deceive or recklessly) by failing to fulfill their fiduciary duties as advisors through reckless conduct that was highly unreasonable and an extreme departure from the standards required of investment advisors and their affiliates as fiduciaries while at the same time paying themselves lucrative fees and entering into affiliate and related party transactions; and , by failing to disclose the truth about, among other things, the GSMI shipping acquisitions, payments and deposits, absence of capital contributions by Sciens Capital throughout the Commitment Period, financial information about the SPVs, related or affiliated party transactions,  and missing funds.

233.    Each of the Advisor Defendants which were involved directly or indirectly in the day-to-day operations of GSMI also acted with *scienter* (*i.e.,* with intent to deceive or recklessly) by failing to disclose the whole truth when they had a duty to do so about, among other things, the GSMI shipping acquisitions, payments and deposits, capital contributions by Sciens throughout  the Commitment Period, distributions, financial information provided to participating shareholders, and receipt of management fees.

234.    These Advisor Defendants not only engaged in the fraudulent acts and practices alleged in this complaint, but also acted with *scienter* because they knew or had access to information, which they failed to disclose when they had a duty to do so, and failed to carrying out their monitoring function about capital contributions (both monetary and  in-kind contributions),  assets under management (AUMs) , random and arbitrary fluctuations in ship NAVs, lost deposits,

profits and losses of GS Holdings and the SPVs,  ship cancellations, and improper affiliated or related party transactions.

235.    Further, the Advisor Defendants had ample motive to engage in the fraudulent conduct alleged in this Complaint with scienter because they not only stood to benefit from mismanagement of investors funds while paying themselves multiple layers of fees, but they also stood to benefit from establishing a stake in the ships acquired and revenue stream and then the ultimate liquidation of the ships, having acquired the ships – and having recouped their own contributions – with the money provided by Plaintiff and other participating shareholders. At the end of this fraudulent scheme, Sciens Capital Management is destined to control the fleet of ships, with little or no expense of their own, having used the money of Plaintiff and other participating shareholders, a pattern that has been witnessed from the conduct of Defendants Rigas and Standen in other cases.

236.    As alleged in paragraph 95 above, Plaintiff has suffered substantial damages due to the fraudulent practices and material misrepresentations and omission of the Rigas, Loucopoulos and the other Advisor Defendants.  His investment and capital contributions have dropped by approximately 75%, from $ of $606,467.79.  to $158,502. Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante.*

237.    Accordingly, Defendants Rigas, Standen, Loucopoulos, and the other Advisor

Defendants violated Section 10(b) of the Securities Exchange Act of 1934 , 15 U.S.C.

78j(b)  and Rule 10b-5(a)-(c), 17 C.F.R. 240.10b-5(a)-(c),  promulgated thereunder.

### COUNT III

**CONTROLLING PERSON LIABILITY**
**Violation of Section 20(a) of the Securities Exchange Act of 1934**
**By**
**Defendant Rigas**

238.    Plaintiff repeats and re-alleges paragraphs  1 through 237 above as if  fully

set forth herein.

239.    As alleged in paragraphs 141 through  237 Counts I and II above, Defendants

Rigas,  Sciens Capital, the other Issuer Defendants and Advisor Defendants have

engaged in devices, schemes and artifices to  defraud, as well as acts, practices and

courses of business that operated or would operate as a fraud and deceit on

Plaintiff.  Moreover, these same Defendants have stated and failed to state material

information, when they had a duty to do so, in violations of the Section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. §78j(a),  and Rule 10b-5, 17 C.F.R.

§240.10b-5,  promulgated thereunder.

240.    Defendant Rigas was at all pertinent times, Founder and principal

shareholders of the Sciens Group of Companies, and serves as its Chairman and CEO.

He is also Chairman and CEO of Defendant Sciens Capital Management.  Further, he

is also the sole voting shareholder of SMH Management, the Investment manager,

and is the sole managing member of Sciens Institutional Services, the Administrator.

Any delegation that may have occurred to the Advisor Defendants was still subject

to the continuing supervision and oversight of Rigas, who continued to play an active role in the management of GSMI and the Advisor Defendants.  Indeed, in the October 2014 Investment Proposal, Mr. Rigas states that he "**directs** portfolio construction, investment research, fund operations and risk management activities as well as corporate management and strategy." Defendant Rigas also states that, "since inception" of Sciens Capital Management, " Mr. Rigas has **directed** the Sciens private equity team in completing over 50 investments in portfolio companies and in the creation of numerous investment funds in a variety of asset classes."  Thus, Defendant Rigas not only possesses but in fact actually exercises the ultimate authority, control over and ability to direct the business practices of all the Issuer and Advisor Defendants, as well as the representations and omissions made by the those Defendants to Plaintiff.

