UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
GRAHAM WALSH, individually and
derivatively as a minority
shareholder of GSMI,

        Plaintiff,

      - against -

IONNAIS P RIGAS, DANIEL STANDEN,         **MEMORANDUM AND ORDER**
ALEXANDER LOUCOPOULOS, GOLDEN SCIENS
MARINE INVESTMENT MANAGEMENT CO.,        17 Civ. 4089 (NRB)
LTD, GOLDEN SCIENS HOLDINGS, LLC,
SCIENS CAPITAL MANAGEMENT,
SCIENS INSTITUTIONAL SERVICES, LLC,
and SMH MANAGEMENT, LTD,

        Defendants,

GOLDEN SCIENS MARINE INVESTMENTS,
LTD.,

        Nominal Defendant.
-------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Graham Walsh ("Walsh" or "plaintiff") brings this

action against Golden Sciens Marine Investments Ltd ("GSMI" or the

"Fund") and eight affiliated entities or individuals, asserting

the following sixteen causes of action: (1) direct and/or

derivative violations of Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") and Rule 10b-5 against all defendants

(Counts I and II); (2) control person liability against defendants

John Rigas, Daniel Standen, and Sciens Capital Management ("SCM"

or "Sciens Capital") under Section 20(a) and (b) of the Exchange

Act (Counts III through V); (3) breach of fiduciary duty against all defendants except for GSMI and Golden Sciens Holdings, LLC (the "Intermediary"), brought directly and derivatively (Counts VI and VII); (4) intentional misrepresentation by all defendants (Counts VIII and IX); (5) fraud in the inducement against Rigas and SCM (Count X); (6) negligent misrepresentation against all defendants except for GSMI, brought directly and derivatively (Counts XI and XII); (7) respondeat superior against SCM (Count XIII); (8) breach of contract against SMH Management (the "Investment Manager"), GSMI Management (the "Portfolio Manager"), and Sciens Institutional Services (the "Administrator") (Count XIV); (9) breach of third-party beneficiary contract against SCM, the Investment Manager, Portfolio Manager, and Administrator (Count XV); and (10) unjust enrichment against all defendants except for GSMI and the Intermediary (Count XVI).

Presently before the Court is defendants' motion to dismiss plaintiff's First Amended Complaint ("FAC") in its entirety pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion to dismiss is granted.

## I. __Factual Background__[1]

### A. **Parties**

Plaintiff Graham Walsh is a participating shareholder in GSMI, an offshore investment vehicle created by Sciens Capital offering investors an opportunity to participate in the market for dry bulk shipping vessels.[2]  FAC ¶¶ 2, 10, 14.  Beginning in 2014, GSMI issued securities in the form of participating shares to fund the acquisition of a fleet of both newbuild and second-hand shipping vessels at a perceived low point in the market.  GSMI's basic strategy was to charter the vessels and then sell them for a profit once the market improved.  FAC ¶¶ 14, 32–33; Shepard Decl. Ex. D, ECF No. 60-4.  Although the precise amount of capital raised by GSMI to date is unclear from the pleading, it initially sought capital commitments of somewhere between $210 million and $300 million.  See FAC ¶¶ 34, 48.

GSMI delegated its day-to-day administration and investment management to the Investment Manager, Administrator, and Portfolio

---

[1]    The facts are largely drawn from the FAC and are assumed to be true for the purposes of this motion.  See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006).  We also consider documents possessed by or known to plaintiff upon which he relied in bringing this action, ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007), including: (1) GSMI's Confidential Private Offering Memorandum ("POM"), Declaration of Jonathan T. Shepard ("Shepard Decl.") Ex. A, Mar. 1, 2018, ECF No. 60-1; (2) Walsh's Subscription Agreement (the "Subscription Agreement"), id. Ex. B, ECF No. 60-2; and (3) Memorandum and Articles of Association of GSMI (the "Articles"), id. Ex. C, ECF No. 60-3.

[2]    Dry bulk shipping involves the marine transport of unpackaged bulk cargo such as grain, coal, or ore.

Manager (collectively, along with their affiliates and representatives, the "Sponsor Group"). FAC ¶¶ 19–21. GSMI also owned an intermediate holding company, the Intermediary, that warehoused assets for the Fund. FAC ¶¶ 17. Individual defendants Rigas, Standen, and Loucopolous held executive or board-level positions at some or all of the aforementioned entities. FAC ¶¶ 11–13.

      B. **Marketing of the Fund and Walsh's Investment**

To generate interest in the Fund, GSMI issued a "Confidential Private Offering Memorandum" ("POM") in December of 2013, providing potential investors with detailed descriptions of the strategy, governance, and myriad risk factors associated with the venture. <u>See</u> Shepard Decl. Ex. A.

The Fund held its first closing on March 25, 2014, yielding $63.325 million in capital commitments, including approximately $30 million contributed by members of the Sponsor Group. FAC ¶¶ 37, 38. Sometime after this initial closing, a sales representative affiliated with Sciens Capital named Timothy Wilkinson contacted Walsh and offered him an opportunity to participate in GSMI's second closing, which was scheduled to occur at the end of June 2014. FAC ¶¶ 38, 41–42. Walsh was provided with the POM and other written marketing materials, and also discussed aspects of the venture with Wilkinson prior to making his investment decision. <u>See, e.g.</u>, FAC ¶¶ 36, 38, 39, 41–45, 47.

During a telephone conversation in April 2014, Wilkinson informed Walsh that Sciens Capital and an entity called Golden Union Shipping (the "Vessel Manager") were contributing up to $30 million to the Fund, an assertion echoed in the POM and other marketing materials. FAC ¶ 38. According to the POM, the Vessel Manager was also expecting to contribute (at no cost to the Fund) options to purchase three new ice-class vessels, which expired at the end of March 2014. Shepard Decl. Ex. A at 6. Wilkinson informed Walsh that the vessels themselves were then trading in excess of $15 million higher than the purchase price in the option contracts, providing GSMI with "a very good start and a nice cushion to have." FAC ¶ 47. Wilkinson warned Walsh, however, of the possibility of these unrealized trading "profits" turning into losses. Id.

In response to separate concerns raised by Walsh regarding vessel prices, Wilkinson stated that "we just bought [a Cape size vessel] for GSMI for $56mm," apparently referring to the ship "Hull 2695" which, according to a GSMI marketing document, had an estimated net asset value (or "NAV") of $56 million as of an undisclosed date in March 2014. FAC ¶¶ 36, 43, 44. Wilkinson and Walsh also discussed the value of earnings streams in the event that charter rates decreased, with Wilkinson describing a strategy intended to ensure positive cashflow by locking in forward charter

rates and keeping operating expenses and insurance costs low. FAC
¶¶ 43, 45.