241.    As Founder and principal shareholder of the Sciens Group of Companies and as Chairman and CEO of Sciens Capital Management, Defendant Rigas exercised actual control over the decision making of Sciens Capital and/or had the power to control all decision-making and actions of Sciens Capital with regard to the private equity program at issue and complained of herein.   Further, as the control person of Sciens, he has the power to control the decisions of the Advisor Defendants in the GSMI private equity program, including the power to control SMH Management as its sole voting shareholder, the power to control the GSMI Management, the Portfolio Manager as a member of tis board of directors.  Further, as a director of GSMI, he had the power to control the decision making of GSMI and the other Issuer Defendants.  The POM states that, in his capacity of as principal shareholder and

Sciens Group Chairman and CEO,  " "Mr. Rigas **directs** investment deployment, fund operations and risk management activities as well as corporate management and strategy. " *(POM at 10.)*  Accordingly, Defendant had control over the GSMI private equity investment program complained of.

242.    As alleged in paragraphs 140  through 237 above,  Defendant Rigas has acted recklessly and departed  not only from the normal standards of a director of GSMI, but  also from the standards and duties as a fiduciary imposed on him as a control person over the Issuer and Advisor Defendants.   Though aware of and having access to material information that should have been provided to the Plaintiff, Defendant Rigas withheld that information and instead misrepresented and omitted material corporate and financial information and failed to fulfill his duty of utmost  good faith, loyalty, honesty,  and reasonable care to avoid misleading Plaintiff, one of his clients, and to avoid conflicts of interest.  He therefore induced and participated in the alleged illegal activity.

243.    Accordingly, Defendant Rigas violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78t (a),  and is jointly and severally liable with and to the same extent as Defendant Sciens Capital and its affiliates.

### COUNT IV

**CONTROLLING PERSON LIABILITY**
**Violation of Section 20(a) of the Securities Exchange Act of 1934**
**By**
**Sciens Capital Management**

244.    Plaintiff repeats and re-alleges paragraphs 1  through 243  above as if  fully set forth herein.

245.    Defendant Sciens Capital was not only the sponsoring entity of the GSMI Fund, but also the controlling entity over all the other Issuer and Advisor Defendants.   The executed subscription documents for each investor were sent to Sciens Capital at its officers in New York City Communications with Defendant GSMI when subscribing were through the offices of Defendant Sciens Institutional Services with the same address as Defendant Sciens Capital.  All the marketing literature and updates were issued under the Sciens Capital name and bore a footnote stating that they were the property of Sciens Capital. Defendant Rigas, who controlled the board of directors of Sciens Capital, the company  which he founded, also controlled Members of the Investment Committee, who in turn controlled Sciens Capital, and Sciens Capital exercised actual control over the officers and directors and thus the affairs of the other Issuer and Advisor Defendants.  Therefore, each of the Issuer and Advisor Defendants, including their boards of directors through which they acted,  operated under and were subject to the supervision, oversight and direction of Defendant Sciens Capital.

246.    As alleged in Counts I and II above, Defendants GSMI, GS Holdings, GSMI Management, SMH Management, and Sciens Institutional Services violated Section 10(b) of the 1934 Exchange Act and Rule 10b-5 thereunder by breaching their fiduciary duties to Plaintiff and other participating shareholders.

247.    Through its officers and directors, Defendant Sciens Capital knowingly induced and participated in the violations committed by Defendants GSMI, GS Holdings, GSMI Management, SMH Management, and Sciens Institutional Services. Indeed, Defendant Sciens Capital, through the acts and practices alleged in this

Complaint and through the numerous failures to disclose material information, engaged in an extreme departure of the standards and duty of care, loyalty,  utmost good faith, avoidance of conflicts of interest, and disclosure of material information.

248.    Accordingly, Defendant  Sciens Capital violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78t (a),  and is jointly and severally liable with and to the same extent as Defendants Rigas, GSMI, GS Holdings, GSMI Management, SMH Management, and Sciens Institutional Services.

## COUNT V

### LIABILITY THROUGH OR BY MEANS OF ANOTHER

### Violation of Section 20(b) of the Securities Exchange Act of 1934
### By
### Rigas and Standen,

249.    Plaintiff repeats and re-alleges paragraphs 1  through 248 above as if  fully set forth herein.

250.    Defendants Rigas and Standen have engaged in violations alleged above in Counts I and II through or by means of other persons and entities.

251.    More specifically,  as alleged in Counts I and II  above, Defendant Rigas has made use of  the Issuer and Advisor Defendants to effectuate the frauds complained of herein.