Walsh ultimately decided to invest $750,000 in exchange for
participating shares in GSMI, signing and submitting the
Subscription Agreement on or about July 3, 2014. On July 8, 2014,
the Investment Manager for the Fund notified plaintiff that his
subscription had been accepted and made its first capital call of
Walsh in the amount of $640,371.90. FAC ¶ 49, 50. To date, Walsh
has only satisfied $606,000 of his original $750,000 commitment.[3]
FAC ¶ 97; Oral Argument Transcript ("Tr.") at 3:18–4:4.

C. **Disclosures and Disclaimers**

As part of the Subscription Agreement, Walsh disclaimed
reliance on the representations made by Wilkinson and any marketing
documents other than the POM, confirming that he was "relying
solely on the facts and terms set forth in the [Subscription
Agreement, POM, and the Articles of Association of GSMI]" in making
his investment decision. Shepard Decl. Ex. B at 7.

As these documents made clear, GSMI was a "blind-pool"
offering in that the Fund had not yet acquired most of its assets
and participating shareholders would not have the opportunity to

_____

[3] While Walsh received subsequent capital calls seeking some or all
of the balance of his $750,000 commitment over the following two years, there
is no indication that he satisfied these requests. The fact that Walsh only
contributed approximately $606,000 – less than the amount of the initial capital
call, and significantly less than the sum of all alleged capital calls, see ¶¶
50, 61, 68, 92, 93, 94 – suggests that he did not.

evaluate investments before they were made.   Shepard Decl. Ex. A

at 29.   Walsh agreed that he "must rely entirely on the management

ability of the Investment Manager, the Portfolio Manager, the

Vessel Manager, the Administrator and the Company's other service

providers," id., and that GSMI "directly or through one or more

subsidiaries" would enter into management agreements pursuant to

which the Vessel Manager would provide the entities that directly

owned the vessels.   Id. at 4.   GSMI disclosed in detail the

management fees to be paid to the Sponsor Group and Vessel Manager

in exchange for performing these services.   Id. at 21.   GSMI's

Articles of Association underscore that Walsh would "not have any

right to inspect any accounting record or book or document of

[GSMI] except as conferred by law or authorised by the Directors

or by the Members by Ordinary Resolution."   Shepard Decl. Ex. C ¶

222.

In addition to describing the corporate governance and

structure of GSMI, the POM devoted over twenty-five pages to

describing risk factors attendant to investments in the

"inherently risky" international shipping industry, such as the

risk that GSMI might overpay for investments, underestimate

acquisition costs, or pay operating and other costs that

outstripped charter rates.   Shepard Decl. Ex. A at 29-54.   GSMI

also warned of, inter alia, potential conflicts of interest between

the Sponsor Group and GSMI, chartering risks, global market

deterioration, extensive capital outlays, increased operating costs, and unfavorable fluctuations in exchange rates. Id.

Walsh, a former hedge fund manager[4] with "knowledge, expertise and experience in financial matters," averred that he was "aware of the risks inherent in investing in [GSMI's] assets . . . and the method by which the assets" were held and operated and could "bear the risk of loss of [his] entire investment." Shepard Dec. Ex. B at 8.

D. **Subsequent Closings**

Following Walsh's investment in July of 2014, GSMI held two additional closings. The third closing did not occur until December of 2014 and was conducted during a significant write down in the NAVs of at least some of GSMI's assets. FAC ¶ 53. GSMI wrote down the values of its assets a second time in May of 2015. FAC ¶ 66.

The fourth and final close, occurring at the end of September 2015, was different from prior closings in that it offered additional participating shares to then-existing investors on a *pro rata* basis using the audited values of GSMI's vessels as of December 31, 2014, which, due to the twice-reduced NAVs, provided a lower point of entry for these investors than available in earlier closings. FAC ¶ 64. Participating shareholders like Walsh

---

[4]     Tr. 3:4-10.

thus faced a choice: they could either invest additional funds at this lower entry point or risk dilution of their investment should other investors participate in the offering. Id.

On September 23, 2015, Rigas's assistant, Cecilia Santos, informed plaintiff that "many of the largest investors have agreed to participate [in the in the *pro rata* closing], including Sciens and [the Vessel Manager] and the two largest institutional investors in the Fund." FAC ¶ 78. She also made clear that Walsh's participation level in the investment would be diluted by either 8.3% (if only $10 million were raised), or 29% (if $45 million were raised), should he choose not to participate. Id.

On September 24, plaintiff responded to Santos that the fourth closing "appears to be a tactic to enhance the returns of the insiders, namely Sciens and Golden Union," as there was "far from full participation from existing investors" and "no new investors." FAC ¶ 79. In a subsequent exchange between Wilkinson and Walsh concerning how many current investors were participating in the additional fund raise, Wilkinson conceded that it "seems like it is all about the two largest holders," and informed Walsh that he was "determined to find out whether any 'friends of Sciens' are invited to subscribe at these sharply discounted levels for their first subscription." FAC ¶ 81. Shortly thereafter, Wilkinson wrote to Walsh that the fact that Walsh was not given

such information [about the "friends of Scien"] was "a disgrace –
and it has been reported this side of the pond." FAC ¶ 82.

Walsh ultimately declined to participate in the *pro rata*
fourth closing.[5] FAC ¶¶ 83.

### E. Allegations of Corporate Malfeasance

Plaintiff's complaint includes several other allegations
relating to the Sponsor Group's interaction with the Fund. Taking
Walsh's allegations as true, defendants did not disclose
information about the management fees collected by members of the
Vessel Manager, FAC ¶ 139, and calculated management fees using
NAVs marked at cost while simultaneously reducing NAVs for purposes
of diluting other shareholders, FAC ¶ 141. Defendants allegedly
failed to disclose financial information about the three ice-class
shipping vessels, FAC ¶ 108, made inconsistent or insufficient
disclosures about its use of funds and assets under management,
see, e.g., FAC ¶¶ 112, 125, 126, and characterized certain realized
losses as "unrealized" in their year-end financial statements, FAC
¶¶ 132–35. Plaintiff also takes issue with the strategy employed
by GSMI and its delegatees with respect to acquiring assets for
the Fund. See, e.g., FAC ¶ 113.

## II.  Procedural Posture

---

[5]     Defendants contend that every other investor in GSMI participated
in the *pro rata* close. ECF No. 61 at 8. Plaintiff disputes this. Pl.'s Opp.
Br. at 5 n.4.

Plaintiff filed his 114-page initial complaint on May 31, 2017. ECF No. 1. Following an exchange of letters by the parties, the Court granted plaintiff leave to amend, and on November 1, 2017, plaintiff filed the even lengthier 139-page FAC. ECF Nos. 44, 46, 48, 52. On March 1, 2018, defendants filed the motion presently before the court seeking dismissal of the FAC in its entirety. ECF No. 59.

## III. Discussion of Federal Securities Law Claims

Counts I through V of the FAC allege violations of either Section 10(b) or Section 20 of the Exchange Act. We first set forth the standards governing our consideration of the pending motion to dismiss those causes of action before turning to the sufficiency of the specific allegations in the complaint.