252.    Similarly, Defendant Standen has engaged in similar acts after joining the investment Committee in or about July 2015.  Specifically, he violated his fiduciary duties to Plaintiff by failing to state material information about and knowingly participating in the fourth and final close in September 2015, which, as alleged

above in paragraphs 50 through 90 above, diluted Plaintiff's participation interest and/or failed to provide real capital to GSMI.

253.    Accordingly, Defendants Rigas and Standen violated Section 20(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78t (b).

**COUNT VI**
**BREACH OF FIDUCIARY DUTIES**
**By**
**Rigas, Standen, Loucopoulos, GSMI and GS Holdings Other**
**(The "Issuer Defendants")**

254.    Plaintiff repeats and re-alleges paragraphs 1 through 253 above as if fully set forth herein.

255.    As the officers and directors of GSMI, the issuer of the securities, as well as members of the Investment and Valuation Committees, Defendants Rigas, Standen, and Loucopoulos owed Plaintiff fiduciary duties, including the duty of care, the duty of loyalty, and the duty to act in good faith and in the best interests of Plaintiff and the other participating shareholders.

256.    The POM stated that valuations shall be determined by GSMI's Board of Directors "in good faith as determined in accordance with the Company's valuation policies and procedures "as adopted from time to time." (*See POM at page 20-21.*) The notes to the year-end December 2015 financial statements also state that GSMI has <u>established </u> a valuation process and procedures designed to <u>ensure that fair value</u> measurements are appropriate and reliable, that they are based on observable inputs where possible, and that GSMI's approach to valuation is <u>consistently applied</u> and the assumptions and inputs are reasonable.  The notes to the financial statements further state that GSMI has also established processes to ensure that the

valuation methodologies, techniques and approaches for Level-3 investments are fair, consistent and verifiable. The responsibility for valuing Level-3 assets is placed in the hands of a "Valuation Committee," chaired by Defendant Rigas. (*See GSMI Financial Statements for Year End 2015, notes, page 12.)*  However, as alleged in paragraphs 167 and 187 above, the footnote to the 2014 and 2015 financial statements of GSMI refer to the use of "unobservable inputs" for  Level 3 assets.

257.    These Defendants had similar fiduciary duties as to the fourth and final close of GSMI, and had discretion over use of options, contracts, deposits, disclosures, and affiliate transactions with the Vessel Manager.

258.    Further, the POM expressly provided that Defendants Rigas and Standen, as members of the board of directors of GSMI, were required "consistent with their fiduciary duties," to review the performance of the SMH Management (the Investment Manger), GSMI Management (the Portfolio Manger) and Sciens Institutional Services ( the Administrator). Defendant Loucopoulos, as member of the Investment Committee, assumed the same or similar fiduciary duties.

259.    Given the superior position or superior access to material and confidential information  by these Defendants, Plaintiff of necessity reposed trust and confidence in them, and as a result, these Defendants were under a duty to act for or to give advice for the benefit of Plaintiff on matters within the scope of their duties and their relationships with each other.

260.    Plaintiff reasonably relied on these Defendants to carry out those duties in the best interests of Plaintiff as a participating shareholder and not pursue their own to his detriment.

261.    As alleged in this Complaint, Defendants Rigas, Standen and Loucopoulos breached these duties by, among other things, engaging in dilutive financing practices, failing to disclose material information when they had a duty to speak, altering ship NAVs when it served their needs, canceling contracts,  mismanaging options and deposits on ships, issuance of shares to the Sponsor Group during the fourth and final close, and undisclosed related or affiliate party transactions.

262.    As alleged in paragraph 96 above, Plaintiff has suffered substantial damages due to the several breaches of fiduciary duties by Defendants Rigas, Standen, and Loucopoulos.

263.    Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

## COUNT VII

**BREACH OF FIDUCIARY DUTIES**
**By**
**RIGAS, Standen,  Loucopoulos, Sciens Capital, SMH Management,**
**GSMI Management, and Sciens Institutional Services**
**("Advisor Defendants")**

264.    Plaintiff repeats and re-alleges paragraphs 1 through 263 above as if fully set forth herein.

265.    As stated in paragraph 11 above, Defendant Rigas is Chairman and CEO of Sciens Capital Management; he is the sole voting shareholder of SMH Management, the Investment manager; he is the Executive Director of GSMI Management, the Portfolio Manager]; and, he is the sole managing member of Sciens Institutional Services, the Administrator In those capacities, he directs the private equity investment program of GSMI. He therefore owed a multi-layered fiduciary duty to Plaintiff.

266.    As stated in paragraph 12 above, Defendant Standen is a member of the board of directors of GSMI Management, the Portfolio Manager, appointed by the Investment Manger. Mr. Standen became a member of the Investment Committee on or about July 1, 2015. As such he owed fiduciary duties to Plaintiff.