### A. Legal Standards

#### i. Motion to Dismiss Under Rule 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), we must accept as true all factual allegations in the plaintiff's complaint and draw all reasonable inferences in plaintiff's favor. City of Providence v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017). However, we "are not bound to accept as true a legal conclusion couched as a factual allegation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown

v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

## ii. Fraud Pleading Under Rule 9(b) and the PSLRA

"It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir.2000). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." Id.

In order to satisfy Rule 9(b), a plaintiff alleging fraudulent misstatements or omissions must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Similarly, the PSLRA requires that complaints must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," and, "if an allegation regarding the statement or

12

omission is made on information and belief . . . state with particularity all facts on which that belief is formed." <u>Id.</u>  15 U.S.C. § 78u-4(b)(1).

iii. <u>Section 10(b) and Rule 10b-5</u>

Section 10(b) of the Exchange Act of 1934 prohibits the use or employment of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security and in contravention of rules and regulation prescribed by the Securities and Exchange Commission ("SEC").  15 U.S.C.A. § 78j(b).

SEC Rule 10b-5(a) and (c) makes it "unlawful for any person . . . [t]o employ any device, scheme, or artifice to defraud . . . or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a) and (c).  To state a claim under subsections (a) and (c), plaintiff must, in addition to satisfying the pleading strictures of Rule 9(b) and the PSLRA, allege that a defendant "(1) committed a deceptive or manipulative act, (2) with *scienter,* that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." <u>In re Parmalat Sec. Litig.</u>, 376 F. Supp. 2d 472, 491–92 (S.D.N.Y. 2005).

Subsection (b) of the Rule makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit

to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to state a claim under subsection (b) of the Rule, "a plaintiff must [plausibly allege] (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Halliburton Co. v. Erica P. John Fund, Inc.</u>, 573 U.S. 258, 267 (2014) (internal quotation marks omitted).

1. *Scienter*

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2). "The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" <u>ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co. ("ECA")</u>, 553 F.3d 187, 197 (2d Cir. 2009) (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007)). The inference must be more than merely reasonable or permissible; it must be "cogent and compelling," <u>i.e.</u>, "strong in light of other explanations." <u>Tellabs</u>, 551 U.S. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference

of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

A strong inference of fraud may be established by alleging facts demonstrating "that defendants had the motive and opportunity to commit fraud." ECA, 553 F.3d at 198. To raise a strong inference of scienter through "motive and opportunity," a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." Id. (internal quotation marks omitted). For example, the "desire to earn management fees is a motive generally possessed by hedge fund managers, and as such, does not suffice to allege a 'concrete and personal benefit' resulting from fraud." Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008); see also In re Citigroup Auction Rate Sec. Litig., 700 F.Supp.2d 294, 305 (S.D.N.Y. 2009) ("Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter").

A plaintiff may also establish a strong inference of scienter by alleging facts that show "strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 553 F.3d at 198. Recklessness in this context has been defined as conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant

must have been aware of it." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and alteration omitted). The Second Circuit has clarified that recklessness here is "a state of mind approximating actual intent, and not merely a heightened form of negligence." Id. (internal quotation marks and alteration omitted).

### 2. *Material Misrepresentation or Omission*

With respect to plaintiff's Rule 10b-5(b) claims, plaintiff "must show that the challenged statements were false when made in order to demonstrate the existence of misstatements under Section 10(b) and Rule 10b-5." Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). In evaluating an alleged misrepresentation or omission, a statement is measured not by its literal truth, but rather by its ability "to accurately inform rather than mislead prospective buyers." McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990).

"A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (internal quotation marks and alteration omitted). "[T]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances." ECA, 553 F.3d at 197. While a bright line percentage cannot substitute for a full consideration of all

relevant considerations, "the use of a percentage as a numerical threshold such as 5%, may provide the basis for a preliminary assumption of materiality." Hutchison, 647 F.3d at 485 (internal quotation omitted) (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999)). Additional qualitative factors to consider at the motion to dismiss stage include whether a misstatement concerns an important segment of the business at issue or whether management "expects that the misstatement will result in a significant market reaction." Id.

Omissions are considered material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988). The Supreme Court has cautioned, however, that "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44-45 (2011) (internal quotation marks and alteration omitted).

### 3. *Reliance*

"A showing of justifiable reliance is essential to sustain a securities fraud claim." Abbey v. 3F Therapeutics, Inc., No. 06-

cv-409 (KMW), 2011 WL 651416, at *7 (S.D.N.Y. Feb. 22, 2011) (internal quotation marks omitted), aff'd sub nom. Abbey v. Skokos, 509 Fed.Appx. 92 (2d Cir. 2013); see Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00-cv-8058 (NRB), 2004 WL 2072536, at *8 (S.D.N.Y. Sept. 14, 2004) ("Federal securities law . . . require[s] a plaintiff to demonstrate justifiable reliance upon the alleged misrepresentation that forms the basis of the plaintiff's action."). Simply alleging that plaintiff relied on defendants' alleged misrepresentation is insufficient; plaintiff's reliance must have been reasonable in order for their claim to proceed. See First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc. of U.S., 43 Fed.Appx. 462, 464 (2d Cir. 2002) (summary order) (citing Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir. 1996)).

In evaluating the reasonableness of plaintiff's reliance, "we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003). "[T]he plaintiff's sophistication and expertise is a principal consideration." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001). "Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish

18

reasonable reliance on that misrepresentation." <u>ATSI Commc'ns</u>,
493 F.3d at 105. Moreover, "[a]n investor may not justifiably
rely on a misrepresentation if, through minimal diligence, the
investor would have discovered the truth." <u>Ashland Inc. v. Morgan
Stanley & Co.</u>, 652 F.3d 333, 337-38 (2d Cir. 2011) (quoting <u>Brown
v. E.F. Hutton Grp., Inc.</u>, 991 F.2d 1020, 1032 (2d Cir. 1993)).

B. **Analysis of Rule 10b-5(b) Claims**

i. <u>Post-Investment Representations or Omissions</u>

Walsh's Rule 10b-5(b) claims are predicated in part upon
allegations of misstatements or omissions made after GSMI accepted
Walsh's $750,000 commitment on July 8, 2014, upon which the parties
became contractually bound to the terms of the Subscription
Agreement. These alleged post-investment misstatements or
omissions are not actionable under Rule 10b-5 on account of
plaintiff's manifest inability to plead reliance on those
representations or omissions in making his investment decision,
among other deficiencies. <u>See</u> <u>Vacold LLC v. Cerami</u>, 545 F.3d 114,
122 (2d Cir. 2008); <u>see also</u> <u>Mills v. Polar Molecular Corp.</u>, 12
F.3d 1170, 1175 (2d Cir. 1993) ("A statement cannot be fraudulent
if it did not affect an investment decision of the plaintiff."); 
<u>Egan v. TradingScreen, Inc.</u>, 2011 WL 1672066, at *11 (S.D.N.Y. May
4, 2011) ("Plaintiff cannot assert loss causation where the
misrepresentations or omissions he pleads took place after he
allegedly purchased the securities at issue.").