267.    As alleged above in paragraph 13, Defendant Loucopoulos, as principal of Sciens Capital, who also works for the Investment Manager and its affiliated entities, including the Administrator, owed fiduciary duties to Plaintiff.

268.    Sciens Capital, as the sponsoring asset management firm and exercising supervision and oversight of the investment manager, portfolio manager and administrator, owed fiduciary duties of utmost good faith, loyalty, and full disclosure to Plaintiff and other participating shareholders. SMH Management, as Investment Manager, and GSMI Management, as the Portfolio Manager, owed these same fiduciary duties to Plaintiff. And, Sciens Institutional Services, as the Administrator, owed fiduciary duties to Plaintiff to properly administer his account. Therefore,

given the superior position or superior access of these Defendants to confidential information between them necessarily required Plaintiff to repose trust and confidence in them, and as a result, these Defendants were under a duty to act for or to give advice for the benefit of Plaintiff on matters within the scope of their relationships among them and with each other.

269.    Given their superior positions and superior access to information, Plaintiff was entitled to reasonably rely on these Defendants for the proper and legal performance of these duties when carrying out this private equity investment program.  Although Plaintiff raised appropriate questions at times, he was inevitably assured everything was proper and legal.

270.    These Defendants breached their fiduciary duties to Plaintiff by engaging in illegal conduct, as alleged in this complaint.

271.    Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.


**COUNT VIII**
**INTENTIONAL MISREPRESENTATION**
**By**
**Rigas, Standen, Loucopolous, GSMI, and GS Holdings,**
**("Issuer Defendants ")**

272.    Plaintiff repeats and realleges paragraphs 1 through 271 above as if fully set forth herein.

273.    By virtue of the positions they held, Defendants Rigas, Standen, Loucopolous, GSMI owed Plaintiff legal duties of good faith, fair dealing, loyalty, and disclosure separate and apart from their initial contractual duty to finance this blind pool offering, which was supposed to be carried out in a lawful manner but was not.

274.    As alleged in paragraphs 144 through 204 above, Defendants Rigas, Standen, Loucopolous, GSMI and GS Holdings made false and misleading statements of and omitted to state material facts regarding capital contributions, valuations, dilutive financing practices during the fourth and final close, management of options, contract and deposits, and issuance of shares to the Sponsor Group during the fourth and final close.

275.    Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings intended to mislead Plaintiff.

276.    Plaintiff reasonably relied on the statements that were made and those omitted when making capital contributions and remaining a participating shareholders in this private equity venture. But for the intentional misrepresentations alleged in this Complaint, Plaintiff would not have invested initially and would not have continued to make capital contributions required, or suffered the dilution he did.

277.    Defendant's Rigas, Standen, Loucopoulos GSMI and GS Holdings caused Plaintiff's loss by making materially misleading statements on which Plaintiff relied and by omitting to state material information on Plaintiff is presumed to have relied in agreeing to commit to the capital contribution schedule demanded of Defendants – in the absence of which Plaintiff would not have invested in this private equity program.  These material misrepresentations and omissions not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused Plaintiff's loss and injury because the risk of his investment loss from these material misrepresentations and omissions were within the zone of risk concealed by the material misrepresentations and omissions as alleged in this Complaint.

278.    Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

**COUNT IX**
**INTENTIONAL MISREPRESENTATION**
**By**
**Rigas, Standen, Loucopoulos, Sciens Capital, SMH Management,**
**GSMI Management and ,  Sciens Institutional Services**
**(The "Advisor Defendants")**

279.    Plaintiff repeats and re-alleges paragraphs 1 through 278 above as if  fully set

forth herein.

280.    As alleged in paragraph 266 through 272 above, Rigas, Standen, Loucopolous,

Sciens Capital, SMH Management,  GSMI Management,  Sciens Institutional Services**,**

the **Advisor Defendants**, some of which were registered with the United States

Securities & Exchange Commission, breached their fiduciary duties to Plaintiff.

These defendants owed a fiduciary duty Plaintiff not only to act unconditionally in

the best interests of Plaintiff and other participating shareholders, but also to avoid

– or worse, not to conceal –material information critical to the GSMI investment

program.   They also breached their fiduciary duties by engaging in affiliate party

transaction for their own benefit and by failing to disclose all management fees they

received.