Plaintiff's argument that each capital call constitutes an additional securities transaction elides well-settled law that a securities transaction "take[s] place when the parties become bound to effectuate the transaction." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 67 (2d Cir. 2012); see also Vacold LLC, 545 F.3d at 122. Even assuming, arguendo, that Walsh paid for his participating shares in installments (which is far from clear, as discussed supra), that does not give rise to new or continuing obligations under federal securities law.[6]

Plaintiff's securities fraud claims against defendants are therefore dismissed insofar as they relate to representations made after the parties became bound on July 8, 2014.

ii. Statements Made Outside of the Integrated Agreement

Walsh also relies upon several allegations of misstatements or omissions made outside of the Subscription Agreement, POM, and

---

[6]     Plaintiff also contends that the Subscription Agreement constituted a "contract to buy, purchase or otherwise acquire" an additional interest in GSMI as part of the fourth closing, giving him standing to sue for fraudulent statements and conduct relating to that closing. But his reliance on the "aborted buyer-seller doctrine" described in Mount Clemens Indus. v. Bell, 464 F.2d 339, 346 (9th Cir. 1972) is inapposite, of questionable vitality, and, in any event, not controlling. See also Weiner v. Rooney, Pace Inc., No. 86-cv-6718 (EW), 1987 WL 11281, at *2 (S.D.N.Y. Feb. 20, 1987) ("great weight of [post-Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)] authority" holds that aborted sales or purchases are insufficient to state a claim under Section 10(b)); Goldman v. A.G. Becker Inc., No. 81-cv-6748, 1983 WL 1302, at *2 (S.D.N.Y. Apr. 20, 1983).

Moreover, the "aborted buyers" in this line of cases allege profitable purchases that they would have made but for some misrepresentation of a defendant. These plaintiffs are readily distinguishable from Walsh, who was fully informed of the consequences of his decision not to participate in the fourth closing and, given his own characterization of GSMI as a losing venture, cannot assert a lost profit opportunity based upon his decision not to acquire an additional interest in the Fund.

Articles of Association in stating his Rule 10b-5(b) claim.  On this point, the Subscription Agreement is clear and unambiguous: Walsh, a former hedge fund manager and self-averred "sophisticated investor" with "knowledge, expertise and experience in financial matters," entered into the Subscription Agreement "relying solely on the facts and terms set forth in this Subscription Agreement, the [POM] and the Articles [of Association.]"  Shepard Decl. Ex. B at 7.  As it is apparent from the face of the pleading and governing agreements that the parties are sophisticated and negotiated at arm's length, plaintiff's alleged reliance on extrinsic statements made by Wilkinson or contained within non-POM marketing materials was unreasonable as a matter of law.  See Harsco Corp., 91 F.3d at 344.

Plaintiff challenges the enforcement of the Agreement's non-reliance clause by citing a provision in the POM inviting prospective investors to ask questions of and receive answers from GSMI's representatives regarding the terms of the offering.  Far from vitiating the Subscription Agreement's integration, this provision, along with the non-reliance clause, incentivized Walsh to request that defendants incorporate any extrinsic representations that he deemed sufficiently important into the Subscription Agreement.  See, e.g., Emergent, 343 F.3d at 196 ("[Plaintiff] should have protected itself by insisting that this representation be included in the stock purchase agreement.");

<u>Carlin Equities Corp. v. Offman</u>, No. 07-cv-359 (SHS), 2008 WL 4387328, at *6 (S.D.N.Y. Sept. 24, 2008) ("This is, of course, a sensible rule — a merger clause such as the one at issue here should alert a sophisticated party represented by sophisticated counsel that it cannot rely on representations that are not included in the final contract."). Walsh chose to not to do so and "will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for this predicament." <u>Emergent</u>, 343 F.3d at 195 (quoting <u>Rodas v. Manitaras</u>, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)).

We also reject Walsh's misplaced argument that a non-reliance clause must contain specific disclaimers of the particular representations forming the basis of his claims. Where, as here, the parties are sophisticated, courts require no such specificity under Rule 10b-5(b).[7] <u>See, e.g.</u>, <u>One Commc'ns Corp. v. JP Morgan</u>

_____

[7]    We reach the same conclusion applying New York law to Walsh's common law fraud claims. Under New York law, while merger clauses generally must track representations made outside of the agreement in order to warrant their exclusion as parol evidence, <u>see</u> <u>Danann Realty Corp. v. Harris</u>, 157 N.E.2d 597 (N.Y. 1959), subsequent courts have relaxed the specificity requirement where "the contracting parties are 'sophisticated business people,' and the disclaimer clause is the result of negotiations between them." <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co.</u>, 404 F.3d 566, 576 (2d Cir. 2005) (citing <u>Citibank, N.A. v. Plapinger</u>, 485 N.E.2d 974 (N.Y. 1985)) (party's "sophistication and the arms-length nature of the transaction compel application of the relaxed specificity requirements . . . ."); <u>see also</u> <u>Axginc Corp. v. Plaza Automall, Ltd.</u>, No. 17-3934, 2018 WL 6767297, at *3 (2d Cir. Dec. 26, 2018) (summary order); <u>McBeth</u>, 171 F. Supp. 3d at 228 (S.D.N.Y. 2016) (addressing similar provisions and concluding that plaintiff's common law fraud claims were barred by general merger clause).  Plaintiff's reliance on <u>Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC</u>, No. 13-cv-4650 (JFK), 2015 WL 769573 (S.D.N.Y. Feb. 24, 2015), in which the district court declined to dismiss fraud claims on account of an analogous non-reliance clause, is unavailing in light of the greater weight of authority giving effect to the clear terms of agreements negotiated at arm's length by sophisticated business parties.

SBIC LLC, 381 F. App'x 75, 79 (2d Cir. 2010) (summary order) (quoting ATSI, 493 F.3d at 105); San Diego Cty., 749 F. Supp. 2d 104, 121 (S.D.N.Y. 2010) (enforcing an analogous non-reliance clause and dismissing plaintiff's Rule 10b-5(b) claims based upon extrinsic representations); Carlin Equities Corp. v. Offman, No. 07-cv-359 (SHS), 2008 WL 4387328, at *8 (S.D.N.Y. Sept. 24, 2008) (under federal securities laws, "the reasonableness of a sophisticated party's reliance on extra-contractual representations in the face of a merger clause does not turn on whether the merger clause refers to the specific representations in dispute"); Matana v. Merkin, 989 F. Supp. 2d 313, 319 (S.D.N.Y. 2013); McBeth v. Porges, 171 F. Supp. 3d 216, 225 (S.D.N.Y. 2016).

Plaintiff's securities fraud claims against defendants are therefore also dismissed insofar as they relate to representations

---

Even if we were to find that the merger clause at issue here lacked sufficient specificity under New York law — which, considering the sophistication of the parties involved and the nature of the transaction, we do not — any claims based upon extrinsic representations fail for several additional reasons. First, separate and apart from the merger clause, as a self-averred sophisticated investor in a "highly speculative" company, plaintiff knew or had reason to know that projections of forward charter rates or ship valuations were speculative, and therefore cannot claim justifiable reliance on oral representations concerning these subject matters. Axginc Corp. at *3; see also Shepard Decl. Ex. A at 29.