281.    The Advisor  Defendants caused Plaintiff's loss by making materially

misleading statements on which Plaintiff relied and by omitting to state material

information on Plaintiff is presumed to have relied in agreeing to an ongoing

commitment to the capital contribution schedule starting in June 2014 through July

2016 demanded of Defendants – in the absence of which Plaintiff would not have

invested in this private equity program.  These material misrepresentations and

omissions not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused Plaintiff's loss and injury because the risk of his investment loss from these material misrepresentations and omissions were within the zone of risk concealed by the material misrepresentations and omissions as alleged in this Complaint.

282.   The consequences of the devices, schemes an artifices to defraud, as well as the acts, practices and courses of business that operated or would operate as a fraud, as perpetrated by the Advisor Defendants were also foreseeable and proximately caused Plaintiff's loss because the risk to his investment loss from these devices, schemes,  and artifices to defraud, as well as the acts, practices and courses of business that operated as a fraud or would operate as a fraud, created risks within the zone of risks, as alleged in this Complaint.

283.   The Advisor Defendants intended for their acts, practices, schemes and devices  as well as  their statements and omissions, to  mislead and lull Plaintiff into believing that his investment was safe and secure.

284.   Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

**COUNT X**
**FRAUD IN THE INDUCEMENT**
**By**
**Rigas and Sciens Capital**

285.     Plaintiff repeats and realleges paragraphs 1   through 284  above as if  fully set forth herein.

286.     As alleged in Counts I and II above, Defendants Rigas and Sciens Capital made materially false and misleading statements to Plaintiff, and omitted to state material information crucial to both his initial and his ongoing capital contributions.

287.     As the person and entity with the superior knowledge and access to confidential and/or proprietary information, Defendants Rigas and Sciens Capital knew or should have known that their representations and omissions were false and misleading.

288.     Defendants Rigas and Sciens Capital made these material misrepresentations and omissions  for the purpose of inducing Plaintiff into making his initial contribution and inducing Plaintiff to continue to make additional capital contributions to support their private equity investment scheme.

289.     Through their misrepresentations and omissions, as alleged in this Complaint, these Defendants acted with deceit and intended to induce Plaintiff into making his initial contribution and intended that Plaintiff continue to make additional capital contributions to support their private equity scheme of purchasing vessels.

290.    Plaintiff reasonably relied on the representations being made by these defendants and is presumed to have reasonably relied on the omissions.

291.    Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

**COUNT XI**
**NEGLIGENT MISREPRESENTATION**
**By**
**Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings**
**(The "Issuer Defendants")**

292.    Plaintiff repeats and re-alleges paragraphs 1  through 291 above e as if  fully set forth herein.

293.    As alleged in paragraphs 254-58, 265-69, 273, and 280, as officers and directors of GSMI, the issuer of the securities, Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings owed Plaintiff a duty of care, a duty of loyalty to act in good faith and in the best interests of the Fund's shareholders, and a duty of disclosure.

294.    Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings breached their duties to Plaintiff by engaging not only in business practices that these defendants knew or should have known were improper, but also by making false

and misleading statements and/or omitting to make adequate disclosure of all necessary information.

295.    Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings knew, or should have known, that the information made was misleading and the information withheld by them was important and necessary to Plaintiff as a participating shareholder in GSMI for the specific purposes not only in evaluating their fulfillment of their duties of care and loyalty to him as a participating shareholder, including management of GSMI and truthful information issued by the valuation and investment committees as well as complete disclosure of all financial information, but also in making continued capital contributions and not preferring Sponsor Group members over others during the fourth and final close.

296.    Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings knew or should have known that Plaintiff would rely on the information they provided, and Plaintiff reasonably relied on what he was  being told to his detriment.  These defendants also knew that Plaintiff would rely to his detriment on what they withheld from him.

297.    Defendants Rigas, Standen, Loucopoulos, GSMI and GS Holdings caused Plaintiff's loss by making materially misleading statements on which Plaintiff relied and by omitting to state material information on Plaintiff is presumed to have relied in agreeing to commit to the capital contribution schedule demanded of Defendants – in the absence of which Plaintiff would not have invested in this private equity program.  These material misrepresentations and omissions not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused

Plaintiff's loss and injury because the risk of his investment loss from these material misrepresentations and omissions were within the zone of risk concealed by the material misrepresentations and omissions as alleged in this Complaint.

298.    Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

**COUNT XII**
**NEGLIGENT MISREPRESENTATION**
**By**
**Rigas, Standen, Loucopoulos,  Sciens Capital, SMH Management,**
**GSMI Management, and Sciens  Institutional  Services**
**(The "Advisor Defendants")**

299.    Plaintiff repeats and re-alleges paragraphs 1  through 298 above as if  fully set forth herein.

300.    As alleged in paragraph 265 through 269,  Defendants Rigas, Standen, Loucopoulos, Sciens Capital, SMH Management, GSMI Management and Sciens Institutional Services,  some of which were registered with the United States Securities & Exchange Commission, had a special fiduciary relationship with Plaintiff. These defendants owed a fiduciary duty Plaintiff not only to act unconditionally in the best interests of Plaintiff and other participating shareholders, but also to avoid – or worse, not to conceal – both potential and actual conflicts of interest. Further, as fiduciaries, these defendants had a duty to exercise

reasonable care in providing full and fair disclosure of all material information and to take reasonable steps to avoid misleading Plaintiff.