Moreover, plaintiff fails to allege that Wilkinson's description of the ice-class options was false when made (or at any time thereafter, for that matter). While Wilkinson described the $15 million in "profit" as a "cushion," he never told Walsh that this profit was realized — in fact, he specifically noted that "it is possible to experience trading losses" and that the figure was based on where the vessels were "currently trading." FAC ¶ 47. Similarly, the FAC is devoid of allegations that GSMI or Wilkinson's pre-investment decision representations regarding the estimated value of Hull 2695 were false when made. With respect to each of these representations, plaintiff further fails to satisfy the requirements of Rule 9(b) or plead any connection between the representations and a resulting injury.

made outside of the Subscription Agreement, POM, or Articles of Association.

   iii. <u>The Sponsor Group's Initial Contribution</u>

Walsh alleges that GSMI misled potential investors regarding the nature of the Sponsor Group's initial contribution. According to the POM, the Sponsor Group (in conjunction with the Vessel Manager) expected to contribute "15% of the aggregate Capital Commitments of all Participating Shareholder," up to $30 million. Shepard Decl. Ex. A at 15. Rather than make the contribution in cash (as plaintiff now asserts he expected), the Sponsor Group made its contribution in-kind (in the form of either Hull 2695 or the purchase contract for Hull 2695) and then received distributions on the basis of that in-kind contribution. <u>See</u> FAC ¶¶ 55, 56, 152.

The only reference to Hull 2695 in the POM unequivocally provides for its in-kind contribution in exchange for participating shares: "On or about the Initial Closing Date (defined below), [the Sponsor Group] will contribute the Harpoon Shares [the entity owning Hull 2695] to the Company at their then current value, as determined in accordance with the valuation policy set forth below, in exchange for Participating Shares in the Company."[8] Shepard Decl. Ex. A at 6; ¶ 99. Glaringly absent

_____

[8]    The POM also provides that "[t]he Sponsor Group will contribute [assets acquired before the initial closing] that are acquired or contracted for acquisition to the Company (directly or indirectly) at their then current

from the FAC is any allegation of a misstatement concerning the nature of the Sponsor Group's initial contribution, let alone any representation that was knowingly false or so unreasonable as to constitute recklessness. Moreover, Walsh fails to allege any material difference between $30 million in cash and $30 million worth of a vessel, particularly given GSMI's raison d'etre of raising cash to buy vessels.[9]

### iv. Ice-Class Vessel Options

Walsh also takes issue with GSMI's description of the Sponsor Group's contribution of options to purchase ice-class vessels, citing the fact that the options had already been exercised by the time Walsh made his investment. However, it is undisputed that the Sponsor Group did in fact contribute the options at issue to GSMI at no cost to the Fund, and, given the POM's unambiguous disclosure that the options "must be exercised in the first quarter of 2014," Walsh knew (or should have known) that GSMI had either exercised the options or let them expire by the time he made his investment in July of 2014. Notwithstanding Walsh's feigned

value in exchange for Participating Shares (which may be nil for certain assets)." Shepard Decl. Ex. A at 23.

[9]     Walsh's allegation that the nature of the in-kind contribution was not shares of an entity (Harpoon Shares) as described in ¶ 99 of the POM, but rather an actual vessel (Hull 2695), ¶ 102, or a purchase contract for a vessel, ¶ 152, fails for the same reason. The POM describes Harpoon Shares as a "company that has executed a contract to acquire a newbuild Capesize vessel" and Walsh fails to allege that it was anything more (or ever represented as anything more) than a holding company for Hull 2695. Shepard Decl. Ex. A at 6.

surprise at GSMI's decision to exercise the options and pay the necessary deposits, the POM's description of the options "accurately informed rather than mis[led] prospective buyers." McMahan, 900 F.2d at 579. Walsh also falls well short of pleading a strong inference of scienter: the far more compelling inference to draw from his allegations is that the Fund had not updated the POM since its publication in December of 2013.

v. Intermediate Holding Company

Walsh's allegation that defendants failed to disclose the existence of the Intermediary almost bears omission from this opinion. Section I of the POM, under "General Information," expressly provides that "The Company (directly or through one or more subsidiaries) will also enter into management agreements . . . . pursuant to which [the Vessel Manager or its affiliates] . . . will provide the entities that directly own the vessels . . . ." Shepard Dec. Ex. A at 4 (emphasis added). The Intermediary is such a "subsidiary."[10]

For the foregoing reasons, plaintiff's Rule 10b-5(b) claims must be dismissed.

C. **Analysis of Rule 10b-5(a) and (c) Claims**

---

[10]     To the extent that plaintiff alleges that any defendant violated Rule 10b-5(a) and (c) by "warehousing" losses in the Intermediary, he fails to allege a deceptive act for the same reason.

Clearly unable to maintain a traditional Rule 10b-5(b) claim, Walsh adopts an "everything but the kitchen sink" approach to pleading violations of subsections (a) and (c), half-heartedly ascribing fraudulent intent to nearly every post-investment decision made by defendants. Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir. 1982). We note at the outset that these types of allegations are not cognizable under any subsection of Rule 10b-5 or Section 10(b) of the Exchange Act, which prohibit only the perpetration of frauds coinciding with the purchase or sale of securities. S.E.C. v. Zandford, 535 U.S. 813, 822 (2002). "Post-stock-purchase corporate mismanagement or breach of fiduciary duty may be just as reprehensible as a misleading statement regarding the value of a security to be sold, but the former is not proscribed by § 10(b), while the latter is actionable." Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 99 (2d Cir. 2001); see also Panos v. Island Gem Enterprises, Ltd., N.V., 880 F. Supp. 169, 179 (S.D.N.Y. 1995) ("The purpose of § 10(b) is not to remunerate plaintiffs for all losses they incur in their securities investments due to a defendant's wrongful conduct.") (citing Marine Bank v. Weaver, 455 U.S. 551, 556 (1982)).

While the failure to allege a connection between deceptive conduct and Walsh's purchase of participating shares is fatal to

all of his subsection (a) and (c) claims, they must also be dismissed for several additional reasons, as set forth below.

### i. Valuation Manipulation

Plaintiff alleges that, sometime in or before March 2014, defendants inflated the purchase price of Hull 2695 by $5.5 million in order to award themselves more equity as part of the initial closing, and also deflated the NAVs of newly-built vessels in connection with the fourth and final closing. Pl.'s Opp. Br. at 3-4, ECF No. 65. But Walsh fails to plausibly allege that the defendants deviated from the valuation procedures prescribed by the POM or that GSMI's vessel valuations had any impact whatsoever on Walsh's purchase of participating shares,[11] and the valuations themselves remain uncontroverted by any external or third-party sources. The mere fact that NAVs changed over time does not give rise to liability under Section § 10(b).[12]

---

[11] At oral argument, plaintiff's counsel was unable to articulate any connection between a change in the estimated valuation of Hull 2695 from $56 million to $61.5 million and the amount of participating shares that Walsh (or even the Sponsor Group) received. We see no basis for such a connection in light of the fact that the Sponsor Group's initial contribution, according to plaintiff's own allegations, was limited to approximately $30 million. FAC ¶ 37.