301.     As alleged in Counts I and II above, Defendants Rigas, Standen, Loucopoulos, Sciens Capital, SMH Management, GSMI Management and Sciens Institutional Services knew or should have know that they were not providing full and adequate disclosure – and at times were concealing—information regarding lack of capital contributions by them, valuation practices, conflicts of interest, dilutive financing practices, financial information about SPVs, management fees they received, and preferential treatment being given to the Sponsor Group.

302.     Defendants Rigas, Standen, Loucopoulos, Sciens Capital, SMH Management, GSMI Management and Sciens Institutional Services caused Plaintiff's loss by making materially misleading statements on which Plaintiff relied and by omitting to state material information on Plaintiff is presumed to have relied in agreeing to commit to the capital contribution schedule demanded of Defendants – in the absence of which Plaintiff would not have invested in this private equity program. These material misrepresentations and omissions not only had a foreseeable consequence on Plaintiff's investment, but also proximately caused Plaintiff's loss and injury because the risk of his investment loss from these material misrepresentations and omissions were within the zone of risk concealed by the material misrepresentations and omissions as alleged in this Complaint.

303.     Contrary to the representations used to induce his investment alongside these Defendants, Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud. Given the impracticality of selling a ship or

dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

**COUNT XIII**
**RESPONDEAT SUPERIOR**
**By**
**Sciens Capital Management**

304.    Plaintiff repeats and re-alleges paragraphs 1  through 303 above as if  fully set forth herein.

305.    As alleged in paragraphs 41 through 50 above, President Wilkinson of Sciens Capital  and  Sciens Fund or Funds, an affiliate company of Defendant Sciens Capital and controlled by Defendant Rigas, solicited,  invited and induced Plaintiff to invest in GSMI.

306.    President Wilkinson was authorized by Defendants Rigas, Sciens Capital and GSMI to solicit investments in and for  GSMI.  He did so within the scope of his authority.

307.    As stated in paragraph 73, on or about September 23, 2015 Defendant Loucopoulos, as principal of Sciens Capital, and within the scope of his authority, spoke with Plaintiff  and asserted that Defendants Sciens Capital, SMH Management, GSMI Management and GSMI **have sole discretion to value the offering at NAV** based on the section from the POM quoted in paragraph 70 above.  Defendant Loucopoulos claimed that participating shareholders may be invited to participate, but if they do not, they will be diluted – in the case of Plaintiff, by a 30% write-down in his investment since inception.

308.    Defendant Loucopoulos, as member of the valuation and investment committees and therefore within the scope of his authority,  also told Plaintiff that that everything was well.

309.    Further, as stated in paragraph 67  above, Cecilia Santos, the personal or executive assistant of Defendant Rigas, stated on behalf of Defendant Rigas and within the scope of her authority that the total capital sought for the fourth and final closing was $45 million.  However, according to an email on or about September 23, 2015, two days before the expiry of the Commitment Period, Cecilia Santos wrote to Plaintiff that he need not be concerned about any insufficient funding because "on the basis of present market facts, the Fund's capital needs will be fully funded with **$10mm."**  Ms. Santos then added that "[w]e believe that the Fund will close on such additional commitments so that it can complete its investment program." Accordingly, to ensure the safety or sound future of the investment program, Ms. Santos represented that Defendant GSMI would raise enough additional capital "complete its investment program."

310.    As stated in paragraph 70 above, Ms. Santos, on behalf of Defendants Rigas, Sciens, SMH Management, GSMI and GSMI Management, also wrote to Plaintiff that while no new investors were lined up, "many of the largest investors have agreed to participate, including Sciens and Golden Union and the two largest institutional investors in the Fund."  She also represented that the Fund's capital needs would be fully funded with $10 mm.  Ms. Santos therefore provided assurances that the fourth and final close would be fully funded and would occur.

311.    Indeed, as stated in paragraph 67 above, by email dated November 3, 2015, sent by Ms. Santos on behalf of Defendants Rigas and Sceins, Ms. Santos reported that the Fund's final closing occurred "as of" September 25, 2015. The final closing produced $22 million in commitments.  Ms. Santos reported that "[a]s of September 25, 2015, the Fund had received aggregate capital <u>contributions</u> of $123.7 million and has remaining unfunded capital <u>commitments</u> of approximately $44.3 million." Thus, after the final closing, "the Fund will have aggregate capital *commitments* of $168 million." The email message of Ms. Santos thus assured Plaintiff that the investment program was on sure and sound footing.