[12] To the extent that Walsh styles these allegations as misrepresentations of valuations under Rule 10b-5(b), any estimated valuations of vessels alleged in the FAC were made outside of the integrated agreement and therefore fail as a matter of law for the reasons stated above. Even if Walsh did reasonably rely on the valuation – which he did not - a misrepresentation concerning between 1.8% and 2.6% of the total value of the Fund ($5.5 million for a fund intending to raise $210 to $300 million) is immaterial as a matter of law given the absence of any mitigating qualitative factors cutting in plaintiff's favor. See Hutchison, 647 F.3d at 485.

ii. <u>Dilution</u>

Walsh's characterization of the fourth and final closing as a deceptive scheme to dilute his investment is belied by the clear language of the POM[13] and the simple fact that the opportunity to purchase additional shares was given to every GSMI investor on the same basis and with full disclosure of the terms of the offering. The failure to disclose whether additional "friends of Scien" were invited to participate in the closing – without any particularized allegation that such "friends" did, in fact, participate – is insufficient to state a claim for securities fraud.

iii. <u>Distributions</u>

Plaintiff's counsel conceded at oral argument that he has no knowledge of any distribution made to the Sponsor Group other than those attributable to the Sponsor Group's status as participating shareholders.  Tr. 41:1-5.  Still, Walsh quibbles with the management fees paid to the Sponsor Group, suggesting that it was inappropriate for defendants to collect fees in advance, FAC ¶ 137, or to calculate them based on capital commitments as opposed to at cost, FAC ¶ 138, or at cost as opposed to at reduced NAVs, FAC ¶ 141.  There are no plausible allegations that defendants

_____

[13]    While the POM indicates that investments will <u>generally</u> be valued at cost for purposes of determining proportionate interests of new shareholders and existing shareholders, it also makes clear that if the Investment or Portfolio Manager determines that it would be inappropriate for new shareholders to participate in a closing at a given time, they may, "in their sole discretion," "adjust the amount of Capital Contributions to be made . . . to reflect such different valuation . . . ." Shepard Decl. Ex. A at 16–17.

conduct was at all inconsistent with the detailed provisions of the POM describing the payment procedures for and calculation of management fees.[14]   <u>See</u> Shepard Decl. Ex. A at 21.   Post-hoc objections to contractual terms disclosed to and agreed upon by the parties do not constitute cognizable claims under subsections (a) or (c).

      iv. <u>Lack of Transparency</u>

Walsh correctly notes that paragraph 222 of the Articles plainly precludes shareholders from inspecting the Fund's books or accounts, a provision in complete conformance with Cayman Islands corporate law.   <u>Compare</u> Shepard Decl. Ex. C at ¶ 222 <u>with</u> Cayman Islands Companies Law Schedule 1, § 98 ("no member (not being a director) shall have any right of inspecting any account, book or document of the company except as conferred by law or authorised by the directors or by the company in general meeting").   Walsh invested in a Cayman Islands private equity fund with a clear-eyed understanding that he would not enjoy the same rights and benefits as investors in companies incorporated in more investor-friendly jurisdictions, and cannot conjure up a valid securities fraud claim

---

[14]   The fact that GSMI's 2015 financial statements described management fees calculated at cost is entirely consistent with fact that the "commitment period" (during which management fees were to be calculated using the cost of assets, as opposed to committed capital) ran through the end of September 2015. <u>See</u> FAC ¶ 138; Shepard Decl. Ex. A at 21.

by now complaining of the Fund's adherence to its own founding documents.[15]

>    v. Misrepresentation or Omissions

In the Second Circuit, a plaintiff cannot make out a claim under Rule 10b–5(a) or (c) where the sole bases for such claims are alleged misrepresentations or omissions.[16] Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005); see also SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b–5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."); In re Smith Barney Transfer Agent Litig., 884 F.Supp.2d 152, 161 (S.D.N.Y. 2012) ("[T]he three subsections of Rule 10b–5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric.").

---

[15]     Counsel for plaintiff's acknowledgement that documents essential to verifying his allegations were "prohibited to us under Cayman law" underscores a broader issue with the FAC. Tr. 10:11–23. On several occasions at oral argument, plaintiff's counsel was unable to respond to simple questions about factual allegations crucial to the survival of his claims. See, e.g., Tr. 3:16–18 (whether Walsh ever satisfied $750,000 commitment); 4:14–16 (whether Walsh was obligated to invest more than $750,000); 6:12–17 (whether Walsh received capital demands after the fourth closing); 10:6–11:15 (whether the valuation of Hull 2695 impacted shares received by the Sponsor Group); 41:1–5 (whether the Sponsor Group received any exclusive distributions). Yet, despite his ignorance, Walsh did not hesitate to file two complaints in this action accusing the nine defendants of rampant securities fraud and violations of various common law duties. Given the requirements of Rule 11 (let alone Rule 9(b)) and the Court's prior admonition to comply with Rule 11 in its letter granting plaintiff leave to file an amended complaint, we are, to put it mildly, troubled by the casualness of Walsh's assertions.

[16]     This issue is currently before the Supreme Court in Lorenzo v. S.E.C., No. 17-1077.

D. **Analysis of Section 20(a) and (b) Claims**

Plaintiff also alleges that defendants Sciens Capital and Rigas are liable under Section 20(a) of the Exchange Act because they acted as "controlling persons" of all other defendants (including one another) who participated in the alleged securities fraud. FAC ¶¶ 266–282. To establish a prima facie case of control-person liability under sections 20(a), a plaintiff must sufficiently allege a primary violation by the controlled person. See <u>ATSI</u>, 493 F.3d at 108. Because Walsh has failed to plead a primary violation by any defendant, his Section 20(a) claims necessarily fail. See <u>Slayton</u>, 604 F.3d at 778. Walsh's Section 20(b) claim against defendants Rigas and Standen fails for the same reason. See <u>Shemian v. Research In Motion Ltd.</u>, 570 F. App'x 32, 35 (2d Cir. 2014) (summary order).

For the foregoing reasons, we grant defendants' motion to dismiss Counts I through V as to all defendants.