312.    The representations of Defendant Loucopoulos, as well as those of Mr. Wilkinson and Ms. Santos, were all made with the interests of Sciens Capital and GSMI in mind.

313.    Contrary to the representations used to induce his investment alongside these Defendants,  Plaintiff's investment in ships exists via an intermediate holding company that houses the fraud.  Given the impracticality of selling a ship or dissolving GSMI to obtain the monetary value of his shares, Plaintiff seeks a rescissionary measure of damages to return the parties to the *status quo ante,* or in the alternative, compensatory damages.

314.    Accordingly, Sciens Capital is liable under the doctrine of *respondeat superior* for the statements made by its principal, officer and employee.

## COUNT XIV

**BREACH OF CONTRACT**
**By**
 **GSMI, SMH Management, GSMI Management, and Sciens Institutional Services**

315.    Plaintiff repeats and re-alleges paragraphs  1  through 314 above as if  fully set forth herein.

316.    In July 2014, Plaintiff filled out, signed and submitted a subscription agreement to Defendants GSMI, in care of Defendants Sciens Institutional Services, pursuant to which  Plaintiff agreed to make a commitment of $750,000 in capital contributions.

317.    The subscription agreement provided that Defendant SMH Management, as Investment Manager, in consultation with GSMI Management, as Portfolio Manager, would invest Plaintiff's capital in the GSMI private equity program under the terms of the POM.

318.    The subscription agreement also expressly stated in paragraph 2 that the subscriber agrees that the participating shares of the company "will be held subject to the terms and conditions of the [Private Offering] Memorandum." As alleged in paragraphs 160-162 and 260 above, the POM expressly provided the terms and conditions under which GSMI's Board of Directors, as well as the Valuation Committee,  would determine ship valuations "in good faith at fair value,"  (POM, at 20)  including the warehousing transaction of s ship – or purchase contract for a ship – at its "then current value."   The POM also provided that the SMH Management, as Investment Manager, would receive a management fee based on net asset value, with all investments valued at cost [POM, at 21] and did not authorize

management fees based on capital commitments.  Further, the POM did not authorize dilution of participating shareholders interests during the fourth and final close.  Finally, as stated in paragraphs 18, 19 and 20 above, the POM described various obligations and duties of Defendants SMH Management, as Investment Manger, GSMI Management, as Portfolio Manager, and Sciens Institutional Services, as Administrator.

319.    An implied term of the subscription agreement was that Defendants GSMI, SMH Management, GSMI Management and Sciens Institutional Services would carry out this private equity investment program in good faith and deal fairly with Plaintiff,  without the fraud or deceit, without material misrepresentations or omissions, and without destroying or injuring Plaintiff's right to receive the lawful fruits of this investment contracts – all as alleged in this Complaint.

320.    Defendants GSMI, GSMI Management, SMH Management and Sciens Institutional Services have breached the express terms of the subscription agreement  and the POM and have breached the implied terms of the  subscription agreement by breaching their fiduciary and other duties to Plaintiff under this contract, including their duties of good faith, fair dealing, and full disclosure.

321.    Plaintiff seeks rescission of the contract and return of his funds, or in the alternative, a recessionary measure of damages if true rescission is not possible, because of nature of this illiquid private equity investment, as well as consequential damages.

<u>COUNT XV</u>

**BREACH OF THIRD PARTY BENEFICIARY CONTRACT**
**By**
<u>Sciens Capital, SMH Management, GSMI Management, and</u>
<u>Sciens Institutional Services</u>

322.    Plaintiff repeats and re-alleges paragraphs  1  through 321  above as if  fully set forth herein.

323.    Sciens Capital states in the POM that, subject to its ongoing supervision and oversight, it has various contractual relationships with the other Advisor Defendants.

324.    As stated in paragraph 18 above and according to its website, **Sciens Capital** provides "bespoke" (*i.e.,* **highly personalized** managed advisory and portfolio management services, brokerage and private wealth management) and "integrated" investment solutions – including investment advisory, portfolio management and administrative services – to institutional and private clients globally.

325.    As stated in paragraph 18 above, **SMH Management, Ltd**,  the Investment Adviser" or "Investment Manager, has, along with the Portfolio Manger and the Administrator, been delegated the day-to-day responsibility for managing GSMI's overall business administration and operations as well as all investment decisions. The services provided by SMH to GSMI include not only direct portfolio and operational risk management services but also oversight of certain day-to-day administrative operations of GSMI.