IV. <u>**Discussion of Common Law Claims**</u>

Having dismissed all claims upon which this Court has original jurisdiction,[17] we must determine whether to exercise supplemental jurisdiction over the remaining state law claims. After

---

[17] Although the parties agree that complete diversity exists between plaintiff and defendants, Tr. 19:12–17, and plaintiff invokes diversity jurisdiction in the FAC at ¶ 28, plaintiff fails to specify the citizenship of several defendants. "Naked allegations that the parties are citizens of different states, absent an averment of the particular states of which the parties are citizens, are insufficient to meet the pleading requirement." <u>Ganoe v. Lummis</u>, 662 F.Supp. 718, 723 (S.D.N.Y.1987), <u>aff'd</u>, 841 F.2d 1116 (2d Cir.).

considering the relevant factors we have concluded that this is an appropriate case for this Court to exercise supplemental jurisdiction. See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006). As such, we now proceed to a discussion of plaintiff's state law causes of action.

A. **Choice of Law**

The parties agree that the law of the Cayman Islands, as the jurisdiction of GSMI's incorporation, applies to the claims plaintiff brings derivatively on behalf of GSMI. See also Winn v. Schafer, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007). With respect to plaintiff's direct claims, the parties' briefs assume that New York law applies, which constitutes "implied consent" and "is sufficient to establish choice of law." Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 296 (2d Cir. 2000). We note that we arrive at the same conclusion applying the relevant analytical frameworks under New York's choice-of-law rules, given that "the core facts implicated by every cause of action . . . center on conduct that occurred in New York." See Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 399–400 (S.D.N.Y. 2010) (citing cases); FAC ¶ 23.

B. **Common Law Fraud and Negligent Misrepresentation (Counts VIII through XII)**

"Because [the elements of common law fraud] are substantially identical to those governing § 10(b), the identical analysis

applies here." <u>Morse v. Weingarten</u>, 777 F. Supp. 312, 319 (S.D.N.Y. 1991). Thus, Claims VIII through XII, which are common law fraud or negligent misrepresentation claims, fail for same reasons that plaintiff's securities claims failed.[18]

C. **Direct Breach of Fiduciary Duty by Rigas, Standen, Loucopoulos, Sciens Capital, the Investment Manager, the Portfolio Manager, and the Administrator (Count VI)**

"It is black letter law that a stockholder has no individual cause of action against a person or entity that has injured the corporation." <u>Serino v. Lipper</u>, 994 N.Y.S.2d 64, 68 (1st Dep't 2014). A "narrow exception" exists "where the wrongdoer has breached a duty owed directly to the shareholder which is independent of any duty owing to the corporation," but "even where an individual harm is claimed, if it is confused with or embedded in the harm to the corporation, it cannot separately stand." <u>Id.</u> at 69; <u>see also, e.g.</u>, <u>Abrams v. Donati</u>, 489 N.E.2d 751, 752 (N.Y. 1985) ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually.").

---

[18]    Counts XI and XII fail for the additional reason that "recovery may be had for pecuniary loss arising from negligent representations where there is actual privity of contract between the parties or a relationship so close as to approach that of privity." <u>Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson</u>, 539 N.E.2d 91, 94 (N.Y. 1989). Walsh omits GSMI from Counts XI and XII and pleads none of the elements required to sustain these claims absent actual privity.

To support his claim, Walsh relies on allegations relating to defendants' asset valuations, distributions, *pro rata* closing, use of an intermediate holding company, and post-investment lack of transparency. Sounding primarily in mismanagement of the Fund or diversion of its assets, these are paradigmatic derivative claims, and this Court has "no basis for finding that [Walsh's] losses are not reflective of a diminution in the value of Fund shares or are otherwise asymmetrical to the losses of the Funds and other shareholders." In re Kingate Mgmt. Ltd. Litig., No. 09-cv-5386 (DAB), 2016 WL 5339538, at *39 (S.D.N.Y. Sept. 21, 2016), aff'd, No. 16-3450, 2018 WL 3954217 (2d Cir. Aug. 17, 2018); see also Serino, 994 N.Y.S.2d at 69 (holding that claims were derivative where "damages are no different from losses suffered by any other investor in the funds and the claims are supported by the same proof").

Any claim that a defendant's pre-investment interaction with Walsh created and breached a fiduciary duty "fails because there is no basis for inferring that the trust and confidence [Walsh] reposed in [any defendant] was anything more than the type parties normally seek before entering an arm's-length transaction, and there is no basis for concluding that the transaction was not made at arm's-length." Atlantis Info. Tech., GmbH v. CA, Inc., 485 F. Supp. 2d 224, 232 (E.D.N.Y. 2007) (internal quotation marks omitted); VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,

348 F. Supp. 2d 255, 268 (S.D.N.Y. 2004) ("A fiduciary relationship may arise when one has reposed trust or confidence in the integrity or fidelity on another . . ."). Far from "trust and repose," Walsh, a sophisticated investor, explicitly disclaimed reliance on extrinsic pre-investment representations and agreed to rely entirely on the stated terms of the integrated agreement.

Plaintiff's broader inability to allege inducement (for many of the same reasons we discussed at length in our analysis of plaintiff's federal securities law claims) distinguishes this case from Anwar, where the Court rejected defendants' argument that plaintiffs' common law claims "essentially amounted to corporate mismanagement" and allowed direct claims for breach of fiduciary duty to proceed on the grounds that the core of plaintiffs' claims were "representations that led Plaintiffs to make and maintain investments." 728 F. Supp. 2d at 400-01 (where, unlike in the instant action, "plaintiffs were free to invest any amount of money in the Funds and free, with some restriction, to redeem the appreciation in their investment"). Unlike the plaintiffs in Anwar, Walsh does not adequately allege "inducement such that recovery . . . would only flow to those individuals . . . who were so induced." In re Optimal U.S. Litig., 813 F. Supp. 2d 351, 379 (S.D.N.Y.) (internal quotation marks omitted) (distinguishing Fraternity Fund Limited v. Beacon Hill Asset Management LLC, 376 F.Supp.2d 385 (S.D.N.Y. 2005) on the same grounds).

For these reasons, plaintiff does not have standing to bring his breach of fiduciary duty claims directly. We therefore grant defendants' motion to dismiss Count VI and consider whether plaintiff properly pleaded a breach of fiduciary duty derivatively. See Abrams, 489 N.E.2d at 752.

D. **Derivative Breach of Fiduciary Duty (Count VII)**

Under Cayman Islands law, a shareholder is generally not permitted to bring a derivative action on behalf of a company. See Winn, 499 F. Supp. 2d at 396 (citing Foss v. Harbottle, 2 Hare 461 (Eng. 1843)). A recognized exception to the Foss rule applies if the alleged wrongful conduct qualifies as a "fraud on the minority," which requires plaintiff to allege that defendants (1) controlled GSMI, and (2) committed fraud in the form of self-dealing. See Seghers v. Thompson, No. 06-cv-308 (RMB), 2006 WL 2807203, at *4 (S.D.N.Y. Sept. 27, 2006) ("English law, unlike its American counterpart, does not permit a derivative action to be maintained to remedy a breach of fiduciary duty that does not involve self-dealing by those in control.").