326.    As stated in paragraph 20 above, **GSMI Management,** the asset management company and affiliate of the SMH Management, serves as the "Portfolio Manager," and has responsibility for selecting the ships, profitably employing them, and then liquidating them. The POM further states that the ability to achieve the Fund's investment objectives and pay distributions to participating shareholders "is largely dependent upon the **performance of the Portfolio Manager** in identifying suitable vessels (that are in good condition) … and making such investments at favorable prices…"  (*See POM at 29.)*

327.    As stated in paragraph 21 above,  the board of directors of GSMI "has delegated, subject to its continuing supervision and review, responsibility for the day-to-day operations and administration of the Company [GSMI] and all investment decisions" to the Investment Manger, the Portfolio Manager, and the Administrator."  (POM, at 6.)   The duties of Sciens Institutional Services, as the Administrator, include investment management support, general internal corporate accounting, general corporate and contractual support, compliance, tax, accounting and financing and administrative functions, but the Administrator does not provide Sciens' primary legal, tax or audit advice.  Defendant Sciens Institutional Services, , when acting as Administrator, is not a true independent third party administer, however, because it is part of Sciens Capital's integrated investment solutions and is an  affiliate of the asset manager, the Investment Manager,  and the Portfolio Manager.

328.    These contractual relationships were intended for he benefit of Plaintiff and other participating shareholders like him.  The POM describes in detail the services

to performed by each Advisor Defendant to effectuate the GSMI private equity program in which Plaintiff and other participating shareholders had invested and relied on the representations and fiduciary duties each Advisor Defendant undertook.  As stated in paragraphs 31 and 32, the goal of the GSMI Fund was  to obtain a portfolio of large size only dry bulk vessels  and to provide direct investment at the vessel level with combination of annual yield (5%-10%) and maximize portfolio value appreciation of more than 20%.   These initiatives were intended for the direct benefit of Plaintiff.  The very purpose of pooling contributed capital was to maximize investment opportunities, leverage and profits by virtue of a portfolio of ships, while at the same time avoiding transaction costs associated with each investor under separate contracts with each and everyone of the Advisor Defendants and benefitting from the integrated bespoke advisory services and their expertise.

329.    The benefits that were to flow to Plaintiff were immediate and ongoing. While waiting for the final liquidation of the ships and return of his capital plus appreciation, he was to participate in annual yields from the revenue stream by receiving distributions.  These were direct and intended benefits, not incidental to the GSMI and Sciens Capital investment program.

330.    Plaintiff seeks rescission of the contract and return of his funds, or in the alternative, a rescissionary measure of damages if true rescission is not possible, because of nature of this illiquid private equity investment, as well as consequential damages.

## COUNT XVI

**UNJUST ENRICHMENT**
**By**
**The Issuer and Advisor Defendants**

331.    Plaintiff repeats and re-alleges paragraphs  1  through 330 above as if  fully set forth herein.

332.    As alleged in paragraph 3, 41 and 139 above, the Issuer Defendants invited Plaintiff to invest "along side' defendants, who were supposed to participate in the GSMI Fund and contribute capital.

333.    As alleged in paragraph  55 above, the Defendant Rigas, Sciens Capital and other Issuer Defendants by year-end 2014 recouped at least $8.9 million of any deposit they may have paid.

334.    In addition, the Issuer and Advisor Defendants have paid themselves management, third party administration and other fees.

335.    As a result, the Issuer and Advisor Defendants have unjustly enriched themselves to the detriment of Plaintiff and other participating shareholders .

336.    Further, equity and good conscience militate against permitting these defendants to retain the funds they not only "took" from participating shareholders when they surreptitiously recouped approximately $8.9 million, but also paid themselves management, third party administration and other fees at the expense of Plaintiff and other participating shareholders.

337.    Therefore, Plaintiff is entitled to his pro rata share of funds by which these defendants unjustly enriched themselves.

## **PRAYER FOR RELIEF**

For his prayer for relief, Plaintiff seeks:

1.      Rescission damages and compensatory, including consequential, damages

2.      Punitive damages for pendent claims

3.      Pre-Judgment Interest

4.      Costs and Attorneys Fees

5.      Post Judgment Interest

6.      Such other relief that the Court deems fair, just and equitable, including

rescission and unjust enrichment.

Dated:  May 31,  2017


Respectfully Submitted,


*S/   TV SJOBLOM*
_____
Thomas V. Sjoblom
*Attorney for Plaintiff*

International Square
Suite 500
1875 I Street, N.W.
Washington, D.C. 20006

(202) 429-7125
Email:  tvsjoblom@tvs-law.com