Plaintiff alleges the following instances of self-dealing by defendants: (1) the in-kind contribution in exchange for which the shareholders received shares and future distributions; (2) fraudulent NAV practices; and (3) the dilutive fourth and final offering. Pl.'s Opp. Br. at 22–23. The changes in the NAVs of assets already owned by GSMI and the dilutive fourth and final

closing — which was conducted pursuant to a provision in the POM and offered to all participating shareholders — plainly do not constitute benefits inuring to defendants beyond their status as shareholders in GSMI. See Shenwick v. HM Ruby Fund, L.P., 966 N.Y.S.2d 69, 71 (1st Dep't 2013) (allegations that managers, directors, and investment advisors "engaged in self-dealing by artificially inflating the value of assets held by the fund" do not satisfy the "fraud in the minority" exception). Moreover, as discussed infra, the Sponsor Group's in-kind contribution was disclosed and permitted by the POM and Walsh is unable to articulate a connection between the alleged pre-investment manipulation of Hull 2695's value and the allocation of shares to either Walsh or the Sponsor Group.[19] FAC ¶ 37; Tr. 10:5–11:15. Any alleged benefits received by defendants thus did not come "in some special way, at the expense of shareholders," Shenwick, 966 N.Y.S.2d at 71, and do not constitute the sort of allegations "sufficient to underpin the [fraud on the minority] exception." City of Harper Woods Employees' Ret. Sys. v. Olver, 577 F. Supp. 2d 124, 135 (D.D.C. 2008).

---

[19] Even assuming, arguendo, that Walsh had properly pleaded such a connection, he does not allege with the requisite particularity that the value of the initial contribution was inaccurate at the time it was made or calculated in a manner inconsistent with the procedures set forth in the POM. DeBlasio v. Merrill Lynch & Co., No. 07-cv-318 (RJS), 2009 WL 2242605, at *14 (S.D.N.Y. July 27, 2009) (applying Rule 9(b) to plaintiffs' fiduciary duty claims sounding in fraud).

Because, under Cayman Islands law, plaintiff's fiduciary duty claims are GSMI's to prosecute, Walsh is barred from maintaining these claims derivatively and we grant defendants' motion to dismiss Count VII.[20]

### E. Breach of Contract by the Investment Manager, the Portfolio Manager, and the Administrator (Count XIV)

The Investment Manager, Portfolio Manager, and Administrator were not parties to the Subscription Agreement or POM and cannot be held liable for breaches of the terms thereof. See, e.g., Castillo v. Tyson, 701 N.Y.S.2d 423, 424 (1st Dep't 2000).

### F. Breach of Third Party Beneficiary Contract by Sciens Capital, the Investment Manager, the Portfolio Managers, and the Administrator (Count XV)

"New York law requires that plaintiffs alleging that they are third-party beneficiaries to a contract establish that the parties to the contract intended to confer a benefit on the third-party." Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 173 (S.D.N.Y. 2009) (internal quotation marks omitted). "To create a third party right to enforce a contract, the language of the contract must *clearly* evidence an intent to permit enforcement by the third party." Consol. Edison, Inc. v. Ne. Utilities, 426 F.3d 524, 528 (2d Cir. 2005) (internal quotation marks omitted)); see also Anwar, 728 F. Supp. 2d at 418 ("New York

---

[20]     Walsh's fiduciary claims fail for the additional reason that the alleged misconduct underpinning Counts VI and VII was disclosed in or expressly permitted by the Subscription Agreement, POM, or Articles. See Guerrand Hermes v. J.P. Morgan & Co. Inc., 769 N.Y.S.2d 240, 241–42 (1st Dep't 2003).

law requires that the parties' intent to benefit a third-party be shown on the face of the contract."). "Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent." LaSalle Nat'l Bank v. Ernst & Young LLP, 729 N.Y.S.2d 671, 676 (1st Dep't 2001) (internal citation omitted).

Walsh fails to plead that any of the specific terms of the relevant third-party contracts evince a breach of those contracts or an intent to permit enforcement by a third party. See FAC ¶¶ 357–365. Indeed, counsel for Walsh conceded at oral argument that he had never seen the relevant agreements before counsel for defendants filed a declaration attaching the contracts in connection with this motion to dismiss. Tr. 39:12–19. These deficiencies make the instant action easily distinguishable from Anwar, upon which Walsh urges us to rely, where plaintiffs pleaded the existence of specific contractual language sufficiently evincing intent to benefit plaintiffs. 728 F. Supp. 2d at 419. Without pleading the existence of such language in any of the third-party agreements, Walsh fails to state a claim under Rule 12(b)(6) and we grant defendants' motion to dismiss Count XV.

G. **Unjust Enrichment by Rigas, Standen, Loucopoulos, and "Advisor Defendants" (Count XVI)**

Walsh brings a derivative claim for unjust enrichment on the basis of the Sponsor Group's receipt of (1) distributions

proportionate to their equity investment, and (2) management fees. FAC ¶¶ 366–73. Neither fall into the "fraud on the minority" exception in <u>Foss</u> and therefore must be dismissed. These claims are also duplicative of other flawed causes of action, and where "other claims are defective, an unjust enrichment claim cannot remedy the defects." <u>Corsello v. Verizon New York, Inc.</u>, 967 N.E.2d 1177, 1185 (N.Y. 2012) ("[U]njust enrichment is not a catchall cause of action to be used when others fail.").

## H. **Respondeat Superior by Sciens Capital (Count XIII)**

It is black letter law that a "viable cause of action against the employee . . . is a condition precedent to imputing vicarious liability . . . to the employer pursuant to the theory of respondeat superior." <u>San Diego Cty.</u>, 749 F. Supp. 2d at 129. Absent any viable cause of action against an employee of Sciens Capital, Count XIII fails to state a claim.[21]

## V. **Conclusion**

For the foregoing reasons, defendants' motion to dismiss is granted in its entirety and with prejudice. Although plaintiff makes a perfunctory request for leave to amend in his opposition brief [Pl.'s Opp. Br. at 25], he does so in conclusory fashion

---

[21] The FAC is no paragon of pleading and defendants' Rule 8 motion is far from frivolously brought. Indeed, plaintiff's scattershot approach to stating his claims placed an enormous burden on both defendants and this Court. Nonetheless, having expended the considerable time and effort necessary to discern plaintiff's causes of action, and given that plaintiff's memorandum of law was coherently organized, little purpose would be served dismissing the FAC on Rule 8 grounds and we deny defendants' motion as moot.

without providing an explanation of what he would allege in a second amended complaint to cure the FAC's significant deficiencies, and we therefore deny his request. See Campo v. Sears Holdings Corp., 371 F. App'x 212, 218 (2d Cir. 2010) (summary order) (upholding denial of leave to amend where "plaintiffs provide[d] no explanation of what they would allege in an amended complaint to save their claims"); see also Metz v. U.S. Life Ins. Co. in City of New York, 662 F.3d 600, 603 (2d Cir. 2011).

The Clerk of Court is respectfully directed to enter judgment for defendants and terminate this case and any motions pending therein.

**SO ORDERED.**

Dated:    New York, New York
          January 23, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

